IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*v.*<br><br>MARIO EARL, and<br>ELISA JOHNSON | Criminal Action No.<br><br>1:23-CR-335-ELR-RGV |

**Government's Opposition to Defendants' Motions to Suppress Evidence from Two Locations and a Vehicle Located in Washington State**

The United States of America, by Theodore S. Hertzberg, United States Attorney, and Matthew R. LaGrone and Sandra E. Strippoli, Assistant United States Attorneys for the Northern District of Georgia, files this Opposition to Defendants Mario Earl and Elisa Johnson's motions to suppress evidence seized from 11527 113th PL NE, Kirkland, Washington, 5416 Rainier Ave S, Seattle, Washington, 98118, and a white Cadillac Escalade. Earl and Johnson filed motions to suppress evidence obtained pursuant to a federal search warrant because the warrants lacked probable cause and because the probable cause was stale. Their arguments fail. Moreover, even assuming the search warrant affidavit failed to establish probable cause, the good faith exception should apply and the evidence obtained from the execution of the search warrant should not be suppressed.

1. **Procedural History**

On October 24, 2023, a grand jury sitting in the Northern District of Georgia returned a seven-count indictment charging Earl, Johnson, and seven others with drug trafficking, firearms, and money laundering offenses. (Doc. 1). Earl and Johnson have filed multiple motions to suppress. Among those motions, Earl filed a motion to suppress evidence seized at two locations—a residence and an office—and a vehicle, pursuant to a federal warrant issued by a magistrate judge in the Western District of Washington. (Doc. 215). Johnson filed a motion to adopt Earl's motion. (Doc. 258). Earl then filed an amended motion. (Doc. 259). The Government conceded that Earl and Johnson could establish standing in the locations at issue. (Doc. 278 at 3).

2. **Factual Background**

In December 2021, DEA began an investigation that eventually led to the identification of Earl as the leader of a national cocaine syndicate. (Doc. 259-2 ¶ 6). Johnson—Earl's longtime girlfriend—assisted the drug trafficking organization with logistical activities. (Doc. 259-2 ¶ 9). After the investigation led to the present indictment, DEA and other agencies executed an operation to arrest the indicted defendants and search locations associated with them. On January 19, 2024, United States Magistrate Judge Brian A. Tscuchida of the Western District of Washington issued a warrant authorizing the search of four individuals, five premises, and two vehicles. (Doc. 259-1 at 2-4).[1] Among the

---

[1] The page numbers in this response refer to the page numbers generated by the CM/ECF filing system.

premises were Earl and Johnson's residence (11527 113th PL NE, Kirkland, Washington), an office space they utilized (5416 Rainier Ave S, Seattle, Washington 98118), and a white Cadillac Escalade that Earl used. (*Id.*) The warrant was supported by an affidavit of DEA Special Agent Evan Leyva. (Doc. 259-2).

**3. The warrant established probable cause in each target location.**

The motion argues that the warrant lacked probable cause because it merely established that Earl and Johnson used the searched locations without tying those locations to their drug trafficking activities. The motion fails to appreciate the nature of Earl and Johnson's drug trafficking activities, as described in the warrant, as well as the Eleventh Circuit's caselaw regarding searches of the residences of drug dealers.

Probable cause exists when, under the totality of the circumstances, there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Noriega*, 676 F.3d 1252, 1261 (11th Cir. 2012). "[P]robable cause deals with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Illinois v. Gates*, 462 U.S. 213, 241 (1983) (quotations omitted). In considering probable cause, reviewing courts should not engage in a "hypertechnical" interpretation of affidavits, but should employ "a realistic and commonsense approach" to afford a "high level of deference" to the magistrate issuing the warrant. *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994). A reviewing court should not conduct a de novo determination of

3

probable cause, but only determine whether there is substantial evidence in the record to support the judge's decision to issue a warrant. *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984). The defendant bears the burden of establishing that a search warrant is defective. *United States v. Bushay*, 859 F. Supp. 2d 1335, 1377 (N.D. Ga. 2012).

The search warrant to search the locations and vehicle in Washington state was essentially a document warrant, seeking evidence of drug trafficking crimes and money laundering activities in places where Earl and Johnson were likely to keep evidence of those crimes. The Eleventh Circuit has said that "there need not be an allegation that the illegal activity occurred at the location to be searched, for example the home." *United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009). Instead, the affidavit "must supply the authorizing magistrate with a reasonable basis for concluding that Defendant might keep evidence of his crimes at his home." *Id*. In one helpful decision, Judge Julie E. Carnes laid out three prerequisites that indicated that a member of a drug conspiracy was likely to have evidence in their residence: (1) evidence that the defendant was involved in the drug conspiracy, (2) evidence that the residence was closely related with the defendant, and (3) the agent's training and experience that led to his opinion that evidence of drug activity is likely to be found in the defendant's residence. *United States v. Acosta*, 807 F. Supp. 2d 1154, 1216-1219 (N.D. Ga. 2011).

The Eleventh Circuit has said it is a "common-sense finding" that "drug dealers are likely to keep evidence of their drug business at home." *United States v. Meryl*, 322 F. App'x 871, 874 (11th Cir. 2009) (quotations omitted). Virtually

4

every other circuit court has reached the same common-sense conclusion. *See United States v. Miggins*, 302 F.3d 384, 393–94 (6th Cir. 2002) (collecting cases from the First, Second, Fourth, Sixth, Seventh, Eighth, Ninth, and D.C. Circuits). Courts have also found it common sense to conclude that the more sophisticated the drug operation the more likely the residences of drug dealers are to contain evidence. *See, e.g., United States v. Hodge*, 246 F.3d 301, 306 (3d Cir. 2001) ("It is reasonable to infer that a person involved in drug dealing on such a scale would store evidence of that dealing at his home.") *United States v. Feliz*, 182 F.3d 82, 86–88 (1st Cir.1999) (relying on fact that defendant was "long-time, successful, drug trafficker.")

In the full context of Agent Leyva's affidavit, the warrant was based on probable cause that the target premises would contain evidence of Earl and Johnson's drug trafficking and money laundering activities. The affidavit established that (i) Earl and Johnson were involved with drug trafficking and money laundering on a significant scale, including in a manner that would create electronic evidence, (ii) Earl and Johnson used the locations and vehicles in the warrant, and (iii) Agent Leyva's experience and background led him to conclude that locations Earl and Johnson used would contain evidence of their drug trafficking and money laundering activities. *Acosta*, 807 F. Supp. 2d at 1216-1219.

### A. Evidence of Earl and Johnson's drug trafficking and money laundering activities.

S.A. Leyva explained that Earl and Johnson's drug trafficking organization—which he termed the Earl DTO—was not a small operation but an "extremely

sophisticated organization." (Doc. 259-1 ¶¶ 6-8). The DTO distributed thousands of kilograms of cocaine on a yearly basis. (*Id.* ¶ 6). The DTO operated "throughout the United States." (*Id.*) The DTO relied on stash house operators, who maintained both paper and electronic registers. (*Id.*) For instance, one ledger contained evidence of 409 kilograms of cocaine sales from in a three-month period. (*Id.* ¶ 15).

Among other tasks, Earl would coordinate money pickups across the country, presumably through electronic communications. (*Id.*) Earl would email DTO members to rent additional stash houses and provided them with fraudulent documents. (*Id.* ¶ 14).

Given the sophisticated nature of the DTO, as well as its use of electronic communications and electronic ledgers,[2] it was reasonable to believe that anywhere Earl and Johnson lived or used frequently would have evidence from their multi-million-dollar business. (*Id.* ¶ 71).

**1. Cresskill, New Jersey search warrant.**

The first specific event recounted in the search warrant was a search warrant at 10 Center Street in Cresskill, NJ, where police found three kilograms of cocaine. (Doc. 259-2 ¶¶ 9-16). Johnson and co-defendant Dominique Gwinn rented the house, but never lived there. (*Id.* ¶ 9). Inside the residence was a Starbucks drink that Earl had purchased earlier in the day with his cell phone, as

---

[2] The Eleventh Circuit has noted that cell phones are "a known tool of the drug trade." *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990).

well as an embroidered bag with his initials and medicine prescribed in his name. (*Id*. ¶ 10). Officers found numerous electronic devices, including "laptops, four cellphones, [and] other electronic storage devices." (*Id*.)

Officers also found other evidence of the scope of the DTO, both in New Jersey and nationwide. In one paper ledger, officers found a ledger giving the price of cocaine in North Carolina ("N.C."), Atlanta ("ATL"), Chicago ("Chi."), New York City ("N.Y."), Baltimore ("B.M."), and Missouri ("M.O."). (*Id*. ¶ 11). The ledger also listed several other locations in northern New Jersey where the DTO operated. (*Id*.)

The electronic devices found at 10 Center Street, which belonged to Earl, contained "extensive conversations among DTO members," as well as detailed electronic ledgers. (*Id*. ¶ 12). In the driveway was a Nissan Sentra with a hidden aftermarket compartment. (*Id*. ¶ 16).

### 2. July 2022 search warrants in Georgia and Maryland.

Further evidencing the scope of the DTO, DEA performed two search warrants approximately 700 miles apart in July 2022, finding evidence that the Earl DTO was operating out of each. After a DTO member, Maurice Lynch, fled from a traffic stop with two kilograms of cocaine, agents executed a search warrant at a stash house in Fairburn, GA. (*Id*. ¶ 17). Inside, agents found six cell phones, drug ledgers, and documents (such as bills, receipts, and money orders) identifying other stash houses across the country. (*Id*.) Evidence of Earl and Johnson's presence was also found inside. (*Id*.)

Two days later, agents executed a search warrant at a residence in Maryland where they had seen DTO member Ramondo Lynch. (*Id.* ¶ 18). In that house was another Nissan Sentra with a hidden after-market compartment, containing approximately $85,000. (*Id.*) Agents also found three cell phones and more ledgers. (*Id.*)

### 3. September 2022 search warrants in New Jersey, Georgia, and North Carolina.

One September 15, 2022, agents executed two search warrants in Georgia. During the first, they found another Nissan Sentra with a hidden after-market compartment. (*Id.* ¶ 20). The second location contained yet another Nissan Sentra; the after-market compartment in this one contained $710,000. (*Id* ¶ 21). Agents also found at least seven electronic devices and more ledgers. (*Id.*) These electronic devices contained sophisticated financial documentation of over one ton of cocaine transactions. (*Id.* ¶ 22).

On the same date, investigators in New Jersey executed warrants at three different stash houses where the DTO operated. (*Id.* ¶ 23). Investigators found approximately $1.6 million in U.S. currency, plus more drug ledgers and other evidence of the movement of bulk currency. (*Id.*) They also found at least four more cell phones. (*Id.* ¶ 26).

The same day, DEA executed a search warrant in Charlotte, NC. (*Id.* ¶ 27). Agents found 8 kilograms of cocaine hidden in a safe—just as in Cresskill, NJ. (*Id.*) The house also contained further drug ledgers. (*Id.*)

### 4. Sandy Springs search warrant.

Agents later executed a search warrant at a DTO member's house in Sandy Springs. (*Id.* ¶ 28). Inside, agents found nine cell phones, as well as more ledgers. (*Id.*) The cell phones contained "extensive stored communications between DTO members and associates coordinating cocaine deals, money drop offs and pickups, and detailed ledgers." (*Id.*)

### 5. Nature of Money Laundering.

S.A. Leyva explained how drug traffickers will often split their deposits to be smaller than $10,000 to avoid transaction reporting requirements. (*Id.* ¶ 29). During DEA's investigation, it reviewed bank account statements for Earl's accounts. (*Id.*) A review of Earl's account showed that deposits consistent with attempting to avoid reporting requirements. (*Id.*)

## B. Evidence connecting Earl and Johnson to the Target Premises.

Given the sophisticated nature of the DTO, its reliance on Earl to operate it across the country, and its use of electronic communications and registers, any location where he lived or operated was likely to have evidence of the DTO. (*Id.* ¶ 71). The warrant explained how Earl and Johnson used both addresses and the White Cadillac Escalade.

### 1. 11527 113th Place NE, Kirkland WA

Earl bought the 113th Place residence from Johnson in 2016 and listed it as the address on his driver's license. (*Id.* ¶ 32). Agents obtained warrants for ongoing geolocation data for Earl and Johnson's phones. (*Id.* ¶ 37). The data from those

warrants was consistent with Earl and Johnson living at the residence. (*Id*. ¶ 38). DEA even observed Johnson in the residence. (*Id*. ¶ 39).

### 2. 5416 Rainer Avenue, Seattle, Washington

MCM Realty Investments, LLC owned 5416 Rainer Avenue. (*Id*. ¶ 42) Earl was the owner and president of that company. (*Id*.) Geolocation data for both Earl and Johnson showed them located at the at the office consistently during the day. (*Id*. ¶ 44). Agents observed Earl and Johnson at the office. (*Id*. ¶¶ 46-47).

MCM Realty facilitated Earl and Johnson's drug trafficking, making it all the more likely that the office contained evidence. Both Johnson and Gwinn used fraudulent MCM Realty pay stubs to rent locations that were used as stash houses. (*Id*. ¶ 41). Their electronic communications made clear that they understood that the pay stubs were falsified. (*Id*.)

### 3. White Cadillac Escalade

During their surveillance, DEA agents observed that Earl usually drove a white Cadillac Escalade to the Rainer Avenue office. (*Id*. ¶¶ 47, 50). The Escalade was registered to both MCM Realty and Earl, using the address of the Rainer Avenue office. (*Id*. ¶ 50).

## C. Agent Leyva's training and experience led him to conclude that the target premises would contain evidence of Earl and Johnson's drug and money laundering crimes.

### 1. Agent Leyva's background

Agent Leyva explained that he had been a special agent with DEA since March 2020. (Doc. 259-2 ¶ 2). Prior to his employment at DEA, S.A. Leyva had

been a narcotics investigator at the Gwinnett County Police Department. (*Id.*) As part of his training to become a special agent, S.A. Leyva received four months of training in the methods of unlawful drug trafficking. (*Id.*)

### 2. Nature of Drug Trafficking and Money Laundering Activities

Agent Leyva also explained how narcotics traffickers and money launderers operate, based on his training, experience, and consultations with other, more experienced agents. (*Id.* ¶¶ 73-79). Importantly, Agent Leyva's training and experience included the manner in which drug traffickers use cell phones to facilitate their illegal activities. (*Id.* ¶ 73). Drug traffickers will often use electronic communications "before, during, and after the commission of crimes to coordinate their crimes." (*Id.* ¶ 77).

Based on his training, experience, and consultation with other agents, Agent Leyva understood that drug traffickers maintain records at locations that are readily accessible to them, such as their residence or office. (*Id.* ¶ 79(a)). Such records are often located on electronic devices. (*Id.*) Drug traffickers will often keep large quantities of cash, expensive jewelry, or other items of value that reflect the proceeds of drug sales. (*Id.* ¶ 79(b)). They may also utilize cryptocurrency, which may be located on electronic devices. (*Id.* ¶ 79(c)). Their electronic devices may also have contact information for other members of the DTO or pictures consistent with drug trafficking. (*Id.* ¶ 79(e), (f)).

Finally, Agent Leyva explained that "Persons who traffic controlled substances commonly maintain documents, letters, and records relating to illegal activity for long periods of time." (*Id.* ¶ 79(g)). This evidence is usually hidden in

11

their residence or the residences of close associates. (*Id*.) Similarly, the information maintained in a phone "can remain on the physical phone for indefinite periods of time and can often be recovered through forensic search of the physical phone, even when the messages have been deleted by the user." (*Id*. ¶ 79(k)).

### 4. The evidence in the warrant was not stale.

Earl and Johnson's motion further argues that the evidence of drug trafficking was stale because, according to the motion, there was no evidence of Earl's involvement in drug trafficking after July 2022. (Doc. 259 at 18-20). This argument misunderstands the nature of the conspiracy here.

Staleness is a doctrine that arises in the context of probable cause. *See United States v. Bervaldi*, 226 F.3d 1256, 1264 (11th Cir. 2000). The staleness doctrine considers whether the facts presented in the affidavit established probable cause to believe that evidence would be found at the location when the warrant was signed. *Id.* "There is no particular rule or time limit for when information becomes stale." *Id.* at 1265. Rather, courts look at each case individually and consider the nature of the suspected crime (including whether it involves discrete crimes or an ongoing conspiracy), the habits of the target, the character of the items sought and the "nature and function" of the location to be searched. *Id.* Given the nature of the conspiracy and the nature of evidence the agents were seeking, the facts in the affidavit were not stale.

With respect to large-scale drug trafficking conspiracies, staleness is to be construed liberally. *United States v. Bascaro*, 742 F.2d 1335, 1346 (11th Cir.1984)

(*abrogated on other grounds by United States v. Lewis*, 492 F.3d 1219 (11th Cir. 2007)). This is because "[p]rotracted and continuous activity is inherent in large-scale drug trafficking operations." *Id.* The Court should do so here.

Here, S.A. Leyva's affidavit showed that Earl led a highly lucrative cocaine trafficking organization for years. (Doc. 259-2 ¶¶ 6, 13-15, 22, 28). Johnson—Earl's longtime girlfriend—helped managed logistics like renting cars and houses. (*Id.* ¶¶ 9, 19). Each played a role likely to create records and documents (both paper and electronic) that would continue to exist and likely to be stored somewhere like a residence, an office, or a personal vehicle. (*Id.* ¶ 71). The scale of the operation over a long period of time makes it likely that locations they continue to use will continue to be places that likely contain evidence. (*Id.* ¶ 79) There was no reason to believe that Earl would have left his involvement in drug trafficking and money laundering. (*Id.* ¶¶ 6-8).

Moreover, agents were seeking documents and electronic evidence from Earl and Johnson's drug activities at their residence, office, and vehicles—locations where individuals can be expected to maintain documents and electronic devices for a long period of time. (*Id.* ¶¶ 73, 77, 79, 81-84). The evidence in the affidavit about Earl and Johnson's continued use of the target premises was anything but stale, as it included evidence that Earl and Johnson used the properties and vehicle in the days and weeks before the warrant. (*Id.* ¶¶ 32-52). The Eleventh Circuit and other courts has noted that warrants that seek to seize electronic evidence are less likely to be stale because such files remain on devices even after they have been deleted. *Cf United States v. Touset*, 890 F.3d 1227, 1238 (11th Cir.

2018) (evidence of child pornography offense was not stale because electronic evidence is "not subject to spoilage or consumption.") (quoting *United States v. Burkhart*, 602 F.3d 1202, 1207 (10th Cir. 2010));[3] *United States v. Flores*, 2022 WL 19828971, at *13 (N.D. Ga. Nov. 17, 2022), *adopted in part, rejected in part* 2023 WL 3095566 (N.D. Ga. Apr. 26, 2023) (collecting cases that supported the conclusion that a warrant seeking electronic evidence from a drug conspiracy was not stale because "electronic information…can remain on the device for long periods of time");[4] *United States v. Rau*, 2020 WL 7687134, at *7 (N.D. Ga. Sept. 16, 2020).

## 5. Even if the warrant lacked probable cause, suppression of evidence is not an appropriate remedy.

Even if probable cause was lacking for the warrant, the good faith exception to the exclusionary rule would apply. The exclusionary rule's deterrent effect is negated where law enforcement agents act in an "objectively reasonable belief that their conduct does not violate the Fourth Amendment." *United States v. Leon*, 468 U.S. 897, 918 (1984). Under the *Leon* good faith exception, evidence obtained by agents who rely in good faith on an otherwise invalid warrant should not be

---

[3] *Touset* contrasted information about electronic images of CSAM with information about drugs, because drugs are likely to be sold or consumed in a short period of time. *Id*. The electronic evidence that agents sought from this warrant—including, among others, electronic ledgers, electronic communications about drug transactions and money pickups, and digital records related to the acquisition of stash locations and vehicles—much more resembles the electronic evidence in *Touset* than consumable drugs. (Doc. 259-2 ¶¶ 81-84).

[4] The district court did not reach the question of whether the warrant was stale in *Flores*.

suppressed. *Leon*, 468 U.S. at 922-25. There are four limited exceptions to this rule: (1) where the magistrate issuing the warrant was misled by information that the affiant knew was false or would have known was false except for reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned her judicial role; (3) where the search warrant was based on an affidavit that was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where a warrant was so facially deficient that the executing officers cannot reasonably presume it to be valid. *United States v. Robinson*, 336 F.3d 1293, 1296 (11th Cir. 2003). Earl and Johnson do not argue that any of these exceptions apply.

Earl and Johnson cannot show the affidavit was so lacking in indicia of probable cause that the agents could not have relied on it. To exclude evidence on this ground, the affidavit must be so clearly insufficient that it provides no hint as to why police believed they would find incriminating evidence. *United States v. McCall*, 84 F.4th 1317, 1325 (11th Cir. 2023) (quotations omitted). The warrant laid out the significant evidence that Earl and Johnson were involved in drug trafficking and money laundering and the basis to believe the Target Premises were their residence, office, and vehicle. The affidavit then explained why, based on the agent's training and experience, those locations were presently likely to contain evidence of their criminal activities. The affidavit's detailed recitation of the facts probable cause, discussed above, cannot be said to be a bare-boned statement of conclusory allegations. Agents' reliance on the warrant was entirely reasonable.

15

**Conclusion**

For all the reasons stated above, the Government respectfully requests that the Court deny the motions.

Respectfully submitted,

THEODORE S. HERTZBERG
*United States Attorney*


/s/MATTHEW R. LAGRONE
*Assistant United States Attorney*
Georgia Bar No. 499437
Matthew.LaGrone@usdoj.gov


/s/SANDRA E. STRIPPOLI
*Assistant United States Attorney*
Georgia Bar No. 688565
Sandy.Strippoli@usdoj.gov


600 U.S. Courthouse, 75 Ted Turner Drive S.W., Atlanta, GA 30303
(404) 581-6000   fax (404) 581-6181