IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*v.*<br><br>MARIO EARL | Criminal Action No.<br><br>1:23-CR-335-MLB-RGV |

**Government's Response in Opposition to Motion for Franks Hearing**

The United States of America, by Theodore S. Hertzberg, United States Attorney, and Matthew R. LaGrone, Assistant United States Attorney for the Northern District of Georgia, files this Response in Opposition to Motion for Franks Hearing with respect to the search of 5416 Rainer Avenue. Earl seeks a *Franks* hearing because he submitted that pole camera footage was inconsistent with statements in the affidavit to obtain a search warrant. But Earl has failed to show that the statements were false, that the statements or omissions were material, nor has he made any allegation that would show the statement was made with knowledge of falsity or a recklessness to its truth. The Court should deny the motion.

**1. Factual Background**

   **A. Procedural Background**

On October 24, 2023, a grand jury sitting in the Northern District of Georgia returned a seven-count indictment charging Earl, and eight others with drug trafficking, firearms, and money laundering offenses. (Doc. 1). Earl filed multiple

motions to suppress. Among those motions, Earl filed a motion to suppress evidence seized at an office building that Earl owned pursuant to a federal warrant issued by a magistrate judge in the Western District of Washington. (Doc. 215). The Government responded to oppose that motion and Earl filed a reply brief. (Docs. 338, 407). The Government has conceded that Earl can establish standing in the office building.

Earl then filed the instant motion seeking a *Franks* hearing. (Doc. 408).[1] Earl's claim is based on certain pole camera footage discussed in the affidavit.[2] Specifically, Earl asserts that the motion should have included three occasions when another individual entered an office that Earl and his girlfriend Elisa Johnson used—one of several offices within the building that Earl owned. (Doc. 408 at 4). Those three instances, according to Earl, undercut a statement in Paragraph 46 of the affidavit that agents "have seen other people [in the office] but not without Earl or when Earl is already inside (the exception being Johnson)." (*Id.*)

---

[1] Earl filed a motion and then an amended motion. (Docs. 406, 408). The Government is responding to the amended motion, though the affidavit was only attached to the original motion. (Doc. 406-1).

[2] Earl states that he has not been able to get the pole camera footage to work for December 9 to 26, 2023. The Government produced that footage and has tried to assist Earl's counsel to get it to function, seemingly without success. The Government has offered to produce the data again, produce extracted video clips of those dates, and for Earl's counsel to come to the undersigned's office review the footage with the undersigned. The parties are working together on a solution.

**B. The Affidavit**

In December 2021, DEA began an investigation that eventually led to the identification of Earl as the leader of a national cocaine syndicate. (Doc. 406-1 ¶ 6). After the investigation led to the present indictment, DEA and other agencies executed an operation to arrest the indicted defendants and search locations associated with them. On January 19, 2024, United States Magistrate Judge Brian A. Tscuchida of the Western District of Washington issued a warrant authorizing the search of four individuals, five premises, and two vehicles. (Doc. 406-1 at 2-3).[3] Among the premises was an office space Earl utilized. (*Id.* at 2) The warrant was supported by an affidavit of DEA Special Agent Evan Leyva. (Doc. 406-1 at 9).

**1. Agent Leyva's background**

Agent Leyva first explained that he had been a special agent with DEA since March 2020. (Doc. 406-1 ¶ 2).[4] Prior to his employment at DEA, S.A. Leyva had been a narcotics investigator at the Gwinnett County Police Department. (*Id.*) As part of his training to become a special agent, S.A. Leyva received four months of training in the methods of unlawful drug trafficking. (*Id.*).

---

[3] The page numbers in this response refer to the page numbers generated by the CM/ECF filing system.

[4] The paragraph numbers refer to the paragraph numbers in Agent Leyva's affidavit.

## 2. Nature of Drug Trafficking and Money Laundering Activities

Agent Leyva also explained how narcotics traffickers and money launderers operate, based on his training, experience, and consultations with other, more experienced agents. (*Id.* ¶¶ 73-79). Agent Leyva's training and experience included the manner in which drug traffickers use cell phones to facilitate their illegal activities. (*Id.* ¶ 73). Agent Leyva understood that drug traffickers will often use electronic communications "before, during, and after the commission of crimes to coordinate their crimes." (*Id.* ¶ 77).

Based on his training, experience, and consultation with other agents, Agent Leyva understood that drug traffickers maintain records at locations that are readily accessible to them, such as their residence or office. (*Id.* ¶ 79(a)). Such records are often located on electronic devices. (*Id.*) Drug traffickers will often keep large quantities of cash, expensive jewelry, or other items of value that reflect the proceeds of drug sales. (*Id.* ¶ 79(b)). They may also utilize cryptocurrency, which may be located on electronic devices. (*Id.* ¶ 79(c)). Their electronic devices may also have contact information for other members of the DTO or pictures consistent with drug trafficking. (*Id.* ¶ 79(e), (f)).

Finally, Agent Leyva explained that "persons who traffic controlled substances commonly maintain documents, letters, and records relating to illegal activity for long periods of time." (*Id.* ¶ 79(g)). This evidence is usually hidden in locations associated with them. (*Id.*) Similarly, the information maintained in a phone "can remain on the physical phone for indefinite periods of time and can

often be recovered through forensic search of the physical phone, even when the messages have been deleted by the user." (*Id*. ¶ 79(k)).

### 3. Evidence of Earl drug trafficking and money laundering activities.

Agent Leyva explained that Earl's drug trafficking organization—which he termed the Earl DTO—was not a small operation but an "extremely sophisticated organization." (Doc. 259-1 ¶¶ 6-8). The DTO distributed thousands of kilograms of cocaine on a yearly basis. (*Id*. ¶ 6). The DTO operated "throughout the United States." *(Id.)* The DTO relied on stash house operators, who maintained both paper and electronic registers. *(Id.)* For instance, one ledger contained evidence of 409 kilograms of cocaine sales from in a three-month period. (*Id*. ¶ 15).

Among other tasks, Earl would coordinate money pickups across the country, presumably through electronic communications. *(Id.)* Earl would email DTO members to rent additional stash houses and provided them with fraudulent documents. (*Id*. ¶ 14).

Given the sophisticated nature of the DTO, as well as its use of electronic communications and electronic ledgers, anywhere Earl used frequently would contain evidence from his multi-million-dollar business. (*Id*. ¶ 71). Agent Leyva then walked the magistrate judge through several instances in which law enforcement obtained evidence of the Earl DTO's drug trafficking and money laundering activity.

### a. Cresskill, New Jersey search warrant.

The first specific event recounted in the search warrant was a search warrant at 10 Center Street in Cresskill, NJ, where police found three kilograms of

cocaine. (Doc. 406-1 ¶¶ 9-16). Earl's longtime girlfriend Elisa Johnson and co-defendant Dominique Gwinn rented the house, but never lived there. (*Id.* ¶ 9). Inside the residence was a Starbucks drink that Earl had purchased earlier in the day with his cell phone, as well as an embroidered bag with his initials and medicine prescribed in his name. (*Id.* ¶ 10). Officers found numerous electronic devices, including "laptops, four cellphones, [and] other electronic storage devices." *(Id.)*

Officers also found other evidence of the scope of the DTO, both in New Jersey and nationwide. In one paper ledger, officers found a ledger giving the price of cocaine in North Carolina ("N.C."), Atlanta ("ATL"), Chicago ("Chi."), New York City ("N.Y."), Baltimore ("B.M."), and Missouri ("M.O."). (*Id.* ¶ 11). The ledger also listed several other locations in northern New Jersey where the DTO operated. *(Id.)*

The electronic devices found at 10 Center Street, which belonged to Earl, contained "extensive conversations among DTO members," as well as detailed electronic ledgers. (*Id.* ¶ 12). In the driveway was a Nissan Sentra with a hidden aftermarket compartment. (*Id.* ¶ 16).

### b. July 2022 search warrants in Georgia and Maryland.

Further evidencing the scope of the DTO, DEA performed two search warrants approximately 700 miles apart in July 2022, finding evidence that the Earl DTO was operating out of each. After a DTO member, Maurice Lynch, fled from a traffic stop with two kilograms of cocaine, agents executed a search warrant at a stash house in Fairburn, GA. (*Id.* ¶ 17). Inside, agents found six cell

6

phones, drug ledgers, and documents (such as bills, receipts, and money orders) identifying other stash houses across the country. *(Id.)* Evidence of Earl's prior presence was also found inside. *(Id.)*

Two days later, agents executed a search warrant at a residence in Maryland where they had seen DTO member Ramondo Lynch. *(Id.* ¶ 18). In that house was another Nissan Sentra with a hidden after-market compartment, containing approximately $85,000. *(Id.)* Agents also found three cell phones and more ledgers. *(Id.)*

        **c. September 2022 search warrants in New Jersey, Georgia, and North Carolina.**

On September 15, 2022, agents executed two search warrants in Georgia. During the first, they found another Nissan Sentra with a hidden after-market compartment. *(Id.* ¶ 20). The second location contained yet another Nissan Sentra; the after-market compartment in this one contained $710,000. (Id ¶ 21). Agents also found at least seven electronic devices and more ledgers. *(Id.)* These electronic devices contained sophisticated financial documentation of over one ton of cocaine transactions. *(Id.* ¶ 22).

On the same date, investigators in New Jersey executed warrants at three different stash houses where the DTO operated. *(Id.* ¶ 23). Investigators found approximately $1.6 million in U.S. currency, plus more drug ledgers and other evidence of the movement of bulk currency. *(Id.)* They also found at least four more cell phones. *(Id.* ¶ 26).

7

The same day, DEA executed a search warrant in Charlotte, NC. (*Id.* ¶ 27). Agents found 8 kilograms of cocaine hidden in a safe—just as in Cresskill, NJ. *(Id.)* The house also contained further drug ledgers. *(Id.)*

### d. Sandy Springs search warrant.

Agents later executed a search warrant at a DTO member's house in Sandy Springs. (*Id.* ¶ 28). Inside, agents found nine cell phones, as well as more ledgers. *(Id.)* The cell phones contained "extensive stored communications between DTO members and associates coordinating cocaine deals, money drop offs and pickups, and detailed ledgers." *(Id.)*

### 4. Nature of Money Laundering.

S.A. Leyva explained how drug traffickers will often split their deposits to be smaller than $10,000 to avoid transaction reporting requirements. (*Id.* ¶ 29). During DEA's investigation, it reviewed bank account statements for Earl's accounts. *(Id.)* A review of Earl's account showed that deposits consistent with attempting to avoid reporting requirements. *(Id.)*

### 5. MCM Realty and 5416 Rainer Avenue

Agent Leyva then connected this office building to Earl, to explain why that connection would mean that there was likely evidence of drug trafficking inside. MCM Realty Investments, LLC owned 5416 Rainer Avenue. (*Id.* ¶ 42) Earl was the owner and president of that company. (*Id.*) Geolocation data for Earl showed him located at the at the office consistently during the day. (*Id.* ¶ 44). Agents observed Earl at the office using a pole camera located outside. (*Id.* ¶¶ 46-47).

MCM Realty had facilitated Earl's drug trafficking. Co-conspirators used fraudulent MCM Realty pay stubs to rent locations that were used as stash houses. (*Id*. ¶ 41). Their electronic communications made clear that they understood that the pay stubs were falsified. (*Id*.)

### C. The Search

Agents searched the office building at 5416 Rainer Avenue pursuant to the warrant on January 29, 2024. Inside, they found electronic devices that contained electronic evidence of Earl's involvement in drug trafficking and money laundering. Earl seeks to suppress that evidence.

### 2. Earl Has Not Made the Substantial Preliminary Showing that a Franks Hearing is Required.

"Affidavits supporting arrest warrants are presumptively valid." *United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009). To justify a *Franks* hearing, the defendant must "make a substantial preliminary showing that (1) the affiant deliberately or recklessly included false statements, or failed to include material information, in the affidavit; and (2) the challenged statement or omission was essential to the finding of probable cause." *United States v. Arbolaez*, 450 F.3d 1283, 1293 (11th Cir. 2006) (quoting *Franks*, 438 U.S. at 155–56) (cleaned up). This showing "is not lightly met." *Id*. at 1294. Earl cannot meet this burden because the statements were not inaccurate, do not undermine the probable cause in the warrant, and Earl has not made any allegation—much less the required evidentiary showing—that the statements were knowingly false or made with reckless indifference to the truth.

### A. The Statements Were Not Inaccurate.

At the outset, the Court should deny the motion because the statements were not untrue. The affidavit, which was dated January 19, 2024, states that agents had been reviewing video surveillance via pole camera between December 2023 to January 2024. (Doc. 406-1 ¶ 45). The affidavit then provided several things that agents had observed while performing surveillance via pole camera. (*Id*. ¶¶ 45-52). The affidavit never asserted that agents had reviewed every minute of the hundreds of hours of footage that the pole camera had recorded, but rather described what agents had seen in their review of the pole camera footage. The magistrate judge would have likely assumed that agents had been monitoring the ongoing pole camera recordings regularly, but not 24 hours a day, 7 days a week, absent an explicit statement that they had reviewed the footage every second of the hundreds of hours of footage.

Moreover, the assertions in the affidavit based on the pole camera footage were not and did not need to be anything more than an assertion of what agents had seen when they had reviewed the pole camera at the office building. From agent's observations, Agent Leyva showed the magistrate judge that Earl and Johnson regularly used the building as an office, thus making it a location likely to contain documents (including electronic documents) of their drug trafficking. Indeed, that is the point of the challenged paragraph, Paragraph 46. Earl routinely entering this part of the building alone increased the likelihood that this was his office and thus one place within the office building that Earl would keep documents related to his crimes. (Doc. 406-1 ¶ 46). The same is true of the

remaining allegations based on the pole camera footage about this office: that Earl usually brought a briefcase to the office, that he went there almost every day, and that he had to unlock the office. (*Id.* ¶ 47).

### B. The Omitted Statements Were Immaterial to the Magistrate Judge's Determination of Probable Cause.

The Court can consider Earl's motion a challenge to facts that were omitted from the warrant. Specifically, the motion argues that Agent Leyva should have included three instances when an individual allegedly entered the office without Earl or Johnson. Such an omission was immaterial. Indeed, even if the Court disagrees with the arguments above and concludes that the statement that "agents have seen other people in [the office] but not without Earl" to be a misstatement, it is not a misrepresentation that affected the probable cause for the warrant.

Insignificant and immaterial misrepresentations or omissions will not invalidate a warrant. *United States v. Jenkins,* 901 F.2d 1075, 1080 (11th Cir. 1990); *Kapordelis*, 569 F.3d 1291, 1309–1310 (11th Cir. 2009). The Defendant bears the burden to show that absent the omissions and misrepresentations, probable cause was lacking. *Kapordelis*, 569 F.3d at 1309. To evaluate materiality with respect to alleged omissions or misstatements, the Court should "disregard those portions of the affidavit which the defendant has shown are arguably false or misleading." *Kapordelis*, 569 F.3d at 1309 (citing *Franks*, 438 U.S. at 171). The Court should then add the omitted facts and determine whether "including the omitted

11

facts would have prevented a finding of probable cause." *Id.* (quoting *Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1997)).

As established in the Government's response to Earl's motion challenging the search warrant, the warrant stated ample probable cause. (*See* Doc. 338 at 3-12). "Probable cause is not a high bar." *United States v. Delgado*, 981 F.3d 889, 897 (11th Cir. 2020) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018)). In the context of a document warrant like this, when agents sought authorization to search for documentary evidence of drug crimes previously committed—especially electronic evidence—a warrant should establish: (1) evidence that the defendant was involved in the drug conspiracy, (2) evidence that the residence was closely related with the defendant, and (3) the agent's training and experience that led to his opinion that evidence of drug activity is likely to be found in the defendant's premises. *United States v. Acosta*, 807 F. Supp. 2d 1154, 1216-1219 (N.D. Ga. 2011).

Paragraph 46, including the challenged statement and alleged omissions, goes to establishing the second prong: Earl's close relationship with this premise. But the affidavit demonstrated Earl's close relationship with this premise in several other ways not challenged by Earl, a sufficient relationship to believe that electronic evidence of his expansive, lucrative criminal organization would likely be there. *First*, a business owned by Earl purchased and owned the building. (Doc. 406-1 ¶ 42). *Second*, agents received geo-location data for both Earl's phone and his girlfriend Elisa Johnson's phone. (*Id.* ¶ 44). This data showed that Earl went to this building almost every day, for most of the work hours in a day. (*Id.*)

*Third*, agents had also observed Earl at the location, using the pole camera, often entering one office within the premises with a briefcase, after unlocking the office. (*Id*. ¶ 46-47, 49).

In addition, the warrant established a direct connection between this premise and Earl's crimes. This premises was owned by a business Earl had created named MCM Realty. (*Id*. ¶ 42). Several of the documents used by co-conspirators to lease the drug premises used by the DTO to distribute cocaine were fraudulent MCM Realty documents. (*Id*. ¶ 41). Electronic communications showed Earl's involvement in creating those documents. (*Id*.) Given that both Earl and MCM Realty were involved in a sophisticated drug trafficking organization, it was likely that Earl's MCM Realty address—which he used nearly every day—would contain documents and electronic evidence of those crimes.

### C. Earl Has Made No Factual Assertions That Would Show That The Factual Assertions Were Knowingly or Recklessly False.

The Court should also deny the motion because Earl failed to provide any affidavit or other evidence that would show that the challenged statements were either deliberate falsehoods or made in reckless disregard for the truth. The Supreme Court in *Franks* specifically required such an evidentiary showing before a hearing is appropriate, holding that within a defendant's motion there "must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Franks*, 438 U.S. at 171.

Earl's motion does not contain any allegation or factual assertion that the challenged statement was made with knowledge of its falsity. Other than reciting caselaw requiring that he show scienter, Earl's motion's only mention of scienter is to say that he "believes he has made the requisite preliminary showing…and is, therefore entitled to a hearing to address whether the affidavit contained material allegations which were deliberately false, or reckless…" (Doc. 408 at 5). Such a conclusory statement is insufficient. But this Court routinely rejects requests for *Franks* hearings when the preliminary showing lacks factual assertions that would support why the statement was made with knowledge of falsity or reckless disregard for the truth. *See, e.g., United States v. Thomas*, 2024 WL 2883522, at *11 (N.D. Ga. Feb. 27, 2024); *United States v. Daniels*, 2024 WL 5184295, at *9 (N.D. Ga. Dec. 20, 2024); *United States v. Boyce*, 2021 WL 9217153, at *4-5 (N.D. Ga. Nov. 10, 2021).

As shown above, the affidavit contained probable cause with or without the information about another man entering the office. Even if the Court disagrees, the statement was not one that was "so clearly critical to the probable cause determination that its omission created a presumption of recklessness." *United States v. Bivins*, 560 F. App'x 899, 906 (11th Cir. 2014) (citing *Madiwale*, 117 F.3d at 1327). Nor has Earl even suggested that the statement was so critical that the Court could presume recklessness. He has simply ignored this requirement altogether. Earl's failure to provide any evidence of scienter is thus damning to his bid for a *Franks* hearing.

## Conclusion

The Court should deny the motion to hold a *Franks* hearing.

        Respectfully submitted,

        THEODORE S. HERTZBERG
          *United States Attorney*


      /s/MATTHEW R. LAGRONE
        *Assistant United States Attorney*
        Georgia Bar No. 499437
        Matthew.LaGrone@usdoj.gov