# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | :: | |
| | :: | CRIMINAL CASE NO. |
| v. | :: | 1:23-cr-00335-MLB-RGV |
| | :: | |
| MARIO J. EARL, *et al.* | :: | |

## MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER

Defendants Mario J. Earl ("Earl") and Ramondo Lynch ("Lynch"), both of whom are charged along with seven co-defendants in a seven-count criminal indictment, see [Doc. 1],[1] have filed motions to suppress evidence obtained from the March 2, 2023, search of the residence located at 6470 Wright Circle, Sandy Springs, Georgia ("6470 Wright Circle"), [Docs. 216 & 252], and Earl filed a motion to amend his suppression motion, seeking a 30-day extension to perfect the motion, [Doc. 262], which the Court granted, see [Doc. 278 at 2].  The government opposes Lynch's motion, [Doc. 341], and Lynch has filed a reply in support of his motion, [Doc. 382].  Additionally, defendant Turomne Washington ("Washington") has filed a motion to suppress evidence obtained from the July 8,

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

2022, search of the residence located at 10 Center Street, Cresskill, New Jersey ("10

Center Street"), [Doc. 217], that he perfected regarding his standing, [Doc. 253],

and after an evidentiary hearing was held on June 3, 2025,[2] the government filed

its response to Washington's motion, [Doc. 340], and Washington has filed a reply,

[Doc. 386].[3]  Earl also filed motions to adopt the motions to suppress of co-

defendants Lynch, Washington, and Elisa Johnson ("Johnson") as to evidence

seized from the searches of 6470 Wright Circle and 10 Center Street,[4] [Docs. 254,

256, & 257]; see also [Docs. 217, 226, & 252], to which the government has filed

responses, [Docs. 340 & 341], and Earl has filed a reply as to 10 Center Street, [Doc.

396].  For the reasons that follow, Earl's motion to adopt as to 6470 Wright Circle,

[Doc. 254], is **DENIED**; Earl's motions to adopt as to 10 Center Street, [Docs. 256

& 257], are **GRANTED**; and it is **RECOMMENDED** that Earl, Lynch, and

Washington's motions to suppress, [Doc. 216, 217, & 252], be **DENIED**.

---

[2] See [Doc. 325] for a transcript of the evidentiary hearing held on June 3, 2025, which will be referred to as "(Tr. at __)" and cited according to the page number located in the top right corner of the transcript.  In addition, the parties submitted exhibits at the evidentiary hearing, see [Docs. 313 & 315], which will be referred to either by the document number or as "(Gov't Ex. __)" for the government's exhibits and "(Def. Ex. __)" for Washington's exhibits.

[3] Earl, Lynch, and Washington each have filed additional motions to suppress, [Docs. 215, 218, 219, 220, & 265], that are addressed in separate Reports and Recommendations.

[4] Johnson subsequently withdrew her motions to suppress.  See [Doc. 370].

## I.    INTRODUCTION

In December 2021, the Drug Enforcement Administration ("DEA") in Atlanta began an investigation into a national drug trafficking organization allegedly involving several individuals, including Earl and Lynch, that was responsible for distributing thousands of kilograms of cocaine throughout the United States on a yearly basis.  [Doc. 252-1 (Moore Aff.) ¶ 8; Doc. 257-5 (Leyva Aff.) ¶ 6].[5]  On December 15, 2021, a traffic stop conducted in Spartanburg County, South Carolina, involving the arrest of a narcotics courier transporting multiple kilograms of cocaine ultimately led to the identification and arrest of the broker who provided the cocaine to the courier.  [Doc. 252-1 ¶ 9].  DEA agents seized the phones used by the broker, obtained federal search warrants for the devices, and discovered a text message thread between the broker and Lynch, identifying Lynch as the source of supply for the cocaine seized during the traffic stop.  [Id. ¶¶ 9-10].  DEA agents obtained a warrant on April 13, 2022, to receive geo-location information for a telephone associated with Lynch.  [Id. ¶ 15].  Using geo-location data, DEA agents identified 6470 Wright Circle as a residence that Lynch visited, and agents subsequently observed activity consistent with drug trafficking during

---

[5] The summary of facts set forth in this section are drawn from the indictment, [Doc. 1], the affidavits submitted in support of the contested search warrants, and the parties' briefs, see [Docs. 216, 217, 226, 252, 254, 256, 257, 341, & 382], and do not represent findings of fact by the Court.

surveillance of the residence via a pole camera. [Id. ¶¶ 17, 20]; see also [id. ¶¶ 26, 32].

In June 2022, DEA-Baltimore began an investigation into Lynch based on information received from DEA-Atlanta. [Doc. 313-6 at 3]. Specifically, using geo-location data obtained pursuant to a search warrant of a cellphone associated with Lynch, the DEA determined that Lynch was in the area of 9125 Saracen Drive, Pikesville, Maryland ("9125 Saracen Drive"), on June 23, 2022. [Id.]; see also (Tr. at 30). That morning, Lynch was observed entering a 2014 white Audi A8 bearing a Maryland tag parked in the driveway of 9125 Saracen Drive, and later that day, Ernest Holloway ("Holloway") was observed using the same vehicle to drive to another area where he was observed completing a transaction with an unknown male. [Doc. 313-6 at 3-4]; see also (Tr. at 32-33).

The residence at 9125 Saracen Drive was identified as a "possible meet location and/or residence for . . . Holloway and . . . Lynch," and surveillance of the residence was initiated on June 30, 2022. [Doc. 313-6 at 3-4]; see also (Tr. at 34-35). That morning, agents observed Holloway and Lynch arrive at the residence in a black Chevrolet truck, and Lynch then carried two large suitcases toward the residence, and Holloway and Lynch entered the garage connected to the residence and closed the door behind them. [Doc. 313-6 at 4]; see also (Tr. at 35). A few hours later, a black male wearing a gray shirt and black pants and carrying a small

bag was observed entering the garage before the garage door shut behind him, and shortly thereafter, Lynch and the black male were observed exiting the garage and departing the area in a gray Honda.  [Doc. 313-6 at 4]; see also (Tr. at 36-37).  On the morning of July 1, 2022, agents observed two unidentified black males meet with Lynch and enter the garage of the residence before the garage door closed behind them.  [Doc. 313-6 at 4]; see also (Tr. at 38-39).

On the evening of July 7, 2022, law enforcement officers in Cresskill, New Jersey, received multiple 911 calls reporting a disturbance involving several individuals with weapons at 10 Center Street.  [Doc. 217-1 (Holmsen Cert.) ¶ 15]; see also [Doc. 257-5 ¶ 9].  Two officers from the Cresskill Police Department responded to the scene and discovered an adult male victim, later identified as Bryan Palacios ("Palacios"), at the opening of the garage who had sustained multiple gunshot wounds.  [Doc. 217-1 ¶ 15].  The officers rendered aid to Palacios and asked him if anyone else was inside the residence, and he said that he did not know.  [Id.].  When asked what had happened, Palacios stated that the perpetrators were looking for codes to safes located inside the residence that Palacios did not know.  [Id.].  One of the officers entered the residence through the garage and discovered two large safes and a chair in the middle of the room that was attached to the garage, and underneath the chair, he observed an unknown amount of U.S. currency and a trail of blood that led into the garage where Palacios

was found. [Id.]. Palacios was transported to the hospital, and the Bergen County Prosecutor's Office ("BCPO") was contacted due to the nature of the investigation and Palacios' life-threatening injuries. [Doc. 217-1 ¶ 16; Doc. 218-1 (Navarro Aff.) ¶¶ 22-23].

Detectives from the BCPO Major Crimes Unit and Special Investigations Squad responded to the crime scene and contacted the owner of the residence, who informed detectives that the residence was recently rented to two females, one of whom was identified as co-defendant Johnson. [Doc. 217-1 ¶ 16; Doc. 218-1 ¶ 23]. Detectives contacted Johnson, who told them that Palacios was house sitting while she was out of state. [Doc. 217-1 ¶ 16; Doc. 218-1 ¶ 23]. Detectives also performed a neighborhood canvass and discovered several nearby video recording sources, and a review of the camera footage revealed three potential suspect vehicles, namely a Honda Accord, a Ford Explorer, and a Sprinter style van, in addition to multiple suspects, one of whom appeared to be carrying a long gun. [Doc. 217-1 ¶ 17; Doc. 218-1 ¶¶ 24-25]. Review of additional video footage showed an individual, later identified as Washington, pull into the driveway of the residence at the time of the attack in a Nissan Sentra, approach the residence, and flee on foot, while another video showed an individual rummaging through the Nissan Sentra that was left parked in the driveway. [Doc. 217-1 ¶ 17; Doc. 218-1 ¶¶ 26, 65; Doc. 219-2 (Morgan Aff.) ¶ 10]. The vehicle was identified as a 2019 Nissan

Sentra bearing a Florida tag and registered to co-defendant Dominique Gwinn ("Gwinn"), the second female who had rented 10 Center Street.  [Doc. 217-1 ¶ 19; Doc. 218-1 ¶¶ 23, 26; Doc. 219-2 ¶ 10].

BCPO detectives applied for and obtained a search warrant for 10 Center Street and the 2019 Nissan Sentra in the early hours of July 8, 2022.  [Docs. 217-1 & 217-2]; see also [Doc. 218-1 ¶¶ 27-28].  Officers from the Cresskill Police Department and the BCPO executed the search warrant shortly thereafter, which revealed two large industrial size safes, one of which contained three, one-kilogram packages of cocaine, in addition to U.S. currency, a money counter, a handgun, multiple vacuum sealers, vacuum sealer bags, utility bills and other mail for other stash locations in New Jersey, laptops, cell phones, handwritten detailed drug and money ledgers,[6] and numerous documents and personal effects bearing the names of and belonging to organization members Earl, Johnson, Gwinn, and Washington.  [Doc. 218-1 ¶¶ 28-29; Doc. 257-5 ¶¶ 9-10].  Documents and affects bearing Earl's name included a Starbuck's cup he purchased from a nearby

---

[6] The ledgers contained multiple handwritten addresses of locations within Bergen County, including 28 7th Street, Englewood Cliffs, New Jersey and 10 Center Street, and agents believed that the locations identified in the ledger, each of which were listed as rental properties, were potential locations utilized as stash houses on behalf of the drug trafficking organization.  [Doc. 218-1 ¶ 29].  The ledgers also contained addresses of parking garages, including the parking garage that was attached to the apartment complex located at 2030 Hudson Street, Fort Lee, New Jersey.  [Id. ¶ 43].

Starbucks on the day of the robbery; a bag embroidered with his initials containing medication prescribed to him; electronic devices believed to belong to Earl that revealed extensive communications between organization members as well as drug and money ledgers; and a laptop believed to belong to him. [Doc. 257-5 ¶¶ 10, 12-13]. Agents also collected numerous cellphones and laptops from the residence and a wallet containing a driver's license and credit and debit cards bearing Washington's name. [Doc. 218-1 ¶¶ 33, 63, 66]. A search of the 2019 Nissan Sentra parked in the driveway, which was registered to Gwinn, revealed a hidden compartment that was empty, [Doc. 219-2 ¶ 10; Doc. 257-5 ¶ 16], and inside the residence, investigators recovered oil change paperwork for a different vehicle connected to a phone number registered to co-defendant Jovan Jackson, a high-ranking member of the organization, [Doc. 257-5 ¶ 16].

On July 14, 2022, agents conducted drive by surveillance of 9125 Saracen Drive and observed a black passenger car parked inside of the open garage door, and the agents discovered that the vehicle was registered to an individual who was a target of a DEA investigation in Chicago, Illinois, based on her ownership of several vehicles containing hidden compartments used to transport drugs and U.S. currency. [Doc. 313-6 at 5]. Subsequently, on July 18, 2022, agents conducted surveillance at 5253 Rosewood Place, Fairburn, Georgia, after receiving information indicating that the residence was being utilized as a possible stash

8

house.  [Id.]; see also [Doc. 252-1 ¶ 21].  Agents observed a 2021 BMW X2 arrive at the residence, and a female, later identified as Amber Egan ("Egan"), entered the residence and shortly thereafter exited the residence carrying a small plastic bag, which she placed in the vehicle.  [Doc. 313-6 at 5]; see also [Doc. 252-1 ¶ 21].  Egan was then observed returning inside the residence, and shortly thereafter, she exited the residence with an unidentified male, later identified as Maurice Lynch ("M. Lynch"), the brother of Lynch, who was carrying a brown Nike bag that he placed into the trunk of Egan's vehicle.  [Doc. 313-6 at 5]; see also [Doc. 252-1 ¶ 21].  Egan's vehicle was subsequently stopped by a Georgia State Patrol ("GSP") Trooper for traffic violations while traveling toward Jonesboro, Georgia, and after she gave verbal consent to search the vehicle, the GSP Trooper located a plastic bag that contained approximately $14,000 in U.S. currency in smaller denominations bound with rubber bands, in addition to the brown Nike bag, which contained a money counter.  [Doc. 313-6 at 5-6]; see also [Doc. 252-1 ¶¶ 21-22].  During the traffic stop, Egan informed agents that she was directed to pick the money up from 5253 Rosewood Place by her business partner, Lynch.  [Doc. 313-6 at 6]; see also [Doc. 252-1 ¶ 23].

M. Lynch was later observed leaving 5253 Rosewood Place with a large bag and small shoulder satchel and getting into the rear of a white Toyota Camry. [Doc. 252-1 ¶ 24]; see also [Doc. 313-6 at 6].  Agents maintained surveillance of the

vehicle while the GSP attempted to perform a traffic stop of the vehicle, and when the vehicle came to a stop, M. Lynch exited the vehicle and fled on foot with the large bag and small shoulder satchel.  [Doc. 252-1 ¶ 24]; see also [Doc. 313-6 at 6].  As he fled, he threw the large bag and small shoulder satchel into the woods.  [Doc. 252-1 ¶ 24]; see also [Doc. 313-6 at 6].  M. Lynch was then arrested, and the large bag and small shoulder satchel were located, seized, and found to contain two kilograms of cocaine, U.S. currency secured in small denominations and wrapped in rubber bands, and an individual key.  [Doc. 252-1 ¶ 24]; see also [Doc. 313-6 at 6].  Agents then obtained and executed a search warrant for 5253 Rosewood Place, during which time they located drugs, firearms, cell phones, and an additional $128,000 in U.S. currency, [Doc. 252-1 ¶ 24]; see also [Doc. 313-6 at 6], in addition to documents which linked Earl, Lynch, M. Lynch, and Johnson to the home and led agents to identify other stash houses used by the organization in Atlanta, Georgia, and around the country, [Doc. 257-5 ¶ 17].

That same day, July 18, 2022, the pole camera placed at 6470 Wright Circle recorded the arrival of three vehicles between 5 and 7:30 p.m.; however, due to the positioning of the camera, agents were only able to see the vehicles enter the driveway and drive toward the house, but were unable to see the trunk area of the vehicles once they were parked.  [Doc. 252-1 ¶ 26].  Because the vehicles did not remain at 6470 Wright Circle for very long, agents believed evidence of drug

trafficking remained inside the residence.  [Id. ¶ 27].  Later that evening, agents observed parked in the driveway of 6470 Wright Circle a white Ford Escape, later identified as a vehicle rented by Egan.  [Id. ¶ 28].  After Egan left the residence, GSP conducted a traffic stop of her vehicle, and Egan provided written consent to search the vehicle, though the search of the vehicle yielded nothing of evidentiary value.  [Id. ¶ 29].  Following the conclusion of the traffic stop, agents asked Egan for permission to speak with her, and she informed agents that Lynch was her business partner and that he directed her to pick up money from 5253 Rosewood Place.  [Id. ¶¶ 29-30].  Egan showed agents her phone that displayed a contact saved as "Doe" with a telephone number associated with Lynch, and she gave agents permission to look through the text message thread between her and Lynch.  [Id. ¶¶ 30-31].  Egan also informed agents that there was a room in 6470 Wright Circle that was locked and required a key to gain access, though Lynch had previously denied her request to access that room.  [Id. ¶ 30].

On the evening of July 20, 2022, DEA-Baltimore obtained a search warrant for 9125 Saracen Drive.  [Doc. 265-2].  When the search warrant was executed the following morning, the house was empty, and no one was present at the residence.  (Tr. at 49-50).  Inside the residence, agents found two U.S. passports belonging to Lynch, and agents found parked in the garage a Nissan Sentra equipped with a trap in the floorboard of the vehicle that contained approximately $85,000 in

vacuum-sealed packaging and a stolen firearm, in addition to three cell phones, handwritten detailed drug and money ledgers, and an additional $15,000 located in the residence.  [Doc. 252-1 ¶ 33; Doc. 257-5 ¶ 18].

On March 2, 2023, DEA-Atlanta applied for and obtained a search warrant for 6470 Wright Circle.  [Doc. 252-1].  During the execution of the search warrant, agents seized handwritten drug and money ledgers, bank and utility documents in Lynch's name, luxury custom jewelry receipts, a vacuum sealer, and approximately nine cell phones.  [Doc. 259-2 ¶ 28]. Analysis of the cell phones seized revealed extensive communications between members and associates of the drug trafficking organization coordinating drug deals, money drop offs and pickups, and detailed ledgers.  [Id.].

Earl, Lynch, and Washington were indicted on October 24, 2023, along with others for conspiring to possess with intent to distribute a controlled substance and conspiring to commit money laundering, and Earl and Lynch were additionally charged with conspiring to open, lease, rent, use, and maintain a place for the purpose of distributing a controlled substance; knowingly possessing with intent to distribute controlled substances; and knowingly possessing a firearm in furtherance of a drug trafficking crime.  [Doc. 1].  Earl, Lynch, and Washington have filed motions to suppress evidence seized from 6470 Wright Circle and 10 Center Street, [Docs. 216, 217, & 252], and Earl has moved to adopt Lynch,

Washington, and Johnson's motions with respect to these locations, [Docs. 254, 256, & 257]. The government opposes these motions, [Docs. 340 & 341], and Lynch, Earl, and Washington have filed replies in support of their motions, [Docs. 382, 386, & 396]. For the reasons that follow, Earl's motion to adopt as to 6470 Wright Circle, [Doc. 254], is **DENIED**; Earl's motions to adopt as to 10 Center Street, [Docs. 256 & 257], are **GRANTED**; and it is **RECOMMENDED** that Earl, Lynch, and Washington's motions to suppress, [Doc. 216, 217, & 252], be **DENIED**.

## II.    DISCUSSION

### A.    Motions to Suppress as to 6470 Wright Circle

#### 1.    Standing

In his motion to adopt co-defendant Lynch's motion to suppress, [Doc. 254], Earl contends that he has standing to challenge the search of 6470 Wright Circle, [id. at 1-5].[7] Specifically, Earl asserts that he has standing to challenge the search of 6470 Wright Circle because he "lived at the . . . home on a regular basis, i.e., more than simply an overnight guest." [Id. at 3]. Earl attached to his motion multiple exhibits, including an affidavit in which Earl averred that Lynch, his best friend, purchased 6470 Wright Circle in 2021 and had given him a key to the home and allowed him unfettered access, [Doc. 254-2 (Earl Aff.) ¶¶ 2-4], and an affidavit

---

[7] The government does not contest Lynch's standing with respect to 6470 Wright Circle, see [Doc. 325 at 20 p. 19, 63 p. 62]; see also [Doc. 297 at 10-11], so the Court will only address standing as to Earl.

by Earl's father in which he averred that he came to visit Earl in 2021, and Earl drove him to a house located off of Wright Circle, unlocked the door with a key he had to the home, and the two stayed at the residence during his visit to Atlanta, [Doc. 254-3 (W. Earl Aff.) ¶¶ 2-3, 5-7].

On June 16, 2025, the Court held an evidentiary hearing to afford Earl an opportunity to present evidence in support of his standing regarding this residence. See [Doc. 324]. Michael Williams, a private investigator hired by Earl to serve subpoenas to a dry cleaner and LA Fitness near 6470 Wright Circle; Kelly Evans, Earl's cousin and the owner of a cleaning service company who Earl hired to clean 6470 Wright Circle in September 2021 and who cleaned the residence beginning in January 2022 for six months; Earl's father; Earl's son; and DEA Atlanta Agent Heather Grimes ("Agent Grimes"), who was part of the team who executed the search warrant at 6470 Wright Circle, testified at the hearing. [Id. at 7-8, 28-32, 36, 43-44, 55-56, 66-67].

The government also has filed a response regarding 6470 Wright Circle in which it argues that Earl has not established a reasonable expectation of privacy at 6470 Wright Circle. [Doc. 341 at 9-19]. Specifically, the government contends that while "Earl presented some evidence that he may have been an overnight guest at the house in the past, [] he introduced no evidence that he had visited the house in the months before the search," and thus, "[w]hatever expectation of

privacy he had at the house no longer existed by March 2023," since the "evidence showed that no one had been in the house for months prior to the search."  [Id. at 9].  Earl did not file a reply to the government's response.

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  However, "'Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.'"  Rakas v. Illinois, 439 U.S. 128, 133-34 (1978) (citations omitted) (quoting Alderman v. United States, 394 U.S. 165, 174 (1969)).  "Fourth Amendment jurisprudence requires that one challenging as unreasonable a search or seizure must have 'standing,' i.e., a legitimate expectation of privacy in the premises searched."  United States v. McCray, CRIMINAL ACTION FILE NO. 1:15-cr-212-WSD/AJB, 2017 WL 9472888, at *6 (N.D. Ga. June 15, 2017) (citing United States v. Gonzalez, 940 F.2d 1413, 1420 n.8 (11th Cir. 1991)), adopted by 2017 WL 3141172, at *14 (N.D. Ga. July 25, 2017).  Consequently, to prevail on a claim that the government conducted an unconstitutional search under the Fourth Amendment, Earl must first establish that he had a legitimate expectation of privacy in the place searched or evidence seized that society is prepared to recognize as reasonable.  Rakas, 439 U.S. at 133-134; see also California v. Ciraolo, 476 U.S. 207, 211 (1986) (citation omitted) (standing to challenge search requires a subjective expectation of privacy

that society would recognize as legitimate); United States v. Baron-Mantilla, 743 F.2d 868, 870 (11th Cir. 1984) (per curiam) (citation omitted).  That is, Earl may challenge a search on Fourth Amendment grounds if "'(1) he has a subjective expectation of privacy, and (2) society is prepared to recognize that expectation as objectively reasonable.'"  United States v. Bushay, 859 F. Supp. 2d 1335, 1361 (N.D. Ga. 2012) (quoting United States v. Harris, 526 F.3d 1334, 1338 (11th Cir. 2008) (per curiam)), adopted at 1354.  Thus, Earl "must establish both a subjective and an objective expectation of privacy,"[8] and he "bears the burden of showing a legitimate expectation of privacy in the area searched."  United States v. Suarez-Blanca, Criminal Indictment No. 1:07–CR–0023–MHS/AJB, 2008 WL 4200156, at *6  (N.D. Ga. Apr. 21, 2008) (citations omitted); see also United States v. Jefferson, Criminal Case No. 1:09–CR–324–WSD–RGV, 2010 WL 3928049, at *4 (N.D. Ga. May 25, 2010) (citation omitted) ("In other words, [defendant] has the burden to establish that he has standing to challenge the search or seizure."), adopted by

---

[8] "The subjective prong is a factual inquiry, and requires that a person exhibit an actual expectation of privacy," while the "objective prong is a question of law, and requires that the privacy expectation be one that society is prepared to recognize as reasonable."  Bushay, 859 F. Supp. 2d at 1362 (citations and internal marks omitted); see also United States v. Durdley, 436 F. App'x 966, 968 (11th Cir. 2011) (per curiam) (unpublished).  "An expectation of privacy is reasonable if it has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."  United States v. Dixon, 901 F.3d 1322, 1338 (11th Cir. 2018) (citation and internal marks omitted).

2010 WL 3927874, at *9 (N.D. Ga. Oct. 4, 2010), aff'd, 451 F. App'x 833 (11th Cir. 2011) (per curiam) (unpublished).

The Court agrees with the government that even if Earl was previously an overnight guest at 6470 Wright Circle, he failed to show that he was an overnight guest "at the time the residence was searched that would give rise to a reasonable expectation of privacy at that location." United States v. Hernandez-Martinez, CRIMINAL ACTION NO. 1:07-CR-356-TWT-CCH, 2008 WL 11443130, at *3 (N.D. Ga. Aug. 25, 2008), adopted by 2008 WL 11443120, at *1 (N.D. Ga. Oct. 7, 2008). Although witnesses testified at the evidentiary hearing about Earl's presence at 6470 Wright Circle in 2021 and 2022, see [Doc. 324 at 7-8, 28-32, 36, 43-44, 55-56]; see also [Doc. 254-5], the search warrant for the residence was not executed until March 2, 2023, see [Doc. 252-1], and Agent Grimes testified that at the time of the search warrant's execution, no one was home, there was no electricity in the home, the yard was unkempt, debris blocked the driveway, and in her experience, it appeared that no one had been in the residence recently, [Doc. 324 at 66-68]. Accordingly, Earl has failed to carry his burden of demonstrating that he had a legitimate expectation of privacy in 6470 Wright Circle at the time of the search,

and his motion to suppress, [Doc. 216], and motion to adopt as to this residence, [Doc. 254], are due to be denied.[9]

**2.    Merits of the Motions to Suppress as to 6470 Wright Circle**

Lynch moves to suppress evidence seized by law enforcement agents from 6470 Wright Circle, arguing that the affidavit submitted in support of the search warrant issued on March 2, 2023, fails to establish probable cause to support the search of 6470 Wright Circle.  [Doc. 252 at 1, 7, 9-13].  Lynch also asserts that the information contained in the search warrant affidavit was stale.  [Id. at 7-8, 13-14]. Finally, Lynch contends that the search warrant affidavit contained material misrepresentations and omissions and should be suppressed pursuant to Franks v. Delaware, 438 U.S. 154 (1978).  [Id. at 14-25].  In response, the government contends that the evidence was seized pursuant to a valid warrant supported by probable cause; the probable cause was not stale; Lynch failed to make the substantial preliminary showing to merit a Franks hearing because he did not allege a material misrepresentation or omission; and even if the warrant's probable cause was defective, exclusion is not an appropriate remedy as the agents relied in good faith on the warrant.  [Doc. 341 at 1-2, 21-35].  Lynch has filed a reply brief in support of his motion to suppress evidence seized from 6470 Wright Circle, [Doc.

---

[9] Although Earl has not established standing, the Court will address the merits of the arguments briefed by the parties regarding the motions to suppress evidence seized from 6470 Wright Circle since Lynch has standing.

382], and a supplemental brief to address a mistake in his initial reply brief, [Doc. 389].

###### i.    *Misrepresentations of Material Facts, Omitted Information*

Lynch argues that he is entitled to a <u>Franks</u> hearing because the search warrant affidavit included material misrepresentations and omitted material information. [Doc. 252 at 14-25]. Specifically, Lynch contends that the government "sought a search warrant based on information that was months-old," and in "order to avoid the claim that the information provided in the affidavit was stale, the affiant contended that no one had entered or exited the residence between July 19, 2022[,] and March 2, 2023, the date the affidavit was signed and presented to the magistrate," which implies "that the only residence monitored, and the only residence the camera was trained on, was 6470 Wright Circle," but that "was not the case," since the "pole camera footage reviewed to date clearly shows that there were two residences that were monitored at various points in time." [<u>Id.</u> at 17-18, 20]. Moreover, Lynch asserts that the "claim that no one entered into the residence between July 18, 2022, and March 2, 2023[,] is simply false," since there is video footage of "a vehicle with two individuals arriv[ing] at the residence," followed by the individuals getting out of the vehicle, walking around the residence, and appearing to go inside the residence for more than two hours on July 20, 2022. [<u>Id.</u> at 18, 21-22]. Similarly, Lynch claims that there is another instance on July 20, 2022,

19

where a vehicle arrives at the residence, stays for a brief period of time, and then leaves that "should have been included in the affidavit[.]"  Id. at 22 (citation omitted)].

In response, the government contends that Lynch has failed to make a substantial showing that would entitle him to a Franks hearing.  [Doc. 341 at 29-35].  Specifically, the government argues that "[m]ost of [] [Lynch's] issues with the pole camera, such as the allegation that it occasionally recorded a different house," and his contention that the affiant "incorrectly stated that the pole camera has shown no one entering or exiting the residence since July 18, 2022," "plainly fall within the domain of omission," and "[w]hen the Court omits the information that [Lynch] allege[s] was false here, and includes the information [he] attest[s] was omitted, there was still probable cause" to support the search warrant, and the Court "thus need not hold an evidentiary hearing, because any omitted or false information was immaterial."  Id. at 30-31].  The government asserts that "[e]ach additional piece of information that [Lynch] seek[s] to introduce does not eliminate the probable cause," since, even if the warrant included information about the pole camera footage on July 20, 2022, the affiant pointed to numerous "potential pieces of evidence" that might have been overlooked and left, including large safes that were "too large to be removed by ordinary vehicles," and further, even if two individuals may have been in the house an additional two hours on

that date, "the magistrate judge would not have concluded that these individuals could have removed every item of evidentiary value in such a short period of time" given that the "house was a four-bedroom, 2,444 square foot house." [Id. at 31-32]. The government also contends that "[t]he fact that it is unclear exactly what motion may have set off the pole camera on some (unnamed) occasions is irrelevant and exactly what the magistrate judge would have expected from a motion-activated camera." [Id. at 33]. Similarly, the government argues that "[t]he fact that for eight moments in a multi-month period, the wind may have blown the pole camera towards a different residence (or some similar mishap), does not alter the probable cause to believe the house contained evidence." [Id.]. The government also asserts that because the residence was still owned by Lynch "and was in such disuse that the house's driveway was 'inaccessible,' it likely still contained [] evidence." [Id. at 33-34]. Finally, the government contends that the warrant stated probable cause even if the pole camera footage was entirely omitted. [Id. at 34-35].

In his reply brief, Lynch argues that the evidence, "reflected in the pole camera, irrefutably proves that either: (1) the affiant intentionally lied when he claimed that nobody entered the house after July 18, based on his review of the pole camera evidence[,]" or "(2) the affiant unintentionally, but recklessly, misrepresented the facts because he, and his colleagues, did not look at the pole

camera footage." [Doc. 382 at 13]. Lynch contends that the "omitted information in the affidavit substantially and materially alters the calculus [of] whether there was evidence of the crime still in the house in March 2023," since the "footage actually shows that it was *unlikely* that any evidence was likely to be found at the property in March 2023," and "[i]f the magistrate had known that [M.] Lynch had gone to the house immediately after being released from prison for a cocaine offense, any reasonable likelihood of finding *any* evidence at the location thereafter would be significantly compromised." [Id. at 14-15]. Lynch asserts that "the law is clear that when a showing is made that the affidavit omits material information, and falsely recites other material information, a *Franks* hearing is necessary to redact the false information," and "'add' the omitted information and then determine whether the repaired affidavit provides a probable cause basis to conduct the search." [Id. at 21 (citations omitted)].[10]

In Franks, the Supreme Court held that where "(i) a defendant makes a substantial preliminary showing that an affiant knowingly and intentionally included a false statement in an affidavit or made the false statement with reckless disregard of its truth, and (ii) the false statement was necessary to the finding of probable cause, then a hearing on the affidavit must be held at the defendant's

---

[10] Lynch filed a supplemental brief to correct a statement made in his reply brief. [Doc. 389].

request."  United States v. Terzado, Case No. 21-CR-60143-SMITH/VALLE, 2022 WL 4794874, at *2 (S.D. Fla. Aug. 2, 2022) (citing Franks, 438 U.S. at 155-56), adopted by 2022 WL 4764108, at *1 (S.D. Fla. Oct. 3, 2022).  This standard "also applies to material omissions of fact," and "[b]oth prongs must be satisfied to warrant a hearing."  Id. (citations omitted) (citing Madiwale v. Savaiko, 117 F.3d 1321, 1327 (11th Cir. 1997)); see also United States v. Kirton, CRIMINAL CASE NO. 1:19-CR-00022-WMR-JFK, 2019 WL 6868978, at *6 (N.D. Ga. Oct. 18, 2019) (stating Franks "is applicable to information omitted from an affidavit for a search warrant"), adopted by 2019 WL 6840132, at *1 (N.D. Ga. Dec. 16, 2019).  Further, "[t]o mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine"; "[t]here must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof."  Franks, 438 U.S. at 171.  "No Franks hearing is required, if, when the omitted information is added to the affidavit, the affidavit's content still establishes probable cause for the search."  Kirton, 2019 WL 6868978, at *6 (citations omitted).

Lynch is not entitled to a Franks hearing because he "has not made a substantial preliminary showing . . . that material information was intentionally and/or recklessly omitted from the affidavit or, alternatively, made a showing that such alleged . . . omissions undermined the probable cause otherwise set forth in

the affidavit as necessary for a <u>Franks</u> hearing to be held."  <u>Id.</u>, at *7; <u>see also</u> <u>Terzado</u>, 2022 WL 4794874, at *3 (citation omitted) (finding defendant had "not provided any offer of proof, affidavit or other sworn statement to support his allegation that the affiant intentionally or recklessly misrepresented" information in the affidavit).  "None of the claimed omitted information on its face is so clearly critical to the probable cause determination that its omission created a presumption of recklessness," and even if the information regarding the two individuals potentially in the residence on July 20, 2022, for two hours "had been included, the warrant affidavit would still have supported the probable cause determination," <u>United States v. Bivins</u>, 560 F. App'x 899, 906 (11th Cir. 2014) (per curiam) (unpublished) (citation omitted), since the affiant, a DEA special agent, attested that he believed the three vehicles observed at the residence on July 18, 2022, were sent to "remove items of monetary value to the [drug trafficking organization], specifically drugs and drug proceeds," but "due to the haste at which the suspected removal of items . . . occurred," less than 24 minutes, "there [was] probable cause to believe that evidence of the cocaine [drug trafficking organization] still remain[ed] inside," because, in his training and experience, while items of high monetary value would quickly be removed, there were numerous items, including "remnants of drug trafficking, and documentary evidence of ownership and occupancy which [did] not carry high monetary value"

and that drug traffickers did not "remove when law enforcement presence [was] imminent," [Doc. 252-1 ¶¶ 2, 26-27, 55].  Moreover, the fact that it is unclear what motion caused the pole camera to record on certain occasions or to be pointed toward a different residence on eight instances in an eight month period does not alter the probable cause determination, since, other than the brief occurrence on July 20, 2022, Lynch points to no evidence that anyone visited the residence for a substantial period of time or with a vehicle sufficient to remove every item of evidentiary value within the four-bedroom, 2,444 square foot house, nor does he point to any pole camera footage of individuals removing items from the residence after July 18, 2022.  "Thus, even if the affidavit were revised to include the omitted [information], that revised affidavit would have established probable cause to search [6470 Wright Circle]," United States v. Jones, 942 F.3d 634, 641 (4th Cir. 2019) (citation omitted), and Lynch is not entitled to a Franks hearing.

      ii.    *Probable Cause*

"The Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence exists at the place for which the warrant is requested." United States v. Betancourt, 734 F.2d 750, 754 (11th Cir. 1984) (citing Zurcher v. Stanford Daily, 436 U.S. 547, 558 (1978)); see also United States v. Cadet, Criminal Action Nos. 1:11-CR-00522-WBH-LTW, 1:11-CR-00113-WBH-LTW, 2013 WL 504892, at *4

(N.D. Ga. Jan. 16, 2013) (citation omitted), adopted sub nom. Cadet v. United States, Criminal Action Nos. 1:11-CR-113-WBH-2, 1:11-CR-552-WBH, 2013 WL 504815, at *1 (N.D. Ga. Feb. 8, 2013), aff'd, 574 F. App'x 917 (11th Cir. 2014) (per curiam) (unpublished).  That is, "[p]robable cause to search a residence requires some nexus between the premises and the alleged crime."    United States v. Graham, CASE NO.: 2:20-cr-47, 2021 WL 2593630, at *9 (S.D. Ga. June 24, 2021) (citation and internal marks omitted), adopted by 2021 WL 4352320, at *5 (S.D. Ga. Sept. 24, 2021), aff'd, No. 22-11809, 2023 WL 5011734 (11th Cir. Aug. 7, 2023).  "Probable cause deals 'with probabilities[, which are] . . . . the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  Illinois v. Gates, 462 U.S. 213, 241 (1983) (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)); see also United States v. Spann, No. 15–20070, 2015 WL 1969111, at *3 (S.D. Fla. May 1, 2015) (citation omitted), aff'd, 649 F. App'x 714 (11th Cir. 2016) (per curiam) (unpublished).[11]

---

[11] "[T]he term probable cause, . . . means less than evidence which would justify condemnation. . . . It imports a seizure made under circumstances which warrant suspicion."  New York v. P.J. Video, Inc., 475 U.S. 868, 876 (1986) (alterations in original) (citations and internal marks omitted).  "Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision."  Id. (citation and internal marks omitted).  That is, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules," Gates, 462 U.S. at 232, and "[c]ertainty has no part in a probable cause analysis," United States v. Frechette, 583 F.3d 374, 380 (6th Cir. 2009) (citation omitted).

The Eleventh Circuit has explained the Court's review of the sufficiency of a search warrant as follows:

> When called upon by law enforcement officials to determine the legitimacy of search warrants and their supporting affidavits, issuing magistrates and reviewing courts alike must strike a delicate balance between constitutional guarantees against excessive intrusions into areas of individual freedom and the Government's need to access and to secure relevant evidence in criminal prosecutions.  In particular, issuing magistrates are given the unenviable task of making "firing line" decisions that attempt to encourage availment of the warrant process while simultaneously striving to protect citizens from unwarranted governmental interference.  In recognition of the difficulty inherent in discharging this responsibility, reviewing courts lend substantial deference to an issuing magistrate's probable cause determinations.

United States v. Miller, 24 F.3d 1357, 1363 (11th Cir. 1994).  "Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner[.]"  Id. at 1361 (citation omitted).  Instead, "a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations."  Id. (citation omitted); see also United States v. McCullough, Criminal Indictment No. 1:11–CR–136–JEC/AJB–01, 2012 WL 11799871, at *13 (N.D. Ga. Oct. 9, 2012) (citations omitted), adopted by 2014 WL 3955556, at *2 (N.D. Ga. Aug. 13, 2014).  Furthermore, "[t]he fact than an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause."  United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985) (citations

omitted); see also Adams v. Williams, 407 U.S. 143, 149 (1972) (citation omitted). The burden of establishing that a search warrant is defective is upon Lynch, United States v. Lockett, 533 F. App'x 957, 965 (11th Cir. 2013) (per curiam) (unpublished) (citation omitted) ("When a search is conducted pursuant to a warrant, the burden is on the defendant to show that the warrant is invalid."); see also Franks, 438 U.S. at 171, and the Court's consideration of Lynch's facial challenge to the search warrant is confined to the four corners of the search warrant affidavit, see United States v. Schulz, 486 F. App'x 838, 841 (11th Cir. 2012) (per curiam) (unpublished) (citation omitted); Donovan v. Mosher Steel Co., Div. of Trinity Indus., 791 F.2d 1535, 1537 (11th Cir. 1986) (citation and internal marks omitted) ("[I]t is elementary that in passing on the validity of a warrant, the reviewing court may consider only information brought to the magistrate's attention — that is, within the four corners of the warrant application.").

"For probable cause to exist . . ., the information supporting [] the government's application for a search warrant must be timely, for probable cause must exist when the [] judge issues the search warrant." United States v. Harris, 20 F.3d 445, 450 (11th Cir. 1994) (citations omitted); see also United States v. Sanders, No. 1:12-cr-373-WSD-ECS, 2013 WL 3938518, at *2 (N.D. Ga. July 30, 2013) (citations omitted); Bushay, 859 F. Supp. 2d at 1378 (citations omitted). "There is no particular rule or time limit for when information becomes stale." United States

v. Bervaldi, 226 F.3d 1256, 1265 (11th Cir. 2000) (citations omitted). Instead, "[t]o evaluate staleness claims, [the Court] look[s] at the unique facts of each case and may consider the maturity of the information, the nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched." United States v. Deering, 296 F. App'x 894, 898 (11th Cir. 2008) (per curiam) (unpublished) (citation and internal marks omitted); see also United States v. Rojas-Coyotl, Criminal Action No. 1:13-cr-0128-AT-AJB, 2014 WL 1908674, at *5 (N.D. Ga. May 13, 2014) (citation omitted), adopted at *1. "As part of this, courts should recognize the difference between isolated criminal activity (for which the passage of time is more likely to diminish probable cause) and protracted or continuous criminal activity (for which the passage of time is less likely to dissipate probable cause.)." United States v. Rau, Case No. 4:18-cr-3-MLB-3, 2020 WL 7488649, at *4 (N.D. Ga. Dec. 21, 2020) (citing Bervaldi, 226 F.3d at 1265).

Lynch argues that the information contained in the affidavit was stale. [Doc. 252 at 13-14]. Specifically, Lynch asserts that the "initial seizure of cocaine described in the [] affidavit[] occurred 18 months prior to the [g]overnment seeking the search warrant" and the "surveillance of individuals at the residence recounted in the [] affidavit occurred eight months before the issuance of the search warrant," and "[w]hile the affidavit describes in great detail a conspiracy

occurring over a months-long period, there are no ongoing conspiratorial acts described relative to Wright Circle, or any other location described in the affidavit that would justify the conclusion that the facts in the affidavit were not stale." [Id. at 14]. In response, the government contends that given the "nature of the conspiracy and the nature of evidence the agents were seeking," the "disuse of the house, and the large-scale nature of the drug trafficking," the facts in the affidavit were "not stale." [Doc. 341 at 25-26]. Specifically, the government argues that "[g]iven the wide variety of items that could be evidence in a residence like 6470 Wright Circle that was used as a stash house for a vast, complex drug trafficking and money laundering group, the house was still connected to the organization and likely to contain evidence months later," and "[a]lthough the affidavit established that the organization likely stopped using the Wright Circle residence as a stash house in July 2022, there was no reason to believe that none of that potential evidence would continue to exist in the residence." [Id. at 27]. The Court agrees with the government.

Lynch's staleness argument fails given the extensive nature of the drug trafficking organization's activities and the type of evidence the agents sought and had recovered in searches of other locations during the investigation, which the affiant attested began in December 2021 and continued through at least February 6, 2023, when agents were able to download the contents of the electronic devices

of another high-ranking member of the drug trafficking organization, [Doc. 252-1 ¶¶ 8, 52-53], and thus, the longstanding and protracted "nature and size of the conspiracy militates against [ Lynch]," United States v. Davis, No. 2:12cr87–WKW, 2013 WL 322122, at *4 (M.D. Ala. Jan. 10, 2013) (citation and internal marks omitted) (stating that "[p]rotracted and continuous activity is inherent in large-scale drug trafficking operations"); Harris, 20 F.3d at 451 (upholding validity of search although affidavit referred to events that occurred two years prior because they pertained to long-term drug conspiracy).  Further, the affiant attested that "when DTOs become concerned that law enforcement agencies have or will identify their stash locations, they quickly remove items with high monetary value - such as narcotics and drug proceeds - leaving behind remnants of drug trafficking, and documentary evidence of ownership and occupancy which do not carry high monetary value," [Doc. 252-1 ¶ 27], and a review of Fulton County and Sandy Springs tax records confirmed that Lynch was still the listed owner of 6470 Wright Circle, [id. ¶ 53], when agents applied for the search warrant, seeking, among other things, "documents, phones, ledgers, packaging material, safes, scales, etc.," [id. ¶ 55].  In short, the affidavit wasn't stale because "the operation of the alleged drug ring was such that telephone, business, financial, and other records were likely to be kept which would link [Lynch] to the conspiracy. . . .

[and] [t]hese records . . . are likely to be present for some time." United States v. Williams, 897 F.2d 1034, 1039 (10th Cir.1990).

"Although most of the information contained in the affidavit referred to events which took place [months] . . . before [the agent] applied for the warrant, the affidavit nonetheless alleged a longstanding and protracted criminal conspiracy," Harris, 20 F.3d at 451 (citation omitted); see also United States v. Fisher-Bland, CRIMINAL ACTION NO. 1:17-cr-00069-SCJ-CMS-1, 2017 WL 6001514, at *4 (N.D. Ga. Nov. 16, 2017) (citations omitted) (stating that in cases in which the suspected criminal activity was not just a one-time incident, "the Eleventh Circuit has found information in search warrant applications of even lengthier delays not to be stale based upon the particular facts and circumstances of those cases," including a narcotics case and six month delay), adopted by 2017 WL 5997466, at *1 (N.D. Ga. Dec. 4, 2017), and considering the type of evidence sought and "the nature of the narcotics distribution conspiracy, the likelihood that the information was stale was diminished," United States v. Gray, No. 10–cr–20410, 2011 WL 4368843, at *3 (S.D. Fla. May 3, 2011) (citation omitted), adopted by 2011 WL 4368839, at *5 (S.D. Fla. Sept. 19, 2011); see also United States v. Gamory, Criminal File No. 1:08–CR–153–TWT, 2009 WL 855948, at *22 (N.D. Ga. Mar. 30, 2009) (finding "that the information contained in [the] affidavit was not

fatally stale because it pertained to an ongoing drug trafficking operation"), aff'd,

635 F.3d 480 (11th Cir. 2011).

Contrary to Lynch's contentions, the affidavit submitted in support of the

March 2, 2023, search warrant provided sufficient facts to establish probable cause

to believe that evidence involving the alleged drug trafficking organization would

be found in 6470 Wright Circle.  The affiant described the evidence developed

during the investigation that established probable cause to believe the residence

contained evidence related to the drug trafficking organization, including that

Lynch was identified as one of the leaders of the organization and a source of a

confidential informant's "supply for cocaine in several states throughout the

United States for several months"; that geolocation data for a cellphone associated

with Lynch placed the cellphone at 6470 Wright Circle on May 1, 2022, and

surveillance that day confirmed Lynch was present at the home; that agents were

in possession of a photograph of ledgers of narcotics transactions that was taken

at 6470 Wright Circle on May 1, 2022; that on June 24, 2022, agents observed M.

Lynch arriving at the residence with an empty black duffel bag and leaving the

residence 18 minutes later with the black duffel bag that "appeared to be full and

very heavy," and after he and another individual drove off in a black Camry,

agents attempted to follow the vehicle, but it "conducted numerous counter-

surveillance maneuvers"; that on July 18, 2022, after the arrest of M. Lynch and

execution of a search warrant at 5253 Rosewood Place, the pole camera in the vicinity of 6470 Wright Circle recorded the arrival of three vehicles at the residence, which the affiant believed were sent to "remove items of monetary value to the [organization], specifically drugs and drug proceeds," but "due to the haste at which the suspected removal of items . . . occurred . . . , there [was] probable cause to believe that evidence of the cocaine [drug trafficking organization] still remain[ed] inside"; that although Egan was observed at the residence for ten minutes on the evening July 18, 2022, a traffic stop conducted shortly after she left the residence and search of her vehicle "yielded nothing of evidentiary value," and that during this traffic stop, Egan informed agents that there was an upstairs room in 6470 Wright Circle that remained locked and required a key to gain access, but that she was not allowed in that room; that after the search warrant was executed on January 9, 2023, at Gwinn's home, Gwinn, who agreed to speak with agents, informed agents that the drug trafficking organization was run by Earl, Lynch, and another individual; that a review of Fulton County and Sandy Springs tax records confirmed that Lynch was still the listed owner of 6470 Wright Circle; and that the investigation into the drug trafficking organization continued nationally after July 18 and was still ongoing as of the date of the affidavit.  [Doc. 252-1 ¶¶ 8, 10, 17, 20-21, 24, 26-29, 31-32, 50, 52-53; see also [id. ¶¶ 33-55].  The affiant further provided information regarding his

training and experience with narcotics trafficking investigations and detailed particular characteristics typically associated with drug traffickers. [Id. ¶¶ 2-7]. The affiant explained that "[b]ased on [his] knowledge, training, and professional experience, when [drug trafficking organizations] become concerned that law enforcement agencies have or will identify their stash locations, they quickly remove items with high monetary value – such as narcotics and drug proceeds – leaving behind remnants of drug trafficking" and "documentary evidence of ownership and occupancy which do not carry high monetary value." [Id. ¶¶ 27, 55].

Contrary to Lynch's arguments, the facts set forth in the affidavit established probable cause to believe that evidence of the drug trafficking organization remained at 6470 Wright Circle, and the affiant's training and experience regarding the behavior of drug traffickers provided adequate support for the Magistrate Judge's finding that the affidavit established probable cause to search the residence on March 2, 2023, see United States v. Cunningham, 633 F. App'x 920, 922 (11th Cir. 2015) (per curiam) (unpublished) (finding probable cause supported the police's search warrant for defendant's home where the police had evidence that he "was involved in drug trafficking and law enforcement officials attested that, based on their significant experience with drug investigations, drug traffickers often store[d] evidence of their crimes in their homes"); United States

v. Mobely, CRIMINAL ACTION FILE NO. 1:16-CR-145-TWT-JKL-6, 2017 WL 10574358, at *16 (N.D. Ga. Oct. 26, 2017) (citation omitted) (stating that "[c]ommon sense tells us that a person suspected of criminal activity 'tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained' and that one's residence is such a place"), adopted by 2018 WL 5077755, at *1 (N.D. Ga. Oct. 18, 2018); United States v. Lisbon, 835 F. Supp. 2d 1329, 1347, 1350 (N.D. Ga. 2011) (finding probable cause supported the magistrate judge's conclusion "that there was sufficient reason to believe that evidence of [defendant's] drug trafficking would be found at [his residence]" where the "affidavit clearly established that [he] had committed violations of 21 U.S.C. §§ 841 and 846" and "demonstrated that the . . . apartment was one of [his] residences," in addition to the fact that the affiant of the affidavit in support of the warrant "had extensive experience in investigating drug traffickers and averred that the residence was a likely hiding place for contraband and evidence of [his] crime"), aff'd sub nom. United States v. Moreno, 559 F. App'x 940 (11th Cir. 2014) (per curiam) (unpublished).  In short, the affidavit included sufficient information to establish probable cause to believe that evidence related to the drug trafficking organization would be located at 6470 Wright Circle. Therefore, Lynch's contention that the affidavit did not establish probable cause to search the residence is without merit.

36

### iii.    *Good Faith Exception*

Even were the search warrant at issue found to be invalid, suppression of the evidence seized from the residence would not be warranted because the agents executing the warrant reasonably relied in good faith on the validity of the warrant.  See United States v. Leon, 468 U.S. 897, 919-21 (1984).  Under Leon, "the exclusionary rule should not be applied to exclude evidence seized pursuant to a defective search warrant if the officers conducting the search acted in 'objectively reasonable reliance' on the warrant and the warrant was issued by a detached and neutral magistrate."   United States v. Sharp, Civil Action File No. 1:14–cr–229–TCB, 2015 WL 4641537, at *14 n.18 (N.D. Ga. Aug. 4, 2015) (citation and internal marks omitted), adopted at *5; see also United States v. Robinson, 336 F.3d 1293, 1295-96 (11th Cir. 2003) (citation omitted).

There are four exceptions to the Leon good-faith doctrine:

(1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for [her] reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 . . . (1979); (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient- i.e., in failing to particularize the place to be searched or the things to be seized-that the executing officers cannot reasonably presume it to be valid.

United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002) (citation and internal marks omitted).  Lynch appears to argue that the third exception applies in this case.  [Doc. 382 at 21].[12]  "'To exclude evidence on this ground, the affidavit must be so clearly insufficient that it provided no hint as to why police believed they would find incriminating evidence.'"  United States v. Ray, 7:24-cr-00073-ACA-JHE-1, 2024 WL 4614017, at *8 (N.D. Ala. Sept. 26, 2024) (quoting United States v. McCall, 84 F.4th 1317, 1325 (11th Cir. 2023)), adopted by 2024 WL 4604376, at *1 (N.D. Ala. Oct. 29, 2024).  However, "[f]or the reasons already discussed, there was sufficient probable cause set forth in the affidavit to support issuance of the search warrant for the residence," United States v. Latorre, CRIMINAL CASE NO. 1:20-cr-00272-ELR-RGV, 2020 WL 7685935, at *7 (N.D. Ga. Nov. 23, 2020) (alteration, citation, and internal marks omitted), adopted by 2020 WL 7351222, at *1 (N.D. Ga. Dec. 15, 2020), and "the same facts that support probable cause also supply the indicia of probable cause [Lynch] claims [to be] missing," Ray, 2024 WL 4614017,

---

[12] Lynch also appears to argue that the first exception applies in this case, [Doc. 382 at 22], but for the reasons previously discussed with respect to his request for a Franks hearing, this exception does not apply.  Indeed, the "first, second and fourth circumstance are not present here—[Lynch] has not shown that [the affiant] misled the issuing judge; there is no evidence that the issuing judge abandoned [her] judicial role in issuing the warrant; and the warrant sufficiently describes the person, premises, and property to be searched, and the things to be seized." United States v. Mayfield, Criminal Action No. 2:16-CR-009-RWS-JCF, Criminal Action No. 2:16-CR-0010-RWS-JCF, 2018 WL 11229147, at *3 (N.D. Ga. May 11, 2018) (citation omitted), adopted by 2018 WL 3371115, at *1 (N.D. Ga. July 10, 2018).

at *9.  That is, even if the affidavit "was lacking in probable cause[,] there is certainly an indicia of probable cause," since "[t]here are sufficient, particularized allegations, which lead this Court to conclude that the third scenario would not apply here."  United States v. Gayden, Case No: 6:16-cr-187-Orl-41TBS, 2018 WL 8809238, at *10 (M.D. Fla. June 7, 2018), aff'd, 977 F.3d 1146 (11th Cir. 2020).  "Accordingly, the agents executing the warrant were justified in believing in its validity, and evidence seized during the execution would not be subject to suppression under the good faith exception even if the warrant were found to lack probable cause."  Latorre, 2020 WL 7685935, at *7 (citation omitted).

## B.    Motions to Suppress as to 10 Center Street

### 1.    Standing

#### i.    *Earl*

In his motions to adopt co-defendants Johnson and Washington's motions to suppress, [Docs. 256 & 257], Earl contends that he has standing to challenge the search of 10 Center Street, [Doc. 256 at 1-5; Doc. 257 at 1-5].  Specifically, Earl asserts that he has standing to challenge the search of 10 Center Street as an overnight guest, [Doc. 256 at 3; Doc. 257 at 3].  Earl attached to his motions multiple exhibits, including an affidavit by Earl that Johnson, his longtime girlfriend who leased 10 Center Street, provided him a key to the address and allowed him unfettered access to the home, and that he returned to 10 Center Street after the

police finished conducting their investigation of the shooting that occurred and used the key he was provided to enter the residence and determine whether any of his personal belongings remained there.  [Doc. 256-2 (Earl Aff.) ¶¶ 2-3, 11-12].

In its response regarding 10 Center Street, the government argues that Earl has not "made the threshold showing of a reasonable expectation of privacy that the Supreme Court requires of defendants."  [Doc. 340 at 4].  Specifically, the government contends that Earl failed to establish that he was an overnight guest at 10 Center Street at the time the warrant was executed, since he did not submit any direct evidence that Johnson gave him permission, and while he submitted an affidavit claiming that Johnson granted him permission, he did not testify at the evidentiary hearing, so the Court should disregard his affidavit.  [Id. at 9-10 & n.3].  The government also asserts that Earl did not show that Johnson could legitimately allow him to be an overnight guest at the residence since renters are commonly restricted with respect to who can stay at a rented residence, and Earl did not submit the lease agreement or any other evidence that Johnson could permit him to stay at the residence, and Earl's drug trafficking activities at the residence "surely exceeded the rights the owner provide Johnson in the lease, making [his] presence illegitimate."   [Id. at 11 (citations omitted)].   The government argues that "[w]hatever expectation of privacy Earl had at 10 Center Street during [his] trip [with his son] had long dissipated by the time of the search

40

warrant," and Earl's self-serving affidavit stating that he spent the night at the residence the day before the search should be disregarded because he did not testify.  [Id. at 12-13 (citations omitted)].  The government contends that while it does not dispute that certain items were found at 10 Center Street when the warrant was executed, the items "show that Earl was in the house at some point, but do not prove that he was an overnight guest at the house at the time of the search."  [Id. at 13-14 (citation omitted)].  Finally, the government asserts that even if Earl showed he was an overnight guest, his expectation of privacy at 10 Center Street diminished by its status as a drug stash house, and further, he did not show standing in the safes.  [Id. at 15-17].  In his reply brief, Earl points out that his affidavit was admitted into evidence without objection at the evidentiary hearing, and he argues that the facts in the affidavit satisfy his burden of proving he had a reasonable expectation of privacy in the premises.  [Doc. 396 at 2, 4].

First, "[t]he Court concludes that [Earl] has submitted sufficient evidence to show that he had a legitimate expectation of privacy with respect to [10 Center Street]." United States v. Ray, 541 F. Supp. 3d 355, 380 (S.D.N.Y. 2021).  At the very least, Earl's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." Minnesota v. Olson, 495 U.S. 91, 96-97 (1990).  Because "[o]vernight guests are among persons courts have recognized as having a reasonable

expectation of privacy[,]" <u>United States v. Gaitor</u>, 2:20-CR-33, 2021 WL 3683897, at

*2 (E.D. Tenn. July 16, 2021) (citation omitted), adopted by 2021 WL 3268362, at *3

(E.D. Tenn. July 31, 2021); <u>see also</u> <u>United States v. Maxi</u>, 886 F.3d 1318, 1326 (11th

Cir. 2018) (citation omitted) ("An overnight guest has a reasonable expectation of

privacy in a residence sufficient to establish standing."), it "is not necessary that

the defendant own the home or be a signatory on a lease or rental agreement; even

an overnight guest can have a Fourth Amendment right when he resides at a home

'with the permission of his host, who is willing to share [her] house and [her]

privacy with [her] guest,'" <u>Ray</u>, 541 F. Supp. 3d at 380 (citation omitted) (quoting

<u>Olson</u>, 495 U.S. at 99)).

Earl submitted an affidavit in which he attested that Johnson, his longtime

girlfriend who leased 10 Center Street, provided him a key to the residence and

allowed him unfettered access to the home.  [Doc. 256-2 ¶¶ 2-3.  Earl also attested

that he stayed at the residence with his son less than two weeks before the

execution of the search warrant, [<u>id.</u> ¶¶ 4-6], and that he stayed at the residence

the night before the attempted murder and home invasion, [<u>id.</u> ¶¶ 7-8], and had

left his clothing, embroidered backpack, medication, and personal items at the

residence on July 7 while he went to visit friends, [<u>id.</u> ¶ 9].  Moreover, as Earl points

out, the government did not object to the admission of Earl's affidavit at the

evidentiary hearing.  [Doc. 324 at 54-55].  "On these facts, [ Earl] had reasonable

expectations of privacy in [10 Center Street]." Maxi, 886 F.3d at 1326 (finding the defendant had standing to challenge the search of a duplex where he testified that he lived at both the duplex and his father's house; lived intermittently at the duplex for the prior three to six months; paid half the rent to the duplex; had a key; and kept certain documents at the duplex, including his Social Security papers, and stating that defendant "was more than just an overnight guest—he was effectively a subtenant"); see also Zayas-Acosta v. Sec'y, Dep't of Corr., Case No. 8:20-cv-2793-SDM-AAS, 2024 WL 987606, at *7 (M.D. Fla. Mar. 7, 2024) (citations omitted) (finding defendant "held a legitimate expectation of privacy in the residence and had standing to challenge the search of the residence" where the record demonstrated that defendant, "who was [the homeowner's] friend, stayed at [the homeowner's] home for two weeks before the search occurred"); Ray, 541 F. Supp. 3d at 381 (citations omitted) (finding defendant had "said enough to satisfy the constitutional standard for establishing that he had a legitimate expectation of privacy that was implicated by the [g]overnment's search" where he submitted two declarations in which he averred that he lived at the residence before he was arrested and incarcerated; he was asleep at the residence when agents arrived to conduct the search; and he described the residence as his home); United States v. Estrada, Criminal Action No. 1:06–CR–358–RWS–ECS, 2010 WL 6434088, at *2 n.2 (N.D. Ga. Aug. 2, 2010) (citation omitted) (finding that defendant

"provided an affidavit attesting to facts which make a prima facie showing of standing as to [the] residence [of his co-defendant], namely, that he had keys to and was regularly an overnight guest at the apartment; that he contributed to the rent; and that he kept personal items there"), adopted by 2011 WL 1258481, at *1 (N.D. Ga. Apr. 4, 2011); United States v. Bellamy, No. 8:10–cr–58–T–23TBM, 2010 WL 3610437, at *2, *4 (M.D. Fla. June 16, 2010) (citation omitted) (finding defendant "had a justifiable expectation of privacy in the premises at the time the deputies entered the apartment" where he "stayed at [the] apartment on and off and he had stayed there the night before along with his children"), adopted by 2010 WL 3610248, at *1 (M.D. Fla. Sept. 14, 2010), aff'd, 456 F. App'x 863 (11th Cir. 2012) (per curiam) (unpublished).  Accordingly, "the Court will proceed to the merits of his arguments for suppression of the evidence seized from [this] residence[.]" Latorre, 2020 WL 7685935, at *4 (citation omitted).

      **ii.**     *Washington*

Washington asserts that he has standing to challenge the search of 10 Center Street as an overnight guest.  [Doc. 253 at 3-5].  Specifically, Washington contends that he has a legitimate expectation of privacy in the residence because his wallet containing his driver's license and credit cards was present in one of the bedrooms in the residence; he was there with the permission of Palacios, who was lawfully residing at the residence at that time and with the permission and knowledge of

the leaseholder, Johnson; he returned to the residence on July 7 during the robbery and attempted murder before fleeing, which reflects "his intention to return to the residence and [] demonstrates that he had unfettered access and control of the residence." [Id.]. Washington asserts that as "a welcome guest, he had a reasonable expectation of privacy in the residence of 10 Center Street and thereby has standing to challenge the search conducted on the premises." [Id. at 5].

The Court held a status conference on February 28, 2025, and scheduled an evidentiary hearing to establish Washington's standing with respect to 10 Center Street. [Doc. 278 at 3]. At the evidentiary hearing held on June 3, 2025, Washington did not testify and withdrew the two unsigned declarations attached to his standing brief, and he indicated that he was going to rely on the exhibits attached to the brief. (Tr. at 6); see also [Docs. 253-2 & 253-5]. The government has since filed a response to Washington's motion to suppress as to 10 Center Street, arguing that Washington failed to make a threshold showing of a reasonable expectation of privacy and thus lacks standing to challenge the warrant. [Doc. 340 at 4-12, 14-17]. Specifically, the government contends that Washington failed to establish that he was an overnight guest at 10 Center Street at the time the warrant was executed, since, although he claims Johnson gave him permission to use and stay at 10 Center Street, he did not submit any direct evidence that Johnson gave him permission; he did not testify, nor did anyone who had direct knowledge that she

authorized him to use the residence; and he has not shown that Johnson could legitimately allow him to be an overnight guest at the residence.  [Id. at 9-10].  The government asserts that although items belonging to Washington were found at 10 Center Street, "[i]tems alone do not create standing, nor does the fact that someone entered the house at least once[,]" and even if Washington had shown that he was an overnight guest, his expectation of privacy was diminished by 10 Center Street's status as a drug stash house.  [Id. at 14-17 (citation omitted)].  Finally, the government argues that even if Washington showed that he had a reasonable expectation of privacy in 10 Center Street, he did not show standing in the safes.  [Id. at 17].

In his reply brief, Washington contends that the evidence "before the Court demonstrates that [ he] could come and go as he pleased (he walked out of the residence, drove away, came back and started to enter the house) and that he had personal items, including his wallet and clothing[,] in a bedroom that was clearly used for sleeping."  [Doc. 386 at 3].  Washington asserts that the government "has not demonstrated 10 Center Street was predominantly or mainly used for drug distribution," and its "attempt at demonstrating [the residence ] was a stash house is fatally flawed," since it "shifts its burden" and "has produced no evidence to establish [the residence ] was a stash house."  [Id. at 7-8 (footnote omitted)].  Finally, Washington argues that the government "is just wrong when it asserts that

[] [he] must establish he has standing to challenge the search of the safes," since, "as an overnight guest, [he] has standing to challenge the search of the entire residence."  [Id. at 9 (citations omitted)].

Although Washington asserts that he has standing to challenge the search of 10 Center Street, he has "presented no evidence supporting any reasonable expectation of privacy in the [residence]," and his "failure to present any evidence indicating an expectation of privacy in the [residence] means that he has not met his baseline burden to show standing to contest the search."  United States v. Jenkins, 743 F. App'x 636, 648 (6th Cir. 2018) (unpublished) (footnote and citation omitted); see also United States v. Caymen, 404 F.3d 1196, 1200 (9th Cir. 2005) (finding defendant failed to "carr[y] his burden of proof to establish an 'acceptable' expectation of privacy in the laptop" where he "did not submit an affidavit or other evidence supporting his claim that he had honestly purchased and owned the laptop" and while he "did make such a claim to the police during their search of his room, that claim was, of course, unsworn"); United States v. Bourassa, CRIMINAL ACTION FILE NO. 4:18-CR-0003-MLB-WEJ-1, 2019 WL 7559294, at *8 & n.12 (N.D. Ga. May 20, 2019) (rejecting defendant's argument that he had standing to contest the search of the residence as both an overnight guest and as a tenant where he failed to support either argument with any evidence and they lacked support in the record), adopted in part by 2019 WL 5288137, at *8 (N.D. Ga.

Oct. 18, 2019).   Washington contends that he was at the residence with the permission of Palacios and that he attempted to return to the residence during the robbery and attempted murder, but he has not provided any evidence to corroborate his assertion regarding being a guest, and he cannot establish standing by relying on the unsworn representations of his counsel or the government's allegations; instead, he must affirmatively "allege facts that, if proved, would require the grant of relief."   United States v. Lewis, Criminal No. 07-00266-CG, 2007 WL 2996347, at *1 (S.D. Ala. Oct. 12, 2007) (citations and internal marks omitted); see also United States v. Thompson, 171 F. App'x 823, 828 (11th Cir. 2006) (per curiam) (unpublished) (internal marks omitted) (finding that where the only fact the defendant alleged in his motion to suppress relating to standing was that the "government contend[ed]" he was renting the room that was searched was not sufficient to establish standing); United States v. Singleton, 987 F.2d 1444, 1449 (9th Cir. 1993) (concluding that "the district court erred by relying solely on the government's theory of the case in finding that [defendant] had standing to contest the search").   It was Washington's burden to demonstrate standing, but he failed to do so by not presenting any evidence.   See United States v. Starks, CRIMINAL CASE NO. 3:18-cr-00005-TCB-RGV, 2018 WL 7918058, at *3 (N.D. Ga. Dec. 4, 2018) (citations and internal marks omitted) (defendant's "failure to present any evidence indicating an expectation of privacy in the [vehicle] means that he has

not met his baseline burden to show standing to contest the search"), adopted by 2019 WL 410472, at *3 (N.D. Ga. Feb. 1, 2019); <u>United States v. Flournoy</u>, CRIMINAL INDICTMENT NO.: 1:15-CR-005-SCJ-JSA, 2015 WL 13736234, at *2 (N.D. Ga. Aug. 3, 2015) (citation omitted) (stating that "a defendant contesting a search of a borrowed car must establish with at least circumstantial evidence that he had the permission of the owner"), adopted by 2016 WL 4764823, at *2 (N.D. Ga. Sept. 12, 2016).  Accordingly, Washington has failed to carry his burden of demonstrating that he had a legitimate expectation of privacy in 10 Center Street at the time of the search.[13]

### 2.    Merits of the Motions to Suppress as to 10 Center Street

Washington moves to suppress evidence seized on July 8, 2022, from the search of 10 Center Street, [Doc. 217], and Earl has filed motions to adopt Johnson and Washington's amended motions to suppress as to 10 Center Street, [Docs. 256 & 257]; <u>see also</u> [Docs. 217 & 226].  Washington argues that the search of the safes located in the residence was warrantless because "[n]owhere in the search warrant that was obtained for the search of 10 Center Street[] [was] law enforcement given the authority to open the locked safes within the residence."  [Doc. 217 at 8-11]. Washington also argues that the warrant was not supported by probable cause

---

[13] Although Washington has not established standing, the Court will address the merits of the arguments briefed by the parties regarding the motions to suppress evidence seized from 10 Center Street, which Earl adopted.

because the certificate in lieu of oath in support of the search warrant failed "to set forth sufficient facts to establish probable cause to believe some of the items sought would: (1) contain evidence of the criminal activity alleged; or, (2) would be found within the residence."  [Id. at 11-15].

In response to Washington's motion, the government argues that probable cause supported the warrant as law enforcement officers "had far more than a fair probability that evidence of crimes they knew occurred inside the house would be located inside the house."  [Doc. 340 at 18-19].  Specifically, the government contends that officers "knew that an armed robbery and attempted murder had occurred within 10 Center Street"; Palacios, the victim, "told them he had been attacked within the house, as the intruders sought codes to safes"; the "blood tr[ai]l began in the house and then continued outside, to where police found Palacios bleeding"; and the "nature of the robbery—the assailants used long guns, wore law enforcement-style jackets, and sought information about specific safes— indicated that this was a targeted robbery, not a random crime."  [Id. (citations omitted)].  The government asserts that the "sophisticated nature of the robbery and the suspicious circumstances observed during the protective sweep gave more than sufficient basis to believe that there would be additional evidence in the house."  [Id. at 19].  The government also argues that the warrant was not overbroad, as it contained a sufficient nexus with the items to be seized and

authorized the search of the safes.  [Id. at 19-23].  Specifically, the government contends that the detective "established that a sophisticated armed robbery occurred [at] 10 Center Street[,] not a random robbery" since the "individuals appeared to know that there were safes in the house and sought the codes for them"; the "strange set up of the room with two safes and a chair—and nothing else—which officers observed during the protective sweep further established that the house was targeted for a particular reason."  [Id. at 20 (citations omitted)].  The government asserts that the warrant "authorized law enforcement to enter locked containers, including the safes"; the "assumption that the assailants did not enter the safes—even if assumed to be true—did not mean the safes contained no evidence"; and "given the targeted nature of the robbery, it was rational to expect that the safes could contain evidence."  [Id. at 22-23 (citation omitted)].  Finally, the government argues that even if the warrant lacked probable cause, suppression is not an appropriate remedy because the good faith exception to the exclusionary rule would apply.  [Id. at 23-24].

In his reply brief, Washington argues that there "is no nexus between the safes and evidence for the crimes of [a]ttempted [m]urder, [a]rmed [r]obbery or [p]ossession of a [w]eapon for an [u]nlawful purpose."  [Doc. 386 at 11].  Washington asserts that "nowhere in the warrant does it say law enforcement may enter the safes," and in fact, "safes are not mentioned anywhere in the warrant,"

and the "fact that the judge gave permission to open only electronic devices is evidence the warrant did not authorize law enforcement to open the safes." [Id. at 13]. Washington also contends that the "good faith exception does not apply where a warrant is so defective that no reasonable law enforcement officer would rely upon it," and here, the "safes were locked when the protective sweep was conducted," and law enforcement "maintained control of the premises." [Id. at 14 (citation omitted)]. Washington thus maintains that "the robbers could not have entered the safes and, as a consequence, there could be no evidence of the crimes of [a]ttempted [m]urder, [a]rmed [r]obbery, or [p]ossession of a [w]eapon for an [u]nlawful purpose inside of the safe," and thus, "the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." [Id. at 14-15 (footnote and citation omitted)]. Earl has also filed a reply to the government's opposition to the motion to suppress evidence seized at 10 Center Street, [Doc. 396], arguing that the government's reliance on the good faith exception is misplaced, [id. at 6-7].

      i.     *Probable Cause*

As previously explained, "[t]he Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence exists at the place for which the warrant is requested," Betancourt, 734 F.2d at 754 (citation omitted), and therefore,

"[p]robable cause to search a residence requires some nexus between the premises and the alleged crime," <u>Graham</u>, 2021 WL 2593630, at *9 (citation and internal marks omitted).  Moreover, "[c]ourts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner," and instead, should employ a "realistic and commonsense approach."  <u>Miller</u>, 24 F.3d at 1361 (citation omitted).  The burden of establishing that a search warrant is defective is upon Washington, <u>Lockett</u>, 533 F. App'x at 965 (citation omitted) ("When a search is conducted pursuant to a warrant, the burden is on the defendant to show that the warrant is invalid."), and the Court's consideration of Washington's facial challenge to the search warrant is confined to the four corners of the search warrant affidavit, <u>see</u> <u>Schulz</u>, 486 F. App'x at 841 (citation omitted).

Contrary to Washington's contentions, the certification in lieu of oath submitted in support of the July 8, 2022, search warrant provided sufficient facts to establish probable cause to believe that evidence involving the attempted murder of Palacios and armed robbery would be found in 10 Center Street.  The affiant described the evidence developed during the investigation that established probable cause to believe the residence contained evidence related to the attempted murder and armed robbery, including that on July 7, 2022, law enforcement received multiple 911 calls reporting a disturbance at 10 Center Street and "multiple actors with weapons on scene"; when officers responded to the

residence, they discovered Palacios lying on his stomach at the opening of the garage with multiple gunshot wounds to his leg and back; Palacios indicated that he did not know if anyone else was inside the residence; Palacios informed an officer that "the parties responsible for the incident were looking for codes to safes located inside the residence that he did not know"; an officer entered the residence through the garage and discovered two large safes and a chair in the middle of the room; underneath the chair was an unknown amount of U.S. currency and a trail of blood that led into the garage where Palacios was found; camera footage revealed three potential suspect vehicles and multiple suspects with one suspect carrying a long gun; and multiple witnesses reported that at least one of the fleeing suspects was wearing a law enforcement style raid jacket.  [Doc. 217-1 ¶¶ 15, 17-18].    The affiant further provided information regarding his training and experience with conducting investigations involving death and serious bodily injury, fraud-related investigations, and robbery and homicide investigations.  [Id. ¶¶ 10-14].  The affiant concluded that it was his "belief that there are items of evidentiary value located within the residence of 10 Center Street . . . related to the attempted homicide of [] Palacios," and that "a search of 10 Center Street . . . will further this investigation and provide additional probable cause in this attempted homicide investigation."  [Id. ¶ 19].

Thus, contrary to Washington's arguments, the facts set forth in the affidavit established probable cause to believe that evidence related to the attempted murder and armed robbery remained at 10 Center Street, and the affiant's training and experience regarding robbery and homicide investigations provided adequate support for the judge's finding that the affidavit established probable cause to search the residence and safes within the residence on July 8, 2022.  See United States v. Lewis, CR 23-143-BLG-SPW, 2025 WL 2777579, at *3 (D. Mont. Sept. 29, 2025) (finding search warrants supported by probable cause where, "[a]lthough the warrants contained relatively limited detail, the discovery of a dead body in [defendant's] trailer, accompanied by signs of 'foul play,' provided a sufficient basis for the court to conclude that probable cause existed to believe a homicide had occurred at that location" and the court "reasonably concluded that the death resulted from a violent criminal act and that evidence related to the cause of death would likely be found in the trailer where the body was discovered").  Moreover, although Washington argues otherwise, the search of the safes was supported by probable cause since the safes were a central part of the affidavit submitted in support of the search warrant and appeared to be the object of the criminal conduct, and it was reasonable to conclude that "evidence related to the cause of [the attempted murder and armed robbery] would likely be found in the [residence] where [ Palacios] was discovered," id., or in the safes that were

targeted, see Belitsky v. United States, Case No: 2:15–cv–298–FtM–29CM, Case No. 2:09–CR–14–FTM–29UAM, 2018 WL 2317796, at *4-5 (S.D. Fla. May 22, 2018) (citation omitted) (explaining that "a search may be extensive as reasonably necessary as required to locate the items described in the warrant, and is generally not limited by the possibility that separate acts of entry or opening may be required to complete the search," and the Eleventh Circuit "has held that a warrant to search a specific area for a certain class of things authorizes government agents to break open locked containers which may contain the objects of the search" and finding that the search warrant at issue "certainly authorized the officers to search the contents of the safe, which obviously could have contained [the] item" to be searched and seized), aff'd, 566 F. App'x 777 (11th Cir. 2014) (per curiam) (unpublished); see also United States v. Alfred, 1:16-cr-245-WSD-JFK-1, 2017 WL 3575004, at *8 (N.D. Ga. Aug. 17, 2017) (quoting United States v. Folk, 754 F.3d 905, 911 (11th Cir. 2014)) ("[O]fficers are 'permitted to break open locked containers which may contain the objects of the search[.]'"); United States v. Tapia, Criminal Action No. 12–03009–02–CR–S–DW, 2012 WL 5904316, at *1 (W.D. Mo. Nov. 2, 2012) (explaining that the search warrant "provided the officers broad authority to search for evidence of illegal drug activity" and the "law allows, in such circumstances, officers to open closets, chests, drawers, and containers in which drugs and other contraband might be found, regardless of the nature of the

container or whether it is locked or not"), adopted by 2012 WL 5904517, at *1 (W.D. Mo. Nov. 26, 2012); United States v. Carlisle, No. 1:06-CR-65 WCL, 2007 WL 1834005, at *4 (N.D. Ind. June 26, 2007) (finding that "although the warrant [ was] broad, it [was] not impermissibly so," the "items the search warrant sought to uncover included hallmarks of drug crimes and clearly these items could have been concealed throughout various rooms in the [d]efendant's residence and inside a safe," and it "matter[ed] little that officers had to obtain both a key and a combination to open the safe").   In short, the affidavit included sufficient information to establish probable cause to believe that evidence related to the attempted murder and armed robbery would be located at 10 Center Street. Therefore, Washington's contention that the affidavit did not establish probable cause to search the residence, or the safes within the residence, is without merit.

### ii.    *Good Faith Exception*

Even were the search warrant at issue found to be invalid, suppression of the evidence seized from the residence would not be warranted because the agents executing the warrant reasonably relied in good faith on the validity of the warrant.  See Leon, 468 U.S. at 919-21.  As previously explained, under Leon, "the exclusionary rule should not be applied to exclude evidence seized pursuant to a defective search warrant if the officers conducting the search acted in 'objectively reasonable reliance' on the warrant and the warrant was issued by a detached and

neutral magistrate." Sharp, 2015 WL 4641537, at *14 n.18 (citation and internal marks omitted). Washington appears to argue that the third exception to the Leon good-faith doctrine applies in this case, [Doc. 386 at 14-15],[14] and "'[t]o exclude evidence on this ground, the affidavit must be so clearly insufficient that it provided no hint as to why police believed they would find incriminating evidence,'" Ray, 2024 WL 4614017, at *8 (citation omitted). However, "[f]or the reasons already discussed, there was sufficient probable cause set forth in the affidavit to support issuance of the search warrant for the residence," Latorre, 2020 WL 7685935, at *7 (alteration, citation, and internal marks omitted), and "the same facts that support probable cause also supply the indicia of probable cause [Washington] claims [to be] missing," Ray, 2024 WL 4614017, at *9. That is, even if the affidavit "was lacking in probable cause[,] there is certainly an indicia of probable cause," since "[t]here are sufficient, particularized allegations, which lead this Court to conclude that the third scenario would not apply here." Gayden, 2018 WL 8809238, at *10. "Accordingly, the agents executing the warrant were justified in believing in its validity, and evidence seized during the execution

---

[14] Further, the "first, second and fourth circumstance are not present here— [Washington] has not shown that [the affiant] misled the issuing judge; there is no evidence that the issuing judge abandoned his judicial role in issuing the warrant; and the warrant sufficiently describes the person, premises, and property to be searched, and the things to be seized." Mayfield, 2018 WL 11229147, at *3 (citation omitted).

would not be subject to suppression under the good faith exception even if the warrant were found to lack probable cause." Latorre, 2020 WL 7685935, at *7 (citation omitted).

## III. CONCLUSION

For the foregoing reasons, Earl's motion to adopt as to 6470 Wright Circle, [Doc. 254], is **DENIED**; Earl's motions to adopt as to 10 Center Street, [Docs. 256 & 257], are **GRANTED**; and it is **RECOMMENDED** that Earl, Lynch, and Washington's motions to suppress, [Doc. 216, 217, & 252], be **DENIED**.

The remaining motions filed by these and other co-defendants in this case are addressed in separate Reports and Recommendations, and once all the pretrial motions have been addressed, the case will be certified as Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 13th day of February, 2026.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE