## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA    ::

    ::    CRIMINAL CASE NO.

    v.    ::    1:23-cr-00335-MLB-RGV

    ::

MARIO J. EARL    ::


## <u>MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER</u>

Defendant Mario J. Earl ("Earl") is named along with eight co-defendants in a seven-count criminal indictment that charges Earl with conspiring to possess with intent to distribute a controlled substance and to open, lease, rent, use, and maintain a place for the purpose of distributing a controlled substance, in violation of 21 U.S.C. § 846; two counts of knowingly possessing with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; one count of knowingly possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i); and one count of conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h). [Doc. 1].[1] Earl has filed a motion to suppress evidence seized from the search of a vehicle and two

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

residences in Washington, [Doc. 215], in addition to a motion to amend the suppression motion, [Doc. 259], to which the government has responded, [Doc. 338], and Earl has filed a reply in support of his motion, [Doc. 405].  Earl filed a second motion to suppress evidence seized from two residences in Georgia, storage units in Washington, a phone number, and an iPhone, [Doc. 216],[2] in addition to a motion to amend the suppression motion which sought a 30-day extension to perfect the motion, [Doc. 262], which the Court granted, see [Doc. 278 at 2].  Finally, Earl has filed a motion requesting a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978), [Doc. 406], which he amended, [Doc. 408], and the government opposes, [Doc. 420].    For the reasons that follow, it is **RECOMMENDED** that Earl's motions to suppress, [Docs. 215 & 216], and amended motion, [Doc. 259], as well as his motion requesting a Franks hearing, [Doc. 406], as amended, [Doc. 408], be **DENIED**.

---

[2] Earl's motion to suppress with respect to the search of 6470 Wright Circle, Sandy Springs, Georgia ("6470 Wright Circle") is addressed in a separate Report and Recommendation, see [Doc. 422], along with his motions to adopt the suppression motions of co-defendants Ramondo Lynch ("Lynch"), Turomne Washington ("Washington"), and Elisa Johnson ("Johnson") related to the searches of 6470 Wright Circle and 10 Center Street, Cresskill, New Jersey ("10 Center Street").  See [Docs. 254, 256, & 257]; see also [Docs. 217, 226, & 252].

## I.    INTRODUCTION

In December 2021, the Drug Enforcement Administration ("DEA") in Atlanta began an investigation into a national drug trafficking organization allegedly involving several individuals, including Earl, that was responsible for distributing thousands of kilograms of cocaine throughout the United States on a yearly basis.  [Doc. 215-2 (Leyva Aff.) ¶ 6].  During the investigation, a home invasion and armed robbery occurred at 10 Center Street on July 7, 2022, and agents learned that the residence was being used as a stash house by the drug trafficking organization.  [Id. ¶ 9]; see also [Doc. 217-1 (Holmsen Cert.) ¶ 15; Doc. 218-1 (Navarro Cert.) ¶ 21; Doc. 219-2 (Morgan Aff.) ¶ 9].  The house was rented in the name of two alleged members of the organization, co-defendants Johnson and Dominique Gwinn ("Gwinn"), though they were not present during the robbery.  [Doc. 215-2 ¶ 9 & n.3].  A search of the residence revealed two large industrial size safes, one of which contained three, one-kilogram packages of cocaine, in addition to a handgun, multiple vacuum sealers, vacuum sealer bags, utility bills and other mail for other stash locations in New Jersey, laptops, cell phones, handwritten detailed drug and money ledgers, and numerous documents and personal effects bearing the names of and belonging to organization members Earl, Johnson, Gwinn, and Washington.  [Id. ¶¶ 9-10].  Documents and effects bearing Earl's name included a Starbuck's cup he purchased from a nearby

Starbucks on the day of the robbery; a bag embroidered with his initials containing medication prescribed to him; electronic devices believed to belong to Earl that revealed extensive communications between organization members as well as drug and money ledgers; and a laptop believed to belong to him.  [Id. ¶¶ 10, 12-13].  A Nissan Sentra equipped with a trap compartment and registered to Gwinn was recovered from the driveway of 10 Center Street, and inside the residence, investigators recovered oil change paperwork for a different vehicle connected to a phone number registered to co-defendant Jovan Jackson ("Jackson"), a high-ranking member of the organization.  [Id. ¶ 16].

Less than two weeks later, on July 18, 2022, while conducting surveillance at 5253 Rosewood Place, Fairburn, Georgia ("5253 Rosewood Place"), another location believed to be used as a stash house by the organization, law enforcement observed co-defendant Maurice Lynch ("M. Lynch"), the brother of Lynch, leaving 5253 Rosewood Place with several bags and getting into the rear of a white Toyota Camry Uber.  [Id. ¶ 17]; see also [Doc. 252-1 (Moore Aff.) ¶ 24].  During a traffic stop of the vehicle, M. Lynch exited the vehicle and fled on foot and was arrested after discarding a bag containing two kilograms of cocaine.  [Doc. 215-2 ¶ 17].  Agents then obtained and executed a search warrant for 5253 Rosewood Place, during which they located approximately 15 kilograms of psychedelic mushroom bars, 5 pounds of THC edibles, 2 firearms, approximately 6 cell phones,

4

handwritten detailed drug and money ledgers, and $112,000, in addition to documents which linked Earl, Lynch, M. Lynch, and Johnson to the home and led agents to identify other stash houses used by the organization in Atlanta, Georgia, and around the country.  [Id.].  Information gathered during the execution of the 5253 Rosewood Place warrant led to the DEA executing an additional state search warrant in Baltimore, Maryland, two days later.  [Id.].  Specifically, on July 20, 2022, DEA-Atlanta, in conjunction with DEA-Baltimore, executed a search warrant for 9125 Saracen Drive, Baltimore, Maryland, another stash house where organization member Lynch had been under surveillance.  [Id. ¶ 18]; see also [Doc. 265-2].  Lynch fled prior to the execution of the search warrant, and in the garage of the home, agents located a Nissan Sentra equipped with a trap compartment containing approximately $85,000 and a stolen firearm, in addition to three cell phones, handwritten detailed drug and money ledgers, and an additional $15,000 located in the residence.  [Doc. 215-2 ¶ 18].

On August 16, 2022, the Bergen County Prosecutors Office ("BCPO") in Bergen County, New Jersey, obtained search warrants for the GPS monitoring of cellular devices used by Johnson and Gwinn, which allowed agents to identify numerous stash houses utilized by the drug trafficking organization and eventually obtain search warrants for additional stash houses in the states of Georgia, New York, New Jersey, and North Carolina.  [Id. ¶ 19].  Specifically, on

September 15, 2022, DEA-Atlanta executed a search warrant at a house owned by Jackson, which revealed $710,000 hidden in a trap compartment of a vehicle parked in the garage, in addition to six handguns, multiple vacuum sealers, vacuum sealer bags, documentary evidence of other residences utilized by the organization, handwritten detailed drug and money ledgers, and an additional $50,000 inside the residence.  [Id. ¶¶ 20-21].  That same day, the BCPO, in conjunction with DEA-Atlanta, executed state search and seizure warrants at three organization stash locations in Bergen County, New Jersey, which resulted in the seizure of approximately $1.6 million, in addition to several money counters, handwritten drug and money ledgers, vacuum sealers, and other paraphernalia consistent with packaging bulk amounts of drug proceeds.  [Id. ¶ 23].  Also, on September 15, 2022, DEA-Charlotte executed a federal search warrant at a stash house location in Charlotte, North Carolina, which resulted in the seizure of approximately $175,000 in cash and eight kilograms of a substance that field tested positive for cocaine and fentanyl.  [Id. ¶ 27].

On March 2, 2023, DEA-Atlanta executed a federal search warrant at 6470 Wright Circle, a home owned by Lynch.  [Id. ¶ 28]; see also [Doc. 252-1].  Agents seized numerous handwritten drug and money ledgers, bank and utility documents in Lynch's name, luxury custom jewelry receipts, a vacuum sealer, and approximately nine cell phones, in addition to phone bills, business filings, vehicle

information, and money orders tying other organization members to the location. [Doc. 215-2 ¶ 28]. Analysis of the cell phones seized revealed extensive communications between members and associates of the drug trafficking organization coordinating drug deals, money drop offs and pickups, and detailed ledgers. [Id.]. On October 24, 2023, Earl, along with Lynch, M. Lynch, Washington, Johnson, Gwinn, and others, were indicted in the Northern District of Georgia and charged with conspiracy to distribute a controlled substance and conspiracy to launder money, among other charges, and arrest warrants were issued. [Id. ¶ 31].

On December 14, 2023, DEA-Atlanta obtained a geolocation search warrant for the cellular devices that were known to be used by Earl and Johnson, and a review of overnight activity for both historical location data and live geolocation data indicated that both cellular devices consistently connected almost every night to the cell sites in the area of 11527 113th Place NE, Kirkland, Washington, a residence Johnson originally purchased but sold to Earl in July 2016. [Id. ¶¶ 32, 37-38]. During the investigation, agents also learned that Earl directed Johnson and Gwinn to rent houses and apartments around the country to be used by the organization as stash houses. [Id. ¶ 41]. Several of the lease agreements for the stash houses revealed that Johnson and Gwinn used fraudulent pay stubs provided by Earl to show proof of income, and on several of the lease agreements,

Johnson listed MCM Realty Investments, LLC, with an address of 5416 Rainier Avenue S, Seattle, Washington, as her employer, and Earl as her supervisor.  [Id.].  Geolocation data for Earl and Johnson showed them leaving 11527 113th Place NE and traveling to 5416 Rainier Avenue S, where they would remain throughout the work hours of the day before returning to 11527 113th Place NE.  [Id. ¶ 44].  Earl was regularly observed driving a white Cadillac Escalade, registered to MCM Realty Investments, LLC, between the two locations.  [Id. ¶¶ 47, 50].  On January 19, 2024, an Atlanta DEA agent applied for and obtained a search warrant for the persons of Earl, Johnson, M. Lynch, and Washington; 11527 113th Place NE; 5416 Rainier Avenue S; and the white Cadillac Escalade, in addition to another vehicle and three other residences.  See [Doc. 215-2].  Earl has filed multiple motions to suppress evidence obtained during the investigation that are ripe for ruling.

## II.    DISCUSSION

### A.    Motion to Suppress, [Doc. 215], and Motion to Amend, [Doc. 259]

In his motion to suppress evidence recovered from the search of 11527 113th Place NE, 5416 Rainier Avenue S, and the white Cadillac Escalade, [Doc. 215],[3] as amended, [Doc. 259], Earl argues that the search warrant application and supporting affidavit fail to set forth sufficient facts to establish probable cause to

---

[3] The government does not contest Earl's standing with respect to 113th Place NE, 5416 Rainier Avenue S, and the White Cadillac Escalade.  [Doc. 278 at 3].

believe any of the items sought would be found in Earl's residence, office, or personal vehicle, [id. at 16]. Earl asserts that "[e]ven assuming that . . . [the] affidavit establishes probable cause to believe that [] [he] is engaged in drug trafficking and money laundering activity, the affidavit utterly fails to establish a sufficient nexus between the crime that the government [was] investigating and the places that [the] government searched." [Id.]. Specifically, Earl contends that there "is absolutely nothing in . . . [the] affidavit that reflects any of the alleged illegal activity occurred out of his residence and/or office or out of his vehicle," since the surveillance "merely established that at the time of his arrest [] [he]: (1) stayed at the 11537 113th Place address with his co-defendant [] Johnson; (2) drove a white Cadillac Escalade; and (3) maintained an office in an office building that he owns and that was occupied by other legitimate business owners." [Id.]. Earl also argues that the information in the application was stale, since the warrants "were sought over a year and a half after the occurrence of any alleged drug related activity during the course of the government's investigation." [Id. at 18-19].

In response, the government argues that the warrant established probable cause to search each target location, and Earl's motion "fails to appreciate the nature of [his] . . . drug trafficking activities, as described in the warrant, as well as the Eleventh Circuit's caselaw regarding searches of the residences of drug

dealers." [Doc. 338 at 3]. The government contends that the affidavit established that "(i) Earl . . . [was] involved with drug trafficking and money laundering on a significant scale, including in a manner that would create electronic evidence, (ii) Earl . . . used the locations and vehicles in the warrant, and (iii) [the affiant's] experience and background led him to conclude that locations Earl . . . used would contain evidence of [his] drug trafficking and money laundering activities." [Id. at 5 (citation omitted)]; see also [id. at 6-12]. The government asserts that the evidence in the warrant was not stale based on the protracted nature of the drug trafficking organization, and further, warrants that seek electronic evidence are less likely to be stale because such files remain on devices even after they have been deleted. [Id. at 12-13 (citations omitted)]. Finally, the government argues that even if the warrant lacked probable cause, suppression is not an appropriate remedy because the good faith exception to the exclusionary rule would apply. [Id. at 14-15].

In his reply brief, Earl asserts that during the 20-month gap between the last alleged narcotics activity identified in the affidavit in which Earl was involved and the search warrant, "there is zero information in the agent's affidavit that suggests [] Earl was engaged in narcotics activity generally, or unlawful conduct at all at [] [his] Seattle properties or in the Escalade," and the general surveillance of Earl between mid-December 2023 and January 2024 reflects Earl "engaging in

completely innocent activities[,]" none of which "ripen the extremely outdated alleged narcotics activities that at the *latest* occurred 20 months prior to the search of [] Earl's Seattle properties and the Escalade." [Doc. 405 at 1-3]. Earl contends that the "affidavit's outdated, unrefreshed information – reflecting a *nearly 20-month absence of any apparent narcotic activity whatsoeve*r – was too stale to establish a fair probability that evidence of a crime would be found at [] Earl's personal residence or office, and/or inside his vehicle at the time the warrant was issued." [Id. at 4 (emphasis omitted)]. Earl asserts that the government has not established a sufficient nexus between his Seattle properties or the white Escalade and any alleged narcotics activities, and there are "no temporal facts suggesting that relevant documents and other evidence would be found there at the time of the search," but even setting aside the nexus issue, "the government's theory defies both common sense and the reality of sophisticated organized crime that the government insists is occurring." [Id. at 6, 9]. Finally, Earl argues that the good faith exception does not apply because "not only did the affidavit rely on stale information[,] it also failed to establish a nexus between the alleged illicit drug activity and [] Earl's Seattle properties and vehicle," and "[a]s such, the affidavit was so lacking in indicia of probable cause as to render official belief in its validity entirely unreasonable." [Id. at 9 (citation omitted)].

### 1.    *Probable Cause*

"The Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence exists at the place for which the warrant is requested." United States v. Betancourt, 734 F.2d 750, 754 (11th Cir. 1984) (citing Zurcher v. Stanford Daily, 436 U.S. 547, 558 (1978)); see also United States v. Cadet, Criminal Action Nos. 1:11-CR-00522-WBH-LTW, 1:11-CR-00113-WBH-LTW, 2013 WL 504892, at *4 (N.D. Ga. Jan. 16, 2013) (citation omitted), adopted sub nom. Cadet v. United States, Criminal Action Nos. 1:11-CR-113-WBH-2, 1:11-CR-552-WBH, 2013 WL 504815, at *1 (N.D. Ga. Feb. 8, 2013), aff'd, 574 F. App'x 917 (11th Cir. 2014) (per curiam) (unpublished).  That is, "[p]robable cause to search a residence requires some nexus between the premises and the alleged crime."   United States v. Graham, CASE NO.: 2:20-cr-47, 2021 WL 2593630, at *9 (S.D. Ga. June 24, 2021) (citation and internal marks omitted), adopted by 2021 WL 4352320, at *5 (S.D. Ga. Sept. 24, 2021), aff'd, No. 22-11809, 2023 WL 5011734 (11th Cir. Aug. 7, 2023). "Probable cause deals 'with probabilities[, which are] . . . . the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"   Illinois v. Gates, 462 U.S. 213, 241 (1983) (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)); see also United States v. Spann, No. 15–

20070, 2015 WL 1969111, at *3 (S.D. Fla. May 1, 2015) (citation omitted), aff'd, 649

F. App'x 714 (11th Cir. 2016) (per curiam) (unpublished).[4]

The Eleventh Circuit has explained the Court's review of the sufficiency of

a search warrant as follows:

> When called upon by law enforcement officials to determine the
> legitimacy of search warrants and their supporting affidavits, issuing
> magistrates and reviewing courts alike must strike a delicate balance
> between constitutional guarantees against excessive intrusions into
> areas of individual freedom and the Government's need to access and
> to secure relevant evidence in criminal prosecutions.  In particular,
> issuing magistrates are given the unenviable task of making "firing
> line" decisions that attempt to encourage availment of the warrant
> process while simultaneously striving to protect citizens from
> unwarranted governmental interference.   In recognition of the
> difficulty inherent in discharging this responsibility, reviewing courts
> lend substantial deference to an issuing magistrate's probable cause
> determinations.

United States v. Miller, 24 F.3d 1357, 1363 (11th Cir. 1994).  "Courts reviewing the

legitimacy of search warrants should not interpret supporting affidavits in a

hypertechnical manner[.]"  Id. at 1361 (citation omitted).  Instead, "a realistic and

---

[4] "[T]he term probable cause, . . . means less than evidence which would justify
condemnation. . . . It imports a seizure made under circumstances which warrant
suspicion."  New York v. P.J. Video, Inc., 475 U.S. 868, 876 (1986) (alterations in
original) (citations and internal marks omitted).  "Finely tuned standards such as
proof beyond a reasonable doubt or by a preponderance of the evidence, useful in
formal trials, have no place in the magistrate's decision."  Id. (citation and internal
marks omitted).   That is, "probable cause is a fluid concept—turning on the
assessment of probabilities in particular factual contexts—not readily, or even
usefully, reduced to a neat set of legal rules," Gates, 462 U.S. at 232, and
"[c]ertainty has no part in a probable cause analysis," United States v. Frechette,
583 F.3d 374, 380 (6th Cir. 2009) (citation omitted).

commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." Id. (citation omitted); see also United States v. McCullough, Criminal Indictment No. 1:11–CR–136–JEC/AJB–01, 2012 WL 11799871, at *13 (N.D. Ga. Oct. 9, 2012) (citations omitted), adopted by 2014 WL 3955556, at *2 (N.D. Ga. Aug. 13, 2014).  Furthermore, "[t]he fact than an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause."  United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985) (citations omitted); see also Adams v. Williams, 407 U.S. 143, 149 (1972) (citation omitted). The burden of establishing that a search warrant is defective is upon Earl, United States v. Lockett, 533 F. App'x 957 (11th Cir. 2013) (per curiam) (unpublished) (citation omitted) ("When a search is conducted pursuant to a warrant, the burden is on the defendant to show that the warrant is invalid."); see also Franks, 438 U.S. at 171, and the Court's consideration of Earl's facial challenge to the search warrant is confined to the four corners of the search warrant affidavit, see United States v. Schulz, 486 F. App'x 838, 841 (11th Cir. 2012) (per curiam) (unpublished) (citation omitted); Donovan v. Mosher Steel Co., Div. of Trinity Indus., 791 F.2d 1535, 1537 (11th Cir. 1986) (citation and internal marks omitted) ("[I]t is elementary that in passing on the validity of a warrant, the reviewing court may consider only

information brought to the magistrate's attention — that is, within the four corners of the warrant application.").

"For probable cause to exist . . ., the information supporting [] the government's application for a search warrant must be timely, for probable cause must exist when the [] judge issues the search warrant." <u>United States v. Harris</u>, 20 F.3d 445, 450 (11th Cir. 1994) (citations omitted); <u>see also</u> <u>United States v. Sanders</u>, No. 1:12-cr-373-WSD-ECS, 2013 WL 3938518, at *2 (N.D. Ga. July 30, 2013) (citations omitted); <u>United States v. Bushay</u>, 859 F. Supp. 2d 1335, 1378 (N.D. Ga. 2012) (citations omitted), adopted at 1355. "There is no particular rule or time limit for when information becomes stale." <u>United States v. Bervaldi</u>, 226 F.3d 1256, 1265 (11th Cir. 2000) (citations omitted). Instead, "[t]o evaluate staleness claims, [the Court] look[s] at the unique facts of each case and may consider the maturity of the information, the nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched." <u>United States v. Deering</u>, 296 F. App'x 894, 898 (11th Cir. 2008) (per curiam) (unpublished) (citation and internal marks omitted); <u>see also</u> <u>United States v. Rojas-Coyotl</u>, Criminal Action No. 1:13-cr-0128-AT-AJB, 2014 WL 1908674, at *5 (N.D. Ga. May 13, 2014) (citation omitted), adopted at *1. "As part of this, courts should recognize the difference between isolated criminal activity (for which the passage of time is more likely to diminish

probable cause) and protracted or continuous criminal activity (for which the passage of time is less likely to dissipate probable cause.)." United States v. Rau, Case No. 4:18-cr-3-MLB-3, 2020 WL 7488649, at *4 (N.D. Ga. Dec. 21, 2020) (citing Bervaldi, 226 F.3d at 1265).

Earl contends that the affidavit failed to establish probable cause because the information about his alleged drug trafficking activity was stale, but Earl's staleness argument fails because the affiant attested that the investigation into the drug trafficking organization began in December 2021 and continued through January 2024, when agents were still identifying stash houses utilized by the drug trafficking organization and applying for and conducting search warrants at those locations, [Doc. 215-2 ¶¶ 6, 8]; see also [id. ¶¶ 32-70], and the longstanding and protracted "nature and size of the conspiracy militates against [ Earl]," United States v. Davis, No. 2:12cr87–WKW, 2013 WL 322122, at *4 (M.D. Ala. Jan. 10, 2013) (citation and internal marks omitted) (stating that "[p]rotracted and continuous activity is inherent in large-scale drug trafficking operations"); Harris, 20 F.3d at 451 (upholding validity of search although affidavit referred to events that occurred two years prior because they pertained to long-term drug conspiracy). Further, the affiant attested that phone records relating to illegal activity were commonly maintained for long periods of time and in places like the residences of drug traffickers, and cellphones used to conduct their illegal business were

commonly maintained in the residences, vehicles, and businesses of drug traffickers, and agents had found such evidence at other locations searched during the investigation, as described in the affidavit.  [Doc. 215-2 ¶¶ 9-13, 18, 21, 23-24, 27-28, 71, 76-77, 79].  In short, "the operation of the alleged drug ring was such that telephone, business, financial, and other records were likely to be kept which would link [Earl] to the conspiracy. . . . [and] [t]hese records . . . are likely to be present for some time."  United States v. Williams, 897 F.2d 1034, 1039 (10th Cir. 1990).

"Although most of the information contained in the affidavit referred to events which took place [months] . . . before [the agent] applied for the warrant, the affidavit nonetheless alleged a longstanding and protracted criminal conspiracy," Harris, 20 F.3d at 451 (citation omitted); see also United States v. Fisher-Bland, CRIMINAL ACTION NO. 1:17-cr-00069-SCJ-CMS-1, 2017 WL 6001514, at *4 (N.D. Ga. Nov. 16, 2017) (citations omitted) (stating that in cases in which the suspected criminal activity was not just a one-time incident, "the Eleventh Circuit has found information in search warrant applications of even lengthier delays not to be stale based upon the particular facts and circumstances of those cases," including a narcotics case and six month delay), adopted by 2017 WL 5997466, at *1 (N.D. Ga. Dec. 4, 2017), and considering the evidence sought and "the nature of the narcotics distribution conspiracy, the likelihood that the

information was stale was diminished," United States v. Gray, No. 10–cr–20410, 2011 WL 4368843, at *3 (S.D. Fla. May 3, 2011) (citation omitted), adopted by 2011 WL 4368839, at *5 (S.D. Fla. Sept. 19, 2011); see also United States v. Gamory, Criminal File No. 1:08–CR–153–TWT, 2009 WL 855948, at *22 (N.D. Ga. Mar. 30, 2009) (finding "that the information contained in [the] affidavit was not fatally stale because it pertained to an ongoing drug trafficking operation"), aff'd, 635 F.3d 480 (11th Cir. 2011).

Contrary to Earl's contentions, the affidavit submitted in support of the January 19, 2024, search warrant provided sufficient facts to establish probable cause to believe that evidence involving the alleged drug trafficking organization would be found in 11527 113th Place NE, 5416 Rainier Avenue S, and the white Cadillac Escalade. The affiant described the evidence developed during the investigation, including that Earl was identified as one of the leaders of the drug trafficking organization; the organization was responsible for distributing thousands of kilograms of cocaine throughout the United States on a yearly basis; the investigation by DEA Atlanta between December 2021 and December 2023 led to the identification of and search warrant executions at multiple stash houses utilized by the drug trafficking organization; on July 8, 2022, following a home invasion and armed robbery of a stash house utilized by the organization, a search of the residence revealed two large industrial size safes, one of which contained

three, one-kilogram packages of cocaine, in addition to a handgun, vacuum sealers, utility bills for other stash locations, laptops, cell phones, drug and money ledgers, and numerous documents and personal effects bearing the names of and belonging to organization members, including Earl, like a Starbucks cup in his name, a bag containing medication prescribed to him, and electronic devices; a search of Earl's electronic devices seized revealed extensive communications between organization members and drug and money ledgers; M. Lynch was observed leaving 5253 Rosewood Place, a stash house utilized by the organization, with several bags, and a subsequent traffic stop resulted in M. Lynch's arrest after he fled from police on foot and discarded a bag containing two kilograms of cocaine; during the execution of a search warrant at 5253 Rosewood Place, agents located approximately 15 kilograms of psychedelic mushroom bars, 5 pounds of THC edibles, 2 firearms, approximately 6 cell phones, handwritten detailed drug and money ledgers, and $112,000, in addition to documents which linked Earl to the home and led agents to identify other stash houses used by the organization in Atlanta and around the country; on July 20, 2022, DEA-Atlanta, in conjunction with DEA-Baltimore, executed a search warrant for 9125 Saracen Drive, a Baltimore stash house where organization member Lynch had been under surveillance, and agents located a Nissan Sentra parked in the garage of the home equipped with a trap compartment containing approximately $85,000 and a stolen

firearm, in addition to three cell phones, handwritten detailed drug and money ledgers, and an additional $15,000 in U.S. currency located in the residence; agents monitoring the GPS of cellular devices used by Johnson and Gwinn were able to identify numerous stash houses utilized by the drug trafficking organization and eventually obtain search warrants to search additional stash houses in the states of Georgia, New York, New Jersey, and North Carolina; on September 15, 2022, DEA Atlanta executed a search warrant at a house owned by Jackson which revealed $710,000 hidden in a trap compartment of a vehicle parked in the garage in addition to six handguns, multiple vacuum sealers, vacuum sealer bags, documentary evidence of other residences utilized by the organization, detailed handwritten drug and money ledgers, and an additional $50,000 inside the residence; on September 15, 2022, the BCPO, in conjunction with DEA-Atlanta, executed state search and seizure warrants at three organization stash locations in Bergen County, New Jersey, which resulted in the seizure of approximately $1.6 million in addition to several money counters, detailed handwritten drug and money ledgers, vacuum sealers, and other paraphernalia consistent with packaging bulk amounts of drug proceeds; on September 15, 2022, DEA-Charlotte executed a federal search warrant at a stash location in Charlotte, North Carolina, which resulted in the seizure of approximately $175,000 in cash and eight kilograms of a substance which field tested positive for cocaine and fentanyl; on

March 2, 2023, DEA-Atlanta executed a federal search warrant at 6470 Wright Circle, a home owned by Lynch which resulted in the seizure of numerous handwritten drug and money ledgers, bank and utility documents in Lynch's name, luxury custom jewelry receipts, a vacuum sealer, and approximately nine cell phones, in addition to phone bills, business filings, vehicle information, and money orders tying other organization members to the location; and analysis of the cell phones seized at 6470 Wright Circle revealed extensive communications between members and associates of the drug trafficking organization coordinating drug deals, money drop offs and pickups, and detailed ledgers.  [Doc. 215-2 ¶¶ 6, 8-10, 12-13, 17-21, 23, 27-28, 32].

With respect to Earl's activity in Washington state, the affidavit indicates that on December 14, 2023, DEA Atlanta obtained a geolocation search warrant for the cellular devices that were known to be used by Earl and Johnson, and a review of overnight activity for both historical location data and live geolocation data indicated both cellular devices consistently connected almost every night to the cell sites in the area of 11527 113th Place NE, Kirkland, Washington; during the investigation, agents learned that Earl directed Johnson and Gwinn to rent houses and apartments around the country to be used by the organization as stash houses, and several of the lease agreements for the stash houses revealed that Johnson and Gwinn used fraudulent pay stubs provided by Earl to show proof of income, and

on several of the lease agreements, Johnson listed MCM Realty Investments, LLC, with an address of 5416 Rainier Avenue S, Seattle, Washington, as her employer, and Earl as her supervisor; geolocation data for Earl and Johnson showed them leaving 11527 113th Place NE and traveling to 5416 Rainier Avenue S, where they would remain throughout the work hours of the day before returning to 11527 113th Place NE; and Earl was regularly observed driving a white Cadillac Escalade, registered to MCM Realty Investments, LLC, between the two locations. [Id. ¶¶ 32, 37-38, 41, 44, 47, 50].  The affiant further provided information regarding his training and experience with narcotics trafficking investigations and detailed particular characteristics typically associated with drug traffickers, including that individuals who deal in illegal controlled substances commonly maintain "books, records, receipts, notes, ledgers, bank records, money orders, and other papers relating to the importation, manufacture, transportation, ordering, sale, and distribution of illegal controlled substances . . . where the dealers . . . have ready access to them, such as in secured locations within their residence[,]" and they "commonly keep in their residences, businesses, and vehicles cellular telephones, telephone paging devices, and computers that they utilize to assist them in the conduct of their illegal business."  [Id. ¶¶ 2-3, 73-79].  The affiant explained that "[i]n virtually every [drug trafficking organization] stash house where agents have executed search warrants, documents and cell phones have been seized, almost all

22

of which contained evidence of the [organizations] operations," and "[b]ased on [his] training, experience, and knowledge of the investigation to date, [he] believe[s] that there is evidence of the [organization's] cocaine trafficking operations, and communications and coordination between the members in furtherance of the [organization] contained within the [t]arget [p]remises." [Id. ¶ 71].

Contrary to Earl's arguments, the facts set forth in the affidavit established probable cause to believe that evidence of the drug trafficking organization would be found at 11527 113th Place NE and 5416 Rainier Avenue S and in Earl's white Cadillac Escalade and that evidence regarding MCM Realty Investments, LLC, was relevant to the investigation, since several of the lease agreements for the stash houses revealed that Johnson and Gwinn used fraudulent pay stubs provided by Earl to show proof of income, and on several of the lease agreements, Johnson listed MCM Realty Investments, LLC, with an address of 5416 Rainier Avenue S, Seattle, Washington, as her employer, and Earl as her supervisor, and the white Cadillac Escalade was registered to MCM Realty Investments, LLC. Moreover, the affiant's training and experience regarding the behavior of drug traffickers, including that phone records relating to illegal activity were commonly maintained for long periods of time and in places like the residences of drug traffickers, and cellphones used to conduct their illegal business were commonly

maintained in the residences, vehicles, and businesses of drug traffickers, provided adequate support for the Magistrate Judge's finding that the affidavit established probable cause to search Earl's residence, office, and vehicle, on January 19, 2024.  See United States v. Cunningham, 633 F. App'x 920, 922 (11th Cir. 2015) (per curiam) (unpublished) (finding probable cause supported the police's search warrant for defendant's home where the police had evidence that he "was involved in drug trafficking and law enforcement officials attested that, based on their significant experience with drug investigations, drug traffickers often store[d] evidence of their crimes in their homes"); United States v. Banks, CRIMINAL ACTION NO. 1:22-CR-00414-SCJ-RDC, 2024 WL 4454439, at *15 (N.D. Ga. Aug. 5, 2024) (citations and internal marks omitted) (explaining that because cell phones had "become important tools in facilitating coordination and communication among members of criminal enterprises and provide valuable incriminating information about dangerous criminals," the affidavit in support of the search warrant "establishe[d] a sufficient nexus between [ defendant's] cellphones and the alleged criminal conduct"), rejected in part on other grounds by 2024 WL 4148741, at *5 (N.D. Ga. Sept. 11, 2024); United States v. Mobely, CRIMINAL ACTION FILE NO. 1:16-CR-145-TWT-JKL-6, 2017 WL 10574358, at *16 (N.D. Ga. Oct. 26, 2017) (citation omitted) (stating that "[c]ommon sense tells us that a person suspected of criminal activity 'tends to conceal fruits and

instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained' and that one's residence is such a place"), adopted by 2018 WL 5077755, at *1 (N.D. Ga. Oct. 18, 2018); United States v. Kendricks, CRIMINAL ACTION FILE NO. 1:15-CR-400-MHC-AJB, 2016 WL 5952743, at *7 (N.D. Ga. Oct. 13, 2016) (citations omitted) ("[I]t takes no special expertise for a judge to infer that information related to an active criminal enterprise may be contained on a cell phone."), aff'd, 723 F. App'x 950 (11th Cir. 2018) (per curiam) (unpublished); United States v. Lisbon, 835 F. Supp. 2d 1329, 1347, 1350 (N.D. Ga. 2011) (finding probable cause supported the magistrate judge's conclusion "that there was sufficient reason to believe that evidence of [defendant's] drug trafficking would be found at [his residence]" where the "affidavit clearly established that [he] had committed violations of 21 U.S.C. §§ 841 and 846" and "demonstrated that the . . . apartment was one of [his] residences," in addition to the fact that the affiant of the affidavit in support of the warrant "had extensive experience in investigating drug traffickers and averred that the residence was a likely hiding place for contraband and evidence of [his] crime"), aff'd sub nom. United States v. Moreno, 559 F. App'x 940 (11th Cir. 2014) (per curiam) (unpublished).  In short, the affidavit included sufficient information to establish probable cause to believe that evidence related to the drug trafficking organization would be located at 11527 113th Place NE and 5416 Rainier Avenue

S and in Earl's white Cadillac Escalade.  Therefore, Earl's contention that the affidavit did not establish probable cause to search the residence, office, and vehicle is without merit.

### 2.    *Good Faith Exception*

Moreover, even if the search warrant at issue was found to be invalid, suppression of the evidence seized from the residence, office, and vehicle would not be warranted because the agents executing the warrant reasonably relied in good faith on the validity of the warrant.  See United States v. Leon, 468 U.S. 897, 919-21 (1984).  Under Leon, "the exclusionary rule should not be applied to exclude evidence seized pursuant to a defective search warrant if the officers conducting the search acted in 'objectively reasonable reliance' on the warrant and the warrant was issued by a detached and neutral magistrate."   United States v. Sharp, Civil Action File No. 1:14–cr–229–TCB, 2015 WL 4641537, at *14 n.18 (N.D. Ga. Aug. 4, 2015) (citation and internal marks omitted), adopted at *5; see also United States v. Robinson, 336 F.3d 1293, 1295-96 (11th Cir. 2003) (citation omitted).

There are four exceptions to the Leon good-faith doctrine:

(1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for [her] reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 . . . (1979); (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the

> circumstances of the particular case, a warrant is so facially deficient-
> i.e., in failing to particularize the place to be searched or the things to
> be seized-that the executing officers cannot reasonably presume it to
> be valid.

United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002) (citation and internal marks omitted).  Earl appears to argue that the third exception applies in this case. [Doc. 405 at 9; Doc. 407 at 8].  "'To exclude evidence on this ground, the affidavit must be so clearly insufficient that it provided no hint as to why police believed they would find incriminating evidence.'"  United States v. Ray, 7:24-cr-00073-ACA-JHE-1, 2024 WL 4614017, at *8 (N.D. Ala. Sept. 26, 2024) (quoting United States v. McCall, 84 F.4th 1317, 1325 (11th Cir. 2023)), adopted by 2024 WL 4604376, at *1 (N.D. Ala. Oct. 29, 2024).  However, "[f]or the reasons already discussed, there was sufficient probable cause set forth in the affidavit to support issuance of the search warrant for the residence," office, and vehicle, United States v. Latorre, CRIMINAL CASE NO. 1:20-cr-00272-ELR-RGV, 2020 WL 7685935, at *7 (N.D. Ga. Nov. 23, 2020) (alteration, citation, and internal marks omitted), adopted by 2020 WL 7351222, at *1 (N.D. Ga. Dec. 15, 2020), and "the same facts that support probable cause also supply the indicia of probable cause [Earl] claims [to be] missing," Ray, 2024 WL 4614017, at *9.  That is, even if the affidavit "was lacking in probable cause[,] there is certainly an indicia of probable cause," since "[t]here are sufficient, particularized allegations, which lead this Court to conclude that the third scenario would not apply here."  United States v. Gayden, Case No: 6:16-cr-

187-Orl-41TBS, 2018 WL 8809238, at *10 (M.D. Fla. June 7, 2018), aff'd, 977 F.3d 1146 (11th Cir. 2020). "Accordingly, the agents executing the warrant were justified in believing in its validity, and evidence seized during the execution would not be subject to suppression under the good faith exception even if the warrant were found to lack probable cause." Latorre, 2020 WL 7685935, at *7 (citation omitted). Therefore, it is **RECOMMENDED** that Earl's motion to suppress, [Doc. 215], as amended, [Doc. 259], be **DENIED**.

**B.**    **Motion to Suppress, [Doc. 216], and Motion to Amend, [Doc. 262]**

Earl also filed a motion to suppress evidence seized during the searches of 5253 Rosewood Place, Fairburn, Georgia; storage units located in Kirkland, Washington; and the geo-location of phone number 206-806-1314 and the data exacted from the iPhone registered to that number. [Doc. 216]. On January 21, 2025, Earl requested an extension of time to perfect this motion, [Doc. 262], and on February 28, 2025, the Court ordered Earl to perfect the motion, including as to standing, by June 20, 2025, see [Doc. 278 at 2]. However, Earl has not perfected his motion, so the motion is deemed to have been abandoned.[5] See United States v. Pacheco-Romero, CRIMINAL INDICTMENT NO. 1:19-CR-00077-LMM-RGV,

---

[5] Earl's motion to suppress also addressed the search of 6470 Wright Circle, but because he attempted to establish standing as to this residence, that portion of the motion was not abandoned and is addressed in a separate Report and Recommendation.

2019 WL 4179550, at *2 (N.D. Ga. Aug. 7, 2019) (citations omitted), adopted by 2019 WL 4169887, at *1 (N.D. Ga. Sept. 3, 2019); see also United States v. Williams, CRIMINAL CASE NO. 1:23-cr-00125-MHC-RGV-7, 2025 WL 868215, at *3-4 (N.D. Ga. Feb. 6, 2025), adopted by 2025 WL 863624, at *1 (N.D. Ga. Mar. 18, 2025); [Doc. 124 at 20 ("When a party fails to supplement or perfect a motion within the time afforded after having requested or been given an opportunity to supplement or perfect said motion, the Court may deem the original motion abandoned or withdrawn.")].  "Moreover, the motion[] to suppress [is] due to be denied because [Earl has] not satisfied [his] preliminary burden to establish standing." Paacheco-Romero, 2019 WL 4179550, at *2 (citations omitted).    Accordingly, it is **RECOMMENDED** that Earl's motion to suppress, [Doc. 216], as amended, [Doc. 262], be **DENIED**.

## C.    Motion Requesting a Franks Hearing, [Doc. 406], as Amended, [Doc. 408]

Earl has filed a preliminary motion requesting a Franks hearing, [Doc. 406], which he subsequently amended, [Doc. 408].  In his amended motion, Earl contends that the government "sought a search warrant based on information that was nearly 20 months old," and in order "to establish a nexus between [] Earl and his office, the affiant contended that no one else had access to his office other than him and his co-defendant and girlfriend, [] Johnson," but the statements in the affidavit that Earl "is often there alone and others do not go in that door without

him" and "[a]gents have seen other people in [ the] premises . . . , but not without Earl or when Earl is already inside (the exception being Johnson)" constitute "material misrepresentations of what is depicted in the pole camera," since a review of the pole camera footage "reveals that on several occasions, at the very least, another individual had access to [] Earl's office and, in fact, accessed his office whether neither he nor [] Johnson were present." [Id. at 3-4 (emphasis and citation omitted)]. Earl asserts that he "has made a requisite preliminary showing as required by *Franks* and is, therefore, entitled to a hearing to address whether the affidavit contained material allegations which were deliberately false, or reckless, and whether the affidavit deliberately or recklessly omitted facts material to the finding of probable cause," and "finally, after the redaction of any falsely stated material facts, and the inclusion of any omitted facts, whether the search warrant for [] Earl's Seattle [o]ffice still supports the magistrate's determination of probable cause," which he "contends that it does not, and that any evidence seized during the search of that office and the fruits thereof should be suppressed." [Id. at 5].

In response, the government argues that Earl has failed to show that statements made in the search warrant application were "false, [or] that the statements or omissions were material, nor has he made any allegation that would show the statement was made with knowledge of falsity or a recklessness to its truth," and therefore, the Court should deny his motion. [Doc. 420 at 1].

Specifically, the government contends that the statements were not inaccurate, since the affidavit "never asserted that agents had reviewed every minute of the hundreds of hours of footage that the pole camera had recorded, but rather described what agents had seen in their review of the pole camera footage," and "the assertions in the affidavit based on the pole camera footage were not and did not need to be anything more than an assertion of what agents had seen when they had reviewed the pole camera at the office building." [Id. at 10]. The government asserts that the "three instances when an individual allegedly entered the office without Earl or Johnson" that Earl contends were omitted from the warrant were "immaterial" and "not a misrepresentation that affected the probable cause for the warrant." [Id. at 11]. Finally, the government argues that Earl "failed to provide any affidavit or other evidence that would show that the challenged statements were either deliberate falsehoods or made in reckless disregard for the truth," nor does his motion "contain any allegation or factual assertion that the challenged statement was made with knowledge of its falsity." [Id. at 13-14].

In Franks, the Supreme Court held that where "(i) a defendant makes a substantial preliminary showing that an affiant knowingly and intentionally included a false statement in an affidavit or made the false statement with reckless disregard of its truth, and (ii) the false statement was necessary to the finding of probable cause, then a hearing on the affidavit must be held at the defendant's

request." United States v. Terzado, Case No. 21-CR-60143-SMITH/VALLE, 2022 WL 4794874, at *2 (S.D. Fla. Aug. 2, 2022) (citing Franks, 438 U.S. at 155-56), adopted by 2022 WL 4764108, at *1 (S.D. Fla. Oct. 3, 2022). This standard "also applies to material omissions of fact," and "[b]oth prongs must be satisfied to warrant a hearing." Id. (citations omitted) (citing Madiwale v. Savaiko, 117 F.3d 1321, 1327 (11th Cir. 1997)); see also United States v. Kirton, CRIMINAL CASE NO. 1:19-CR-00022-WMR-JFK, 2019 WL 6868978, at *6 (N.D. Ga. Oct. 18, 2019) (stating Franks "is applicable to information omitted from an affidavit for a search warrant"), adopted by 2019 WL 6840132, at *1 (N.D. Ga. Dec. 16, 2019). Further, "[t]o mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine"; "[t]here must be allegations of deliberate falsehood or reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." Franks, 438 U.S. at 171. "No Franks hearing is required, if, when the omitted information is added to the affidavit, the affidavit's content still establishes probable cause for the search." Kirton, 2019 WL 6868978, at *6 (citation omitted).

Earl is not entitled to a Franks hearing because he "has not made a substantial preliminary showing . . . that material information was intentionally and/or recklessly omitted from the affidavit or, alternatively, made a showing that such alleged . . . omissions undermined the probable cause otherwise set forth in

the affidavit as necessary for a <u>Franks</u> hearing to be held."  <u>Id.</u>, at *7; <u>see also</u> <u>Terzado</u>, 2022 WL 4794874, at *3 (citation omitted) (finding defendant had "not provided any offer of proof, affidavit or other sworn statement to support his allegation that the affiant intentionally or recklessly misrepresented" information in the affidavit).  "None of the claimed omitted information on its face is so clearly critical to the probable cause determination that its omission created a presumption of recklessness," and even if the information regarding the individual potentially in the office on three dates in January 2024 for brief periods of time "had been included, the warrant affidavit would still have supported the probable cause determination," <u>United States v. Bivins</u>, 560 F. App'x 899, 906 (11th Cir. 2014) (per curiam) (unpublished) (citation omitted), since the affiant, a DEA Special Agent, attested that he believed evidence related to the drug trafficking organization would be found at Earl's office and that Earl was transporting potential evidence between his residence and his office inside of his briefcase or bag based on his training, experience, and participation in narcotic and drug-related investigations, since "[i]ndividuals involved in drug trafficking commonly keep in their residences, businesses, and vehicles cellular telephones, telephone paging devices, and computers that they utilize to assist them in the conduct of their illegal business," in addition to "smartphones and computers," [Doc. 215-2 ¶¶ 2, 5, 44-47, 52, 79 (internal marks omitted)], and there is no allegation that the

individual seen in the pole camera footage removed any electronic devices from the office.  "Thus, even if the affidavit were revised to include the omitted [information], that revised affidavit would have established probable cause to search [5416 Rainier Ave S]," United States v. Jones, 942 F.3d 634, 641 (4th Cir. 2019) (citation omitted), and Earl is not entitled to a Franks hearing.

### III.  CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Earl's motions to suppress, [Docs. 215 & 216], and amended motion, [Doc. 259], be **DENIED**, and his motions requesting a Franks hearing, [Docs. 406 & 408], be **DENIED**.

The other pretrial motions filed by Earl and his co-defendants have been addressed in separate Reports and Recommendations, and there are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 13th day of February, 2026.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE