IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

MARIO EARL,
RAMONDO LYNCH, AND
TUROMNE WASHINGTON

Criminal Action No.

1:23-CR-335-MLB-RGV

**Government's Response to Defendants' R&R Objections**

The United States of America, by Theodore S. Hertzberg, United States
Attorney, and Matthew R. LaGrone and Sandra E. Strippoli, Assistant United
States Attorneys for the Northern District of Georgia, files this Response to
Defendant's Objections to the Magistrate Judge's Reports and Recommendations
(Docs. 444-449).[1] Defendants Mario Earl, Ramondo Lynch, and Turomne
Washington challenged several searches that DEA and other investigators
carried out pursuant to duly-authorized search warrants during a long
investigation into their nationwide cocaine distribution scheme. United States
Magistrate Judge Russell G. Vineyard carefully considered all their arguments
and issued several R&Rs that determined that the warrants were valid and
authorized each of the searches. (Docs. 422, 424, 426, 428). The Magistrate Judge

---

[1] Because this response addresses several objections from three defendants,
the United States requests leave to file an omnibus response that exceeds the
page limit allotted for one response. (LCrR 59(3)).

also found that the defendants had failed to prove that they had a reasonable expectation of privacy in several of the locations. Defendants' objections to the R&Rs should be rejected. This response addresses the objections in the order in which the locations were searched, addressing standing as relevant.

## 1. Procedural History.

Earl, Lynch,[2] and Washington were charged via indictment with a variety of drug, firearm, and money laundering offenses arising out of a nationwide cocaine distribution ring that they operated. (Doc. 1). Defendants challenged numerous search warrants that authorized the searches during DEA's investigation, including searches that took place in Georgia, Maryland, New Jersey, North Carolina and Washington State. (Docs. 215, 217-220, 252, 254, 256, 257, 259, 265). The Magistrate Judge held two days of evidentiary hearings to allow the Defendants to prove their standing at many of these locations,[3] but no Defendant testified. (Docs. 309, 322).

After fully briefing the motions, the Magistrate Judge issued four R&Rs that explained, in over 150 pages, why Defendants had failed to meet their burden to show standing in multiple locations and, moreover, why they had failed to show

---

[2] Ramondo Lynch's brother, Maurice Lynch, was also charged in the indictment. For clarity, in this pleading "Lynch" always refers to Ramondo Lynch.

[3] The Government conceded that Lynch could show standing at 6470 Wright Circle and Earl could show standing at the Washington State locations. (Doc. 278 at 3).

2

that any of the evidence seized pursuant to the warrants should be suppressed. (Docs. 422, 424, 426, 428).

## 2. 10 Center Street.

In the evening of July 7, 2022, local police in Cresskill, New Jersey received a 911 call about a robbery and attempted murder that took place at 10 Center Street, a residence. (Doc. 422 at 5). A man named Brian Palacios was bleeding in the driveway and nearly died from blood loss. (*Id*.) Palacios told the responding officers that he had been attacked and shot by individuals looking for codes to safes located inside the house. (*Id*.) Law enforcement performed a protective sweep to see if the attackers or any other victims were still in the house. (*Id*.) When they went inside, they observed a pool of blood in a room with two large, industrial safes and nothing else. (*Id*. at 5-6). New Jersey police then obtained a search warrant and searched 10 Center Street. (Doc. 422 at 7). Among other items of evidentiary value, officers found three kilograms of cocaine in one of the safes. (*Id*.). New Jersey investigators later took their evidence and assisted with an already-ongoing DEA investigation, which led to this case. Both Earl and Washington challenge this warrant. (Docs. 444-446).

### A. Standing - Washington

The Magistrate Judge found that Washington did not have standing to challenge the 10 Center Street warrant. (Doc. 422 at 47-49). When it comes to standing, it is always a defendant's burden to prove both a subjective expectation of privacy and that their expectation was reasonable. *See Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980) ("Petitioner, of course, bears the burden of proving not

only that the search of [the challenged location] was illegal, but also that he had a legitimate expectation of privacy in that [location]."); *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008) ("The accused bears the burden of demonstrating a legitimate expectation of privacy in the area searched.") Washington chose not to testify at the evidentiary hearing that the Magistrate Judge held to allow him an opportunity to prove standing.[4]

Indeed, Washington submitted essentially no evidence to support his argument that he had a reasonable expectation of privacy at 10 Center Street. Nonetheless, he objects that the Magistrate Judge incorrectly concluded that he had not met his burden to prove standing. *See United States v. Brazel*, 102 F.3d 1120, 1148 (11th Cir. 1997) (finding the appellant failed to carry their burden to show a legitimate expectation of privacy in a residence). Washington relies on a mix of facts that are insufficient, and on the Government's theory—which is not a basis to prove standing. *See United States v. Montemayor*, 2013 WL 12205087, at *1 (N.D. Ga. May 8, 2013) ("Courts have held that defendants cannot rely on the government's position or theory to establish standing and must instead prove their expectation of privacy as to a particular search.") Washington's objection refers to three items that supposedly proved his standing: (1) his wallet was in the 10 Center Street house when law enforcement searched it; (2) surveillance footage showed Washington arrive at the house, and then flee, during the robbery; and (3) law enforcement concluded that Washington was staying in one

---

[4] If Defendants had testified, the Government could not affirmatively use their statements against them. *See United States v. Simmons*, 390 U.S. 377, 394 (1968).

of the bedrooms. (Doc. 444 at 4-6). Washington then makes a series of unsupported conclusions from this limited evidence: that Bryan Palacios could and did give him authority to be there, and that Washington was an overnight guest with unlimited access to the house. (Doc. 444 at 6).

Washington's evidence does not support these conclusions and the Magistrate Judge was right to conclude that Washington lacked standing. (Doc. 422 at 48). Keeping items in a house does not create standing. *See United States v. Sweeting*, 933 F.2d 962, 964 (11th Cir. 1991) (no standing although defendant kept personal effects at a home rented by family members and had a right of access); *United States v. Armenta*, 69 F.3d 304, 308 (9th Cir. 1995) (finding that "wallet, baptismal certificate, and social security card application," even when combined with sworn declaration and testimony of a friend was insufficient to show status as overnight guest); *United States v. Henry*, 939 F. Supp. 2d 1279, 1287-88 (N.D. Ga. Apr. 5, 2013). The fact that Washington entered the house on some occasions was not sufficient either. *See United States v. Baron-Mantilla*, 743 F.2d 868, 870 (11th Cir. 1984) (defendant must show "an unrestricted right of occupancy or custody and control of the premises as distinguished from occasional presence on the premises as a mere guest or invitee.") And Washington cannot rely on law enforcement's conclusion that he was staying in one of the bedrooms. *See United States v. Singleton*, 987 F.2d 1444, 1449 (9th Cir. 1993) (holding that defendant could not establish standing simply by relying on government's theory of case). If Washington wanted the Court to believe he was staying in one of the

bedrooms at 10 Center Street, he should have testified to that effect, or had someone else testify to that.

**B.  The 10 Center Street Warrant Authorized the Search of the Safes.**

Washington and Earl make the same argument about safes the Magistrate Judge already considered and rejected. (Doc. 422 at 55-57). In a nutshell, they argue that because the safes were not specifically mentioned in the warrant, and because (they claim) the safes could not have contained evidence, the search within the safes was warrantless. (Doc. 444 at 10-16; Doc. 445 at 5-8). But the Magistrate Judge rightly noted that the safes were a central part of the affidavit, that the safes were the object of the criminal conduct, and thus that it was reasonable to conclude that evidence related to the cause of the attempted murder and armed robbery were likely to be found there. (Doc. 422 at 55). Washington and Earl provide no reason to doubt this conclusion.

The Eleventh Circuit "has held that a warrant to search a specific area for a certain class of things authorizes government agents to break open locked containers which may contain the objects of the search." *United States v. Jackson*, 120 F.3d 1226, 1228-29 (11th Cir. 1997); *see also United States v. Ross*, 456 U.S. 798, 820-821 (1981). Here, agents were seeking evidence of what motivated the armed robbery and attempted murder, since the facts showed that this was not a random crime. The robbers wore law enforcement jackets, had long guns and targeted specific safes: large, industrial-sized safes that were located in a room by themselves. (Doc. 226-1 ¶¶ 15, 16, 18). The blood showed that the robbers shot Palacios by these safes when he refused to give over the combinations to the

6

safes. (Doc. 226-1 ¶ 15). Because the robbers targeted the safes, the safes thus likely contained evidence of why the robbers were committing the crimes, and indeed that is exactly what they ultimately contained (the cocaine that motivated the robbery). That the safes were not opened does not matter. The inside of the safes may not have the robbers' fingerprints or DNA, but they would continue to hold the items that drew the robbers inside the house, where they shot and nearly killed a man in an attempt to gain access to the safes. *See United States v. Jenkins*, 901 F.2d 1075, 1082 (11th Cir. 1990) (acknowledging that "evidence of motive" can be a proper basis to seize evidence).

### C. The 10 Center Street Warrant Established Sufficient Nexus.

Another set of items that would contain evidence of the motivation for the crime and the relationship between 10 Center Street and its robbers were cell phones and other electronic devices.[5] Nonetheless, Washington argues that the warrant affidavit failed to explain why cell phones and other electronic devices would contain evidence. (Doc. 444 at 16-20). "[T]he particularity requirement must be applied with a practical margin of flexibility, depending on…the circumstances and nature of activity under investigation permit." *United States v. Wuagneux*, 683 F.2d 1343, 1349 (11th Cir. 1982). "[T]he nexus between the objects to be seized and the premises searched can be established from the particular

---

[5] Washington and Earl never mentioned that the cell phones were ultimately searched pursuant to a second warrant, not the warrant they challenge. (Docs. 340-3, 340-4).

circumstances involved and need not rest on direct observation." *United States v. Lockett*, 674 F.2d 843, 846 (11th Cir. 1982).

If this had been a random home invasion, perhaps searching cell phones would be overly intrusive, but this was not a random robbery. "[I]t takes no special expertise for a judge to infer that information related to an active criminal enterprise may be contained on a cell phone." *United States v. Kendricks*, 2016 WL 5952743, at *7 (N.D. Ga. Oct. 13, 2016) (citing *Riley v. California*, 573 U.S. 373, 401 (2014)). "Cell phones have become important tools in facilitating coordination and communication among members of criminal enterprises, and can provide valuable incriminating information about dangerous criminals." *Riley*, 573 U.S. at 401. While New Jersey investigators did not know whether the residents of 10 Center Street were targeted because they were engaged in crimes themselves or for some other reason, there was nonetheless still a strong likelihood that their phones would explain why the robbers targeted this house.

### D. Good Faith.

Beyond categorically saying that good faith should not apply, (Doc. 444 at 21), Washington gives the Court no reason to doubt the Magistrate Judge's conclusion that the good faith exception should prevent the suppression of any evidence. (Doc. 422 at 57-59). Earl ignores good faith altogether. Because officers relied on the warrant in good faith, the Court should not suppress evidence even if it agrees with Earl and Washington that the warrant lacked probable cause or a sufficient nexus to the items seized. *See United States v. McCall*, 84 F.4th 1317, 1325 (11th Cir. 2023) (good faith reliance on warrant improper only if the warrant

provided "no hint" as to why officers thought they would find evidence); *United States v. Patel*, 2010 WL 11508324, at *5 (N.D. Ga. Mar. 29, 2010) ("In the Eleventh Circuit, the good faith exception to the exclusionary rule applies to alleged violations of the particularity requirement.") (citing *United States v. Accardo*, 749 F.2d 1477, 1479-81 (11th Cir. 1985)). The Magistrate Judge's analysis shows, at minimum, that there were more than sufficient hints of probable cause for law enforcement to rely on the warrant.

### 3. 9125 Saracen Drive

In June and July 2022, DEA agents were investigating Ramondo Lynch. DEA Atlanta agents asked DEA Baltimore agents to conduct surveillance of a location where Lynch was believed to be, 9125 Saracen Drive Pikesville, MD. (Doc. 426 at 3). On July 18, 2022, DEA agents in Atlanta learned that Lynch had sent a woman, Amber Egan, to the house of Lynch's brother, Maurice Lynch, to pick up money. (Doc. 426 at 5-6). Later that same day, DEA agents observed Maurice Lynch leave his house—located on Rosewood Place in Fairburn, GA. (Doc. 428 at 4-5). After a traffic stop and a chase, DEA agents seized 2 kilograms of cocaine from Maurice Lynch. (*Id.*) DEA Baltimore agents then obtained a warrant to search the Saracen Drive residence where they had seen Lynch, which they obtained on July 20, 2022. (Doc. 426 at 7). The warrant was executed overnight between July 20-21, 2022. (*Id.*) Lynch challenges the evidence found from this warrant. (Doc. 447).

9

### A. Standing - Lynch

The Magistrate Judge found that Lynch lacked standing. (Doc. 446 at 18-20). Lynch repeatedly attempts to flip the burden on the Government to show that he did not have a reasonable expectation of privacy at 9125 Saracen Drive.[6] But standing is his burden. *Rawlings,* 448 U.S. at 104. Ultimately, Lynch failed to show that he was ever permitted to be in the Saracen residence and failed to show that he was an overnight guest at the location at the time of the search. Lynch could have introduced this evidence through his testimony or the testimony of other individuals who would know. He instead elected to call a DEA agent who only saw him on a few occasions. From this limited evidentiary record, Lynch asks the Court to jump to the conclusion that he was living at the house. Lynch then compares himself favorably to cases where the defendant proved that they were living within a residence, something Lynch never did. The Government did not provide the Court with mere speculation. Instead, it simply pointed out the flaws in what Lynch elected to present to the Court.

The first thing a person who claims standing at someone else's house "must prove" is that "he was legitimately in the place searched." *United States v. Rodriguez-Alejandro*, 664 F. Supp. 2d 1320, 1342-43 (N.D. Ga. 2009) (finding that defendants lacked standing because "they presented no evidence that anyone with authority to do so gave them permission to stay as guests in the residence").

---

[6] To take one of many examples, Lynch says "The Government presented no evidence that any person *other than* Mr. Lynch was residing in the house." (Doc. 447 at 6).

Lynch's own uncorroborated affidavit—whose contents he was unwilling to take the stand to defend—is the only evidence that anyone gave Lynch permission to be in the residence.[7] (Doc. 265-1). The Government did not speculate that Lynch was a trespasser—standing is not the Government's burden, so it had no obligation to speculate or prove anything about whether Lynch was allowed to be at Saracen Drive. Lynch's decision not to introduce any evidence of his authority to be in the Saracen Drive house did not meet his burden.

Second, Lynch did not show that he was an overnight guest at the relevant time—the time of the search. In the Eleventh Circuit, a defendant must show more than "occasional presence on the premises as a mere guest or invitee." *Baron-Mantilla*, 743 F.2d at 870. An overnight guest can have standing, *Minnesota v. Olson*, 495 U.S. 91, 98 (1990), though not every overnight guest will have standing. *United States v. Rodriguez-Alejando*, 664 F. Supp. 2d 1320, 1341 (N.D. Ga. 2009). Even if Lynch were an overnight guest at Saracen Drive at some point, perhaps even as recently as June 18, he did not show that he was an overnight guest at the time of the search warrant. Not even his self-serving affidavit claimed he was still staying at Saracen Drive when agents executed the warrant. (Doc. 265-1). That was an important failure. As the Third Circuit has held, "an

---

[7] The Government acknowledged that Lynch had filed the affidavit on the docket but told the Court it would argue that Lynch's affidavit should be discounted or ignored because he was unwilling to defend it on cross-examination. (Doc. 325 at 61). The Court can and should discount the affidavit. *See United States v. Hamilton*, 2007 WL 2582233, at *1 n.1 (S.D. Ga. Aug. 31, 2007) (a defendant "may not hope to avoid the rigors of cross examination by the simple expedient of tendering his testimony in the form of an affidavit.")

overnight guest in the house of another has a legitimate expectation of privacy for as long as they are in the home." *United States v. Pettiway*, 429 F. App'x 132, 135 (3d Cir. 2011). In other words, when Lynch left the house, he no longer held a reasonable expectation of privacy. *See also United States v. Bushay*, 859 F. Supp. 2d 1335, 1366 (N.D. Ga. 2012) (finding no support for a visitor to challenge search "when the visitor was not present at the time of the search and seizure"); *United States v. Azrate*, 2014 WL 1256075, at *9 (N.D. Ga. Mar. 26, 2014); *United States v. Son*, 2012 WL 4711978, at *8 (N.D. Ga. Oct. 2, 2012) ("The Defendant here was not only not on the property at the time of the search, he has also failed to show he had even been there recently."); *United States v. Brazel*, 102 F.2d 1120, 1148 (11th Cir. 1997). And because Lynch left the Saracen Drive house, his reliance on cases when the defendant was present at the time of the search is unpersuasive. (Doc. 426 at 19 n.9). Nothing in Lynch's objection points to any evidence that would have established that he was an overnight guest when agents executed the warrant, which further establishes that the Magistrate Judge was correct to find he lacked standing.

Third, the evidence found within the house did not establish that Lynch was an overnight guest at the time of the search warrant, nor that Lynch had a reasonable expectation of privacy in the house. Lynch does not contest the DEA agent's testimony that the house "did not appear to be lived in for a substantial period of time, and there was minimal bedding and furniture." (Doc. 426 at 19). Lynch points out that there were clothes in the house, but introduced no evidence to show that the clothes belonged to him. In any event, personal effects

are not enough to prove standing. *See Sweeting*, 933 F.2d at 964. True, Lynch left two passports in the house, but such items are not sufficient to establish standing without more. *See, e.g., Armenta*, 69 F.3d at 308. Moreover, the evidence from the search of the house certainly did not show that Lynch had "an unrestricted right of occupancy or custody and control of the premises," as the Eleventh Circuit has required. *Baron-Mantilla*, 743 F.2d at 870 (finding no standing although defendant possessed a key).

Fourth and finally, Lynch failed to show that he was not using the Saracen Drive house as a stash location for storing drugs and drug proceeds. *See United States v. Cooper*, 203 F.3d 1279, 1285 n.3 (11th Cir. 2000) (requiring defendants to prove that their presence at a residence was personal, not related to a commercial, drug trafficking purpose); *see also United States v. Rivera-Pabon*, 493 F. App'x 15, 17 (11th Cir. 2012). The DEA agent that Lynch called to testify to establish his standing explained that the nature of the house and the items it contained made the agent believe this was a stash house for drugs and drug proceeds. (Doc. 325 at 48-53). Because Saracen Drive was used as a stash house, Lynch had a reduced expectation of privacy there. Combined with his decision not to testify or offer compelling evidence of his privacy interest, this illegal use of the premise underlines Lynch's lack of standing.

### B. Probable Cause.

The Saracen Road warrant established probable cause that Lynch was involved in a drug organization and that evidence of the drug crimes would be within the Saracen Road house. "Probable cause is not a high bar." *United States*

*v. Delgado*, 981 F.3d 889, 897 (11th Cir. 2020) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018)). Probable cause exists when, under the totality of the circumstances, there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Noriega*, 676 F.3d 1252, 1261 (11th Cir. 2012). "[P]robable cause deals with 'probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Illinois v. Gates*, 462 U.S. 213, 241 (1983). The Magistrate Judge cited the following facts in the affidavit as evidence that the Saracen residence would contain evidence:

- Lynch had recently used the house. (Doc. 426 at 26; Doc. 265-2 at 3-4).

- Another individual also used the house and then conducted a transaction later the same day he was seen at the house. (Doc. 426 at 26; Doc. 265-2 at 3-4).

- Lynch and others came and went from the house, including with several bags, consistent with what drug dealers are known to do. (Doc. 426 at 26; Doc. 265-2 at 3-4).

- A black Nissan was at the house, registered to someone who also registered cars in Chicago with hidden compartments for drugs. (Doc. 426 at 26-27; Doc. 265-2 at 5, 7).[8]

---

[8] Lynch points out that investigators did not see this woman at Saracen Road. (Doc. 447 at 16 n.6). That fact only makes the probable cause stronger, as investigators knew that drug traffickers often place vehicles in the names of other people. (Doc. 265-2 at 7).

14

- Two days before the warrant was executed, Lynch directed Amber Egan to his brother Maurice Lynch's house to collect $14,000 in cash. (Doc. 426 at 27; Doc. 265-2 at 5-7).[9]

- That same day, Maurice Lynch left the same house with two kilograms of controlled substances. (Doc. 426 at 27; Doc. 265-2 at 5-6).

- Inside the Rosewood Place house, agents found further evidence of drug trafficking including, firearms, currency, and additional drugs. (Doc. 426 at 29; Doc. 265-2 at 6, 8).

- The agents who conducted the search warrant knew that individuals involved with high-level drug trafficking maintain records in residences that they may use. (Doc. 426 at 27-28; Doc. 265-2 at 9-12).

The Magistrate Judge was correct to conclude that this established probable cause that there would be evidence of drug trafficking and money laundering.

**C. Good Faith.**

Lynch goes on to argue that the Saracen Road warrant was so lacking in probable cause that agents could not rely upon it in good faith. (Doc. 447 at 18-19). Tellingly, Lynch does not cite a single example of the Eleventh Circuit, or even a court within the Eleventh Circuit, finding that a duly-authorized warrant

---

[9] Lynch argues that Egan was truthful that she was going to use the money to purchase a business. (Doc. 447 at 15 n.5). Even if that were true, it would not matter. Egan picked up thousands of dollars in cash from a drug stash house at Lynch's direction. (Doc. 265-2 at 5-6). Doing so connected Lynch directly to the drug crimes that occurred at his brother's house at the same time. Investing drug proceeds into a legitimate business is still money laundering.

was so lacking in probable cause to render reliance upon it unreasonable. In the Eleventh Circuit, "the affidavit must be so clearly insufficient that it provided no hint as to why police believed they would find incriminating evidence." *McCall*, 84 F.4th at 1325 (citations and quotation marks omitted). Because courts assume "that the judge is more qualified than the police officer to make a probable cause determination…the officer's judgment must be more than just mistaken—it must be so plainly incompetent that no officer of reasonable competence would have requested the warrant." *Id*. (citations omitted).

The Magistrate Judge found that the affidavit "provided sufficient facts to establish probable cause," and then discussed those facts in detail. (Doc. 426 at 26-30). Lynch disagrees with that conclusion, but the fact that the Magistrate Judge could reach it proves that the warrant contained much more than "no hint" of why there was evidence in the house. Even if this Court disagrees with the Magistrate Judge, the good faith exception requires that the Court not suppress any evidence.

### 4. 2030 Hudson Street, 7724 Raynor Road, and Nissan Maxima

During the investigation, New Jersey investigators placed a tracker on a Nissan Maxima that it believed Washington was using to distribute drugs and launder money. Then, on September 15, 2022, New Jersey law enforcement and DEA agents conducted a series of search warrants, including an apartment located within the building at 2030 Hudson Street in Fort Lee, NJ and a house located at 7724 Raynor Road in Charlotte, NC. Washington's lone argument to suppress the evidence from these searches is that they were the fruits of the

16

search of 10 Center Street, which he argues was unlawful. (Doc. 444 at 20). The district court found that Washington lacked standing at each location.

### A. Standing.

Because Washington does not have standing at 10 Center Street, even if that search were unlawful it would not give him grounds to suppress any evidence. "[A] defendant may not exclude evidence that has been 'come at by exploitation' of a violation of somebody else's rights." *United States v. Jarvi*, 537 F.3d 1256, 1260-61 (10th Cir. 2001) (police found drugs at Defendant A's residence pursuant to a warrant procured using statements illegally-extracted from Defendant B; the statements were suppressed as to Defendant B, but the results of the warrant derived from those statements were not suppressed as to Defendant A, whose rights were not violated by the extraction of those statements); *United States v. Rauda-Constantino*, 2019 WL 7838968, at *19–20 (N.D. Ga. Aug. 6, 2019) ("[B]ecause [Defendant's] rights were not violated by any illegality in the application or issuance of the geolocational warrant relating to [Co-Defendant's] phone, no 'poison' attaches to the use of that evidence against [Defendant].").

At 2030 Hudson Street, law enforcement saw Washington in the parking garage and believed he lived in the apartment they searched, but Washington cannot rely on their belief alone. *See United States v. Thompson*, 171 F. App'x 823, 828 (11th Cir. 2006). Washington was in the apartment when New Jersey agents searched it, but that does not necessarily prove that he was an overnight guest. *See United States v. Dukes*, 2017 WL 11610362, at *4 (N.D. Ga. Aug. 1, 2017). If Washington wanted the Court to conclude that he was an overnight guest

permitted to be in the apartment, he should have said so or asked another knowledgeable witness to say so through testimony.

Washington's claim of standing at 7724 Raynor Road and in the Nissan Maxima is even weaker. Standing in a vehicle usually requires either a possessory interest or to be the driver. *United States v. Lee*, 586 F.3d 859, 864-65 (11th Cir. 2009). But Washington never said he was driving the Nissan, he just pointed to the Government's theory. Not enough. Similarly, it is not enough that the Internet bill at 7724 Raynor Road used his name. Washington presented the Court with no evidence about who put the utility bill in his name or why.

**B. Good Faith.**

Even if the Court were to decide that the search at 10 Center Street was unlawful, the Court should not suppress the fruits of the other searches based upon that decision. Because the exclusionary rule is a judicially created remedy whose purpose is to deter future Fourth Amendment violations, the Supreme Court has also created a judicial exception when officers rely on a warrant in good faith. *United States v. Taylor*, 935 F.3d 1279, 1289 (11th Cir. 2019). Suppression of evidence is not proper when agents rely on a warrant, even if later that warrant was invalid for lack of probable cause, relied on an error in a database, or relied on a statute or precedent later deemed unconstitutional. *See id.* (collecting cases). The Magistrate Judge carefully reviewed the evidence and concluded that the 10 Center Street search was valid and lawful. It was reasonable for other agents to believe the same and rely upon warrants that authorized the subsequent searches.

18

### 5.  6470 Wright Circle

As described above, on July 18, 2022, Lynch's brother Maurice Lynch was arrested with two kilograms of cocaine and his Fairburn, GA house was searched. (Doc. 422 at 9-10). Lynch owned a house in Sandy Springs, 6470 Wright Circle. (Doc. 422 at 34). On the night of Maurice Lynch's arrest, several cars came and stayed for a short time at 6470 Wright Circle, as if they were cleaning out some items of evidentiary value. (Doc. 422 at 10-11). After that night, the house was essentially unused, though Lynch did not sell it. (Doc. 422 at 17). Agents obtained a warrant and searched it in March 2023. (*Id.*) Earl and Lynch challenged this search. The Magistrate Judge found that Earl lacked standing. (Doc. 422 at 17-18). Earl and Lynch challenge the warrant. (Doc. 445, 447, 448).

### A.  Standing – Earl

Earl claims that the Magistrate Judge failed to evaluate his standing at 6470 Wright Circle under the correct standard. (Doc. 445 at 2-5). He is wrong. The R&R noted that Earl may have been an overnight guest at 6470 Wright Circle at some point in the semi-distant past, but Earl did not show that he had been inside the residence within months of the March 2023 search. (Doc. 422 at 17). A reasonable expectation of privacy is measured "at the time of the search." *United States v. Brazel*, 102 F.3d 1120, 1148 (11th Cir. 1997); *see also United States v. Hernandez-Martinez*, 2008 WL 11443130, at *3 (N.D. Ga. Aug. 25, 2008). While Earl tries to distinguish *Hernandez-Martinez*, it is clear from that decision and others that the focus of the Court must be on the privacy interest at the time of the search. *Hernandez-Martinez*, 2008 WL 11443130, at *3 (mentioning five different

19

times what the evidence showed about the defendant's standing "at the time of the search").

Agent Heather Grimes testified that at the time of the search, it appeared that no one had been in the Wright Circle house for months. (Doc. 324 at 68). Agent Grimes testified that the house did not have electricity, fall leaves still surrounded the house in March, and so much debris covered the property that agents could not use the driveway. (Doc. 422 at 17; Doc. 324 at 67-68). A newspaper from November 2022 remained in the trash can — which said nothing about when Earl had last been in the house, nor even that *anyone* had been inside the house in November (rather than placing a newspaper in an outdoor trash can), but rather proved beyond dispute that no one had lived in the house for at least four months. (Doc. 324 at 69). The evidence Earl presented did not come close to showing any expectation of privacy at the time of the March 2023 search:

- A self-serving[10] and misleading[11] affidavit that did not give a hint of when Earl had last entered the Wright Circle house. (Doc. 329-73).
- Dry cleaning receipts with the name "James Jackson" with Earl's phone number, the last of which was dated 7+ months before the search. (Doc.

---

[10] *See, e.g., United States v. Williams*, 536 F.2d 810, 812-13 (9th Cir. 1976) (holding that defendant had to take stand if Government challenged affidavit); *see also* Doc. 341 at 13-14.

[11] Earl claimed in his affidavit, as he does in his R&R objections, that he used Wright Circle, "as my second home." (Doc. 329-73 ¶ 4). But Earl failed to tell the Court about the second home he owned in Atlanta. (Docs. 327-5, 327-6).

20

329-59). The receipts give no indication of whether Earl was staying at Wright Circle or somewhere else, such as the nearby house he owned.

- Testimony from Earl's cousin, which was not credible,[12] that she had cleaned the Wright Circle house as recently at June 2022—nine months before the search.

- One furniture receipt for a rug purchased in cash by "Mario James," using Earl's girlfriend's email address, which was found in the Wright Circle house. (Docs. 329-71, 329-72). Nothing about the receipt indicates that the rug was the placed at Wright Circle.[13] The rug was purchased well over a year before the search of Wright Circle.

In short, Earl gave the Court no reason to believe he had any interest in the Wright Circle house in the months prior to the search—much less that he had a reasonable expectation of privacy at the actual time of the search. Instead, the flight records he introduced showed that he had not even been in the Atlanta-area in the months prior to the search. (Doc. 327-90). Moreover, Earl asks the Court to conclude that his purpose for being in the Wright Circle residence was

---

[12] Earl's cousin claimed to be paid $1,000 per cleaning—four times the most anyone else paid her, and ten times her median rate. (Docs. 329-65 to 329-68).

[13] Earl claims that purchasing this rug makes him more than an overnight guest, but cites no case that holds this. It cannot be the case that purchasing one rug—even if the Court assumes that Earl proved the rug went to Wright Circle, which he did not—does not give someone an indefinite and reasonable expectation of privacy in the whole house. *See Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978) (standing depends on what society is prepared to recognize as reasonable).

personal, which would require ignoring the evidence that Wright Circle was a drug stash house. (Doc. 252-1 ¶¶ 14, 20, 26-27, 31, 50, 52). The use of the house to store and sell drugs reduces any privacy interest that Earl had there. *Cooper*, 203 F.3d at 1285 n.3

Finally, it is telling that Earl claims—without evidence— that Wright Circle was "formerly used as his home." (Doc. 445 at 4). Earl had a home that he owned at 3491 Roswell Road, not far from Wright Circle, and his girlfriend owned at least one other home in Atlanta, all while Earl primarily lived in Seattle. (Doc. 324 at 41-42, 65; Docs. 327-5, 327-6). Earl elides this fact and inflates his long defunct privacy interest at Wright Circle because the facts he introduced at the evidentiary hearing do not support a reasonable privacy interest at the time of the search.

### B. Probable Cause.

Earl and Lynch nit-pick the probable cause in the Wright Circle affidavit, but taken as a whole there was more than sufficient reason to believe that evidence would be inside the house. Probable cause is "not a high bar" but is a "flexible and fluid concept" that takes into account "all information together." *Delgado*, 981 F.3d at 897. The affidavit showed three principal things: (1) Lynch, the owner of the house, was involved in a large-scale drug organization; (2) the Wright Circle house had previously been used as a stash house; and (3) despite the removal of some items, evidence would remain, such as attribution evidence to show who used the stash house.

*First*, the house was owned by Lynch and the affidavit established that Lynch was involved in drug trafficking. A named co-conspirator identified Lynch as one of the leaders of a drug organization that she joined and had worked with for eight years. (Doc. 252-1 ¶ 50). The affidavit established that Lynch's organization operated across the country. (*Id.* ¶¶ 14, 33, 49-51). Lynch was personally present in stash houses in Maryland and New Jersey, in addition to Wright Circle. (*Id.* ¶¶ 33, 36). Agents had phone conversations from another co-conspirator that showed Lynch negotiating cocaine purchases in the Atlanta area. (*Id.* ¶¶ 10-14). Lynch also directed a money pickup from the stash house operated by his brother. (*Id.* ¶ 23).

*Second*, the affidavit showed that Lynch's house was used as a stash house to store drugs and drug proceeds.[14] Consider the following four pieces of evidence from the affidavit that established that Wright Circle was used as a stash house:

- A co-conspirator took a picture of a drug ledger from within the house, showing millions of dollars of cocaine sales. (*Id.* ¶ 52).

- Co-conspirator Maurice Lynch—someone known to distribute cocaine—came to the house for a short visit, and left with a full duffle bag, exactly what one would expect a drug dealer to do. (*Id.* ¶ 20).

---

[14] Because the evidence in the affidavit showed that Wright Circle was a stash house, not just a place Lynch lived, this case is unlike several cited in Lynch's objection. (Doc. 447 at 37-41). It is improper to introduce arguments and evidence for the first time in a reply brief. *See United States v. Morris*, 2016 WL 8669407, at *8 (N.D. Ga. July 15, 2016).

- According to two knowledgeable witnesses, the house had a locked room where women were not allowed to enter, which is consistent with the rooms where this organization would store cocaine. (*Id.* ¶¶ 31, 50).

- Most importantly, at the exact same time that agents searched one Atlanta-area stash house, individuals began showing up for quick visits at Wright Circle and then essentially never used the house again. (*Id.* ¶¶ 22, 24, 26-27). The only plausible explanation for this conduct is that Wright Circle was also a stash house and co-conspirators needed to remove the drugs and money from it. (*Id.* ¶ 27).

*Third*, the affidavit showed that the house would still contain evidence in March 2023. Lynch still owned the house. (*Id.* ¶ 53). Since July 2022, it sat essentially unused and agents had not seen an indication that it was so thoroughly cleaned out that nothing would remain inside. (*Id.* ¶ 32 and pages 32, 34). Because Wright Circle was a stash house, a vast range of items likely to be in the house would be evidence of the crimes under investigation. Items that would be innocuous in an ordinary residence would be probative of drug trafficking in this house, as indicia of residency or occupancy of a stash house.

Indeed, this investigation has shown the value that attribution evidence can have, even from items that are not contraband and may seem insignificant to someone trying to clean items out of a stash house. In this case, New Jersey police never saw Mario Earl at 10 Center Street when they executed a search warrant and found three kilograms of cocaine inside. But they did find a discarded Starbucks cup, and subpoena returns showed that Earl purchased the

24

Starbucks drink the morning of the search warrant around the corner from 10 Center Street—showing that he was inside the stash house and next to the cocaine that day no less than if he had been actually standing in the stash house during the search. (Doc. 253-1 ¶ 54). Here, because 6470 Wright Circle was a stash house, all kinds of documents that would be overlooked by someone removing high value items could be evidence—receipts, mail, discarded cups, old and forgotten phones, etc.

## C. Good Faith.

Again, Earl and Lynch fail to show that the evidence should be suppressed, even if the warrant were stale or probable cause were lacking. Once more, the standard they must meet is to show that the affidavit gave "no hint" of probable cause. *McCall*, 84 F.4th at 1325.  Two magistrate judges of this Court have reviewed the affidavit and found that it established probable cause—one who issued the warrant and one who issued the R&R. Both were correct. As the discussion above shows, there was certainly more than a hint of probable cause in the affidavit and agents were right to rely on the warrant in good faith.

## D. The Statement about Pole Camera Footage Was Immaterial.

Grasping at straws to suppress the evidence from Wright Circle, Earl and Lynch argue that one sentence from a fifty-five-paragraph affidavit was incorrect and undermined all the probable cause established by the rest of the affidavit. "[E]ven intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." *Madiwale v. Savaiko,* 117 F.3d 1321, 1327 (11th Cir. 1997). Specifically, Earl

and Lynch argue that the affidavit should have mentioned that on July 20, 2022, two individuals appear to go inside the residence for approximately two hours. (Doc. 447 at 32).[15] The Magistrate Judge reviewed the affidavit in full and found that the statement about the pole camera, even if incorrect, was immaterial. (Doc. 422 at 24-25).[16] Earl and Lynch's objections give the Court no reason to reconsider that sound decision.[17]

The affidavit admitted that high-value items such as drugs and drug proceeds were likely removed during the rapid actions at Wright Circle on July 18, 2022, but contended that other items of evidentiary value likely remained. (Doc. 252-1 ¶ 27). The Wright Circle house was a 2,444 square foot house and it would take substantial time to remove every single item of evidentiary value. (Doc. 252-1 ¶ 55). Whether co-defendants were in the house for 24 minutes or a couple hours is immaterial; neither is sufficient to remove everything of evidentiary value. Because Wright Circle was a stash house, the evidence could include almost any

[15] If anything, the assertion that Maurice Lynch came to the Wright Circle house immediately after he was arrested with cocaine makes the probable cause stronger. (Doc. 447 at 32-34). Maurice Lynch going straight to the house for a short stay after his arrest only increases the likelihood that Wright Circle is a stash house.

[16] The Magistrate Judge also concluded that Earl and Lynch had not made the substantial preliminary showing that the statement was made knowing it was false or with reckless indifference to its truth. (Doc. 422 at 24). Earl and Lynch's objections give the Court no reason to doubt that conclusion.

[17] Lynch's objections point the Court to affidavits and transcripts included in his reply brief. (Doc. 447 at 32, 36; Doc. 382). The Court should not consider evidence and arguments introduced for the first time in reply briefs.

indicia of occupancy or use of the residence—old phones, discarded mail, handwritten ledgers, and so on.

The condition of the house confirmed that it still contained evidence. Drug dealers do not often return to stash houses once they have been identified as such, as Wright Circle was in July 2022. (Doc. 252-1 ¶ 27). Lynch still owned the house the whole time. (*Id.* ¶ 53). The house was so unused between July 18, 2022 and March 2, 2023 that debris piled up in the driveway until the house was inaccessible. (*Id.* ¶ 32 and pages 32, 34). Such a house was not likely lived in or often visited, making it likely that it still contained some evidence.

### 6. Earl's Seattle Residence, Office, and Car

After the grand jury returned the indictment in this case, DEA agents arranged to arrest the defendants and search locations related to them. Among the locations they searched were Earl's Seattle-area residence (11527 113th Place NE, Kirkland, Washington), his office (5416 Rainer Avenue South, Seattle, Washington), and a car he used. Agents obtained that warrant on January 19, 2024 and executed it on January 24, 2024. Earl challenges the legality of those searches. (Doc. 449).

#### A. Probable Cause.

Earl argues that the Magistrate Judge's conclusion that the warrant established probable cause was incorrect. (Doc. 449 at 2-4). But the Magistrate Judge followed a well-established line of precedents establishing that individuals who sell drugs and launder money in large volume keep evidence of those

crimes in their residences, offices, and vehicles. (Doc. 428 at 24-26).[18] After all, "[p]robable cause is not a high bar." *Delgado*, 981 F.3d at 897 (quoting *Wesby*, 583 U.S. at 57). The Eleventh Circuit has explicitly said that there "need not be an allegation that the illegal activity occurred at the location to be searched." *United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009). The Eleventh Circuit and many other courts have said that it is "common sense" that drug dealers "keep evidence of their drug business at home." *United States v. Meryl*, 322 F. App'x 871, 874 (11th Cir. 2009); *see also United States v. Miggins*, 302 F.3d 384, 393-94 (6th Cir. 2002) (collecting cases from eight circuits). One current Eleventh Circuit judge laid out a path to reach the common sense conclusion that a particular drug dealer will keep evidence in a particular location, suggesting that courts look at the evidence that an individual was involved in drug trafficking, that he was closely associated with the residence, and whether the agent could say, based on their training and experience, that such a defendant was likely to keep evidence in a similar location. *See United States v. Acosta*, 807 F. Supp. 2d 1154, 1216-1219 (N.D. Ga. 2011).

---

[18] Earl cites *Martin* to make the unremarkable point that the warrant affidavit must establish probable cause to believe a residence will contain evidence, not simply the defendant's involvement in crimes. (Doc 449 at 3 (citing *United States v. Martin*, 297 F.3d 1308 (11th Cir. 2002)). Precedent has established when a warrant establishes probable cause that a defendant will keep evidence in their home, and this warrant did so.

The warrant provided significant evidence that Earl organized a large-volume drug trafficking organization, and that he did so in a way that involved electronic devices:

- Agents knew that Earl coordinated a sophisticated drug trafficking organization that distributed thousands of kilograms of cocaine a year across the country. (Doc. 259-1 ¶¶ 6-8).

- The drug organization maintained electronic ledgers, such as a ledger that showed 409 kilograms of cocaine sales in a three-month period. (Doc. 259-1 ¶¶ 6, 15).

- Earl coordinated the renting of stash houses and money pickups across the country with his co-conspirators, using electronic devices. (Doc. 259-1 ¶¶ 14-15).

- Earl was present inside a New Jersey stash house earlier on the day it was searched and cocaine was found. Inside the house was a phone Earl used to communicate with other co-conspirators. (Doc. 259-2 ¶¶ 9, 10, 12).

- The same month, 700 miles away, agents found evidence connecting Earl to a stash house from which they had seized cocaine. (Doc. 259-2 ¶ 17). Again, they found several electronic devices connecting this stash house to a nation-wide conspiracy. (*Id.*)

- In September 2022, agents executed search warrants in New Jersey, Georgia, and North Carolina, identifying further electronic devices that

were involved in the large-volume cocaine trafficking scheme. (Doc. 259-2 ¶¶ 20-27).

- A later search warrant in Sandy Springs found nine cell phones used by the organization with "extensive stored communications" about drug transactions and money laundering. (Doc. 259-2 ¶ 28).

- Earl engaged in structured transactions, consistent with money laundering. (Doc. 259-2 ¶ 29).

The warrant also explained why each location in Washington state was one that Earl used routinely and where he thus would be expected to keep his electronic devices and other records about his drug trafficking activity:

- Earl owned the house (11527 113th Place) in his own name. Ping data from his cell phone showed that he was living there. (Doc. 259-2 ¶¶ 32, 37).

- Earl's office (5416 Rainer Avenue) was owned by MCM Realty Investments LLC. Earl was the owner and president of this company, and used it to create false pay stubs to allow co-conspirators to rent stash houses. Both geo-location data and physical surveillance showed that Earl used the office. (Doc. 259-2 ¶¶ 41, 42, 44, 46-47).

- The white Cadillac Escalade was owned by Earl and MCM Realty, and agents observed him driving it. (Doc. 259-2 ¶¶ 47, 50).

- The affiant explained the types of documents that he would expect, based on his training and experience, a significant drug trafficker to maintain on his phone that he keeps nearby. (Doc. 259-2 ¶ 79).

## B. Staleness

Earl goes on to argue that the evidence of his involvement in drug trafficking was stale by the time agents obtained the warrant. But Earl's argument ignores the nature of the evidence that the warrant sought, especially electronic evidence of his drug trafficking. Because drug trafficking, especially large-scale professional trafficking involves its participants repeating their crimes over and over, the Eleventh Circuit has asked its courts to construe staleness liberally in such cases. *United States v. Bascaro*, 742 F.2d 1335, 1346 (11th Cir. 1984); *United States v. Harris*, 20 F.3d 445, (11th Cir. 1994) (information in warrant was not stale despite information mostly 2+ years old). In addition, courts have repeatedly found that electronic evidence does not get stale like other evidence. *See United States v. Touset*, 890 F.3d 1227, 1238 (11th Cir. 2018) (electronic evidence "is not subject to spoilage or consumption"); *United States v. Flores*, 2022 WL 19828971, at *13 (N.D. Ga. Nov. 17, 2022). The facts here showed that Earl was engaged in repeated, large-scale drug trafficking, and that the evidence would remain on electronic devices in a manner that was unlikely to become stale.

## C. Good Faith

Finally, Earl argues in conclusory fashion that the good faith exception should not apply. Earl cannot cite a single case from the Eleventh Circuit or a district court in the Eleventh Circuit in which the Court found that the good faith exception should not apply due to an utter lack of probable cause. The Eleventh Circuit has held that a Court should not suppress evidence unless there was "no hint" of why police expected to find evidence in the location. *McCall*, 84 F.4th at

31

1325. The requirement that a defendant showed that an affidavit provided "no hint" of probable cause applies equally to claims that the warrant lacked a sufficient nexus or that it was stale. *Patel*, 2010 WL 11508324, at \*5; *United States v. Ayala-Castaneda*, 2009 WL 10673147, at \*4 (N.D. Ga. May 15, 2009) (applying good faith exception to claim that warrant was stale). A Magistrate Judge of this court found that there was probable cause to believe that the warrant established that there would be evidence in Earl's residence, office, and vehicle. (Doc. 428 at 18). He was correct. But even if not, his lengthy analysis and conclusion proves that there were more than enough hints of probable cause that good faith should prevent the suppression of any evidence.

**Conclusion**

The Court should adopt the Magistrate Judge's Reports and Recommendations (Docs. 422, 424, 426, 428).

Respectfully submitted,

THEODORE S. HERTZBERG
*United States Attorney*

/s/MATTHEW R. LAGRONE
*Assistant United States Attorney*
Georgia Bar No. 499437
Matthew.LaGrone@usdoj.gov

/s/SANDRA E. STRIPPOLI
*Assistant United States Attorney*
Georgia Bar No. 688565
Sandy.Strippoli@usdoj.gov

600 U.S. Courthouse, 75 Ted Turner Drive S.W., Atlanta, GA 30303
(404) 581-6000   fax (404) 581-6181

33