**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

United States of America,

v.                                                    Case No. 1:23-cr-335-MLB

Mario J. Earl, et al.,

          Defendant.

_____/

## <u>ORDER</u>

Defendants Mario Earl, Raymondo Lynch, and Turomne Washington move to suppress evidence seized from two residences. (Dkts. 216, 217, 252.)  The Court adopts the Magistrate Judge's Report and Recommendation (Dkt. 422) in part, denies Earl's and Washington's motions (Dkts. 216, 217), and schedules a *Franks* hearing on Lynch's motion (Dkt. 252) for July 23, 2026 at 10:00 a.m.

## I.    Background

This case arose from a nationwide drug-trafficking investigation. Law enforcement executed search warrants at various locations in Georgia, Maryland, New Jersey, North Carolina, and elsewhere.  (Dkt.

1

252-1 ¶¶ 21, 26, 33, 48, 49.)  This order involves two of those warrants: one for the residence located at 6470 Wright Circle in Sandy Springs, Georgia (Dkt. 252-1) and one for the residence located at 10 Center Street in Cresskill, New Jersey (Dkt. 217-1).

### A.    The Wright Circle Search Warrant

In the Wright Circle warrant application, a law enforcement agent averred that, on December 15, 2021, DEA agents in South Carolina arrested a person carrying 15 kilograms of cocaine hidden in a secret compartment (or trap) of a car.  (Dkt. 252-1 ¶ 9.)  The affiant explained agents identified the courier's source of cocaine, indicted that person, searched his or her cell phone, and found a series of text messages in which Lynch discussed the distribution of cocaine.  (*Id.* ¶¶ 9-10.)  That person agreed to cooperate with law enforcement, thus becoming known as Cooperating Defendant 1 or CD-1.  (*Id.*)   He or she told law enforcement Lynch had supplied the cocaine seized on December 15, 2021 and had provided CD-1 cocaine in other states over the last several months.  (*Id.*)  The affiant described text messages from CD-1's phone that corroborated his or her allegation.  (*Id.* ¶¶ 11-14.)  This included text messages from December 15, 2021 in which Lynch agreed to deliver 20

kilograms of cocaine to CD-1 in two bags, one containing 5 kilograms and the other containing 15 kilograms. (*Id.* ¶¶ 13-14.) Lynch arranged for delivery at a hotel in Atlanta. That hotel is about three miles from the Wright Circle residence and the affiant reported that, based on the "short turn-around time" Lynch gave for delivering the drugs, he believed the cocaine came from that residence. (*Id.*)

Through geo-location warrants and surveillance, agents identified a phone Lynch appeared to be carrying and tracked him with that phone from California to the Wright Circle residence. (*Id.* ¶¶ 15-17.) Agents saw Lynch at the residence, photographed him, and showed that photograph (in a lineup) to CD-1. (*Id.* ¶¶ 17-18.) CD-1 again confirmed Lynch as his or her source of cocaine. (*Id.* ¶ 18.)

On June 24, 2022, Agents saw Maurice Lynch (Lynch's brother) and Defendant Kenyatta Willis load what they believed to be a duffle bag of drugs from the Wright Circle house into a car, notice agents conducting surveillance, and drive away from the home while "conducting numerous counter-surveillance maneuvers by rapidly changing multiple lanes for no apparent reason and exiting the highway at the last second," ultimately losing the agents. (*Id.* ¶ 20.)

On July 18, 2022, Agents followed Amber Egan from the Wright Circle residence to a home on Rosewood Place in Fairburn, Georgia, where she got a small plastic bag and placed it in her car. (*Id.* ¶ 21.) Minutes later, Maurice Lynch placed a brown Nike bag in the trunk of her car. (*Id.* ¶¶ 22.) After Egan left the house, police stopped her and found $14,000 (in small denominations separated with rubber bands) in the plastic bag and a money counter in the Nike bag. (*Id.* ¶ 22-23.) A dog alerted to the odor of drugs on the money and scale. (*Id.*) Egan said she was carrying the money for Defendant Lynch, who she called her "Executive Printing business partner." (*Id.*) Law enforcement released her.

At 5:50 that evening, agents saw Maurice Lynch leave the Rosewood Place house carrying a large bag and small satchel. (*Id.* ¶ 24.) When a state trooper stopped him, Lynch ran from the car with the two bags, abandoning a child he had with him. (*Id.*) Law enforcement arrested him and found 2 kilograms of cocaine and money in the bags he had been carrying. (*Id.*) During a search of the Rosewood Place home, law enforcement found 15 kilograms of psychedelic mushrooms, 5 pounds of THC edibles, 2 guns, and $128,000 in cash. (*Id.* ¶ 25.)

While that search was occurring, a pole camera installed near the Wright Circle residence recorded the arrival of three cars between 5:00 and 7:30 that night. (*Id.* ¶ 26.) The camera's position prevented agents from seeing the cars (or their trunks) after they entered the driveway. (*Id.*) The affiant explained that the cars remained at the residence for twenty-four minutes. (*Id.* ¶ 27.)[1] The affiant opined that someone sent people in those cars to the residence "to remove items of monetary value to the DTO, specifically drugs and drug proceeds" following Egan's interaction with law enforcement. (*Id.* ¶ 27.) He averred, however, that "due to the haste" with which people may have removed items, there was probable cause to believe evidence of drug trafficking—including documents, phones, ledgers, packaging material, safes, and scales— would still be in the home. (*Id.*) He further stated that based on his "knowledge, training, and professional experience, when [drug traffickers] become concerned that law enforcement agencies have or will identify their stash locations, they quickly remove items with high

---

[1] The affiant included arrival and departure times for each car. (Dkt. 252-1 ¶¶ 27, 55.) The Court cannot reconcile that information with the agent's statement that they stayed at the home for only twenty-four minutes. Neither side raises this issue.

5

monetary value—such as narcotics and drug proceeds—leaving behind remnants of drug trafficking, and documentary evidence of ownership and occupancy which do not carry high monetary value." (*Id.*)

At 9:00 that night, Agents saw Egan leave the house in a rented van, stopped her, and spoke with her. (*Id.* ¶¶ 28-31.) She told them she had spoken with Lynch after police stopped her earlier that day. (*Id.* ¶ 31.) When she went back to the Wright Circle residence, she saw a car in the driveway, and called Lynch again. (*Id.*) He told her to "make the block" (meaning drive around the block) before going to the home. (*Id.*) When she got back, the car was gone. (*Id.*) She explained she had never seen narcotics (other than marijuana) in the home, but knew Lynch kept a room on the second floor locked and denied her access to it. (*Id.*) The affiant opined that the car Egan saw in the driveway belonged to someone Lynch had sent to remove things from the house because of Egan's prior interaction with law enforcement. (*Id.*)

The affidavit described the investigation into Defendants' drug-trafficking activities elsewhere in Atlanta and other cities. Some of those allegations also implicated Lynch in the activity. A few implicated the Wright Circle home. The affiant, for example, explained that, after law

6

enforcement arrested "a high ranking [Drug Trafficking Organization] member named Ray Bradley in September 2022, agents searched his phone and found photographs of drug ledgers that—according to geolocation information—were sent, received, or created on May 1, 2022 while the phone was at the Wright Circle residence. (*Id.* ¶ 52.)[2]

On March 23, 2023, the affiant applied for the search warrant. He stated Lynch still owned the home and opined Lynch (and others) had used the home to distribute cocaine until July 18, 2022. (*Id.* ¶ 54.) He again alleged that, given the fact the cars were only at the home for twenty-four minutes on that night, people could not have removed everything from the home and there was probable cause to believe documents, phones, ledgers, packaging material, safes, and scales and other evidence of drug distributing would still be at the house. (*Id.* ¶ 55.) Finally, he alleged that, based on pole camera footage, no one had been in the house since July 19, 2022 and that debris had piled up in the

---

[2] In his reply, Lynch notes the affidavit does not indicate where the photo was taken. (Dkt. 455 at 11.) That's correct. The affiant noted only that the photo seemed to have been sent, received, or created while at the home. Still, it ties someone with access to the drug ledger to the home, and that is all the affiant averred.

driveway, making access difficult. (*Id.* ¶¶ 32, 53.) A magistrate judge issued the warrant.

## B.    The 10 Center Street Warrant

The search of the Center Street home arose from a separate investigation. The affiant for that warrant reported that, on July 7, 2022, several people called to report "multiple actors with weapons" at the home. (Dkt. 217-1 ¶ 15.) Police found Bryan Palacios lying in the garage screaming for help, with gunshot wounds to his legs. (*Id.*) He told police people tried to get combinations to safes inside the home and shot him during the altercation. (*Id.*) Officers found two large safes inside the home, money on the ground by the safes, and a trail of blood from that spot to the garage where they found Palacios. (*Id.*) Through the owner of the home, police identified the tenant, who said she was traveling but Palacios (her boyfriend) was housesitting. (*Id.* ¶ 16.) From neighborhood cameras, police obtained video footage showing "three potential suspect vehicles and multiple suspects," one of whom was carrying a rifle. A neighbor told police one of the assailants was wearing a "law enforcement style raid jacket." (*Id* ¶ 18.) From this, the affiant posited there was probable cause to believe a search of the home (and a car at the home)

would provide evidence related to the attempted murder of Palacios. (*Id.* ¶ 19.) The affiant did not request authorization to enter the safes and the warrant did not specifically authorize that conduct. After obtaining the warrant, police searched the home and the safes, finding three kilograms of cocaine in the safes. (Dkt. 252-1 ¶¶ 35-36.)

### C. Motions to Suppress

Lynch moved to suppress the search of the Wright Circle residence, arguing the affidavit failed to establish probable cause to support the search of the home, contained stale information, and included material misrepresentation and omissions. (Dkt. 252.) Washington moved to suppress the search of the Center Street residence. (Dkts. 217, 253.) Earl also moved to suppress and to adopt Lynch's and Washington's motions. (Dkts. 216, 254, 257, 262.)[3] Earl also filed his own motion to suppress the search of the Center Street residence. The Magistrate Judge issued a report and recommendation, saying this Court should deny Lynch's motion regarding the Wright Circle location, conclude Earl lacks

---

[3] Earl also adopted a motion to suppress the Center Street search filed by Defendant Elisa Johnson. (Dkt. 256.) But she pleaded guilty, thus nullifying her motion. (Dkt. 365.) So the Court denies this motion to adopt as moot.

standing to challenge the search of that home but has standing to challenge the search of the Center Street home, determine Washington lacks standing to contest the search of the Center Street home, and deny Earl's motion regarding the Center Street home.  (Dkt. 422.)  All Defendants filed objections.  (Dkts. 444, 445, 447.)[4]

## II.   Standard of Review

28 U.S.C. § 636(b)(1) requires district courts to "make a de novo determination of those portions of [an R&R] to which objection is made."

---

[4] Defendant Earl seeks to incorporate his "legal analysis" from his prior pleadings.  (Dkt. 445 at 1.)  The Court does not consider those.  It considers only the specific objections he raises in his objections to the R&R.  *United States v. Matthews*, 2024 WL 688666, at *2 (N.D. Ga. Feb. 20, 2024) (Brown, J.) ("[W]hen a party merely makes general objections, such as incorporating by reference other arguments made in prior briefs, the objecting party does not receive a de novo review."); *United States v. Middleton*, 595 F. Supp. 3d 1277, 1283 (N.D. Ga. 2022) (Batten, J.) ("[A] party does not state a valid objection to an R&R by merely incorporating by reference previous filings. . . .  Because [defendant's] objections were general and merely incorporated their prior briefing, the Court will overrule them.").  Defendants Lynch and Earl filed replies to the United States's response to their objections.  (Dkts. 455, 457.)  Under Local Criminal Rule 59(3), they needed leave of Court to do that and did not get it.  The Court does not consider those pleadings.

Any such objection "must specifically identify the portions of the [R&R] to which objection is made and the specific basis for objection." *McCullars v. Comm'r, Soc. Sec. Admin.*, 825 F. App'x 685, 694 (11th Cir. 2020)[5]; *see United States v. Schultz*, 565 F.3d 1353, 1360 (11th Cir. 2009) ("[A] party that wishes to preserve its objection must clearly advise the district court and pinpoint the specific findings that the party disagrees with."). A court must conduct a plain error review of the record for findings and recommendations to which a party has not asserted objections. *See United States v. Slay*, 714 F.2d 1093, 1095 (11th Cir. 1983). "Frivolous, conclusive, or general objections need not be considered by the district court." *Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988).

## III. Discussion

Defendants' objections attack both the Magistrate Judge's conclusions about which Defendants have standing to challenge the

---

[5] The Court recognizes *McCullars* is unpublished and not binding. The Court cites it and other unpublished cases as instructive, nonetheless. *See Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1355 n.5 (11th Cir. 2018) ("Unpublished cases do not constitute binding authority and may be relied on only to the extent they are persuasive.").

warrants and his conclusion that the warrants provided probable cause to justify the searches.

### A.    Standing to Challenge the Searches

"[T]o claim the protection of the Fourth Amendment, a defendant must demonstrate that he [or she] personally has an expectation of privacy in the place searched, and that his [or her] expectation is reasonable." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998); *see also United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000) ("Fourth Amendment rights, however, are personal, and only individuals who actually enjoy the reasonable expectation of privacy have standing to challenge the validity of a government search."). This threshold issue "has come to be known colloquially (but as it turns out misleadingly) as Fourth Amendment 'standing.'" *United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020) (en banc).

"A defendant may have a reasonable expectation of privacy in a home that he [or she] does not own or rent if he [or she] shows 'an unrestricted right of occupancy or custody and control of the premises as distinguished from occasional presence on the premises as a mere guest or invitee.'" *See United States v. Campbell*, 434 F. App'x 805, 810 (11th

12

Cir. 2011) (quoting *United States v. Baron-Mantilla*, 743 F.2d 868, 870 (11th Cir. 1984)); *see also United States v. Rodriguez*, 762 F. App'x 712, 715–16 (11th Cir. 2019) (holding defendant's status as social guest or commercial transaction participant could not establish standing to challenge the search of a home).  A defendant has the burden of showing a legitimate expectation of privacy in the area searched by a preponderance of the evidence.  *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008).

The United States agrees Lynch has standing to contest the search of the Wright Circle residence because he owned it.  The United States, however, argued before the Magistrate Judge that Earl lacked standing to contest the search of that residence.  Earl filed an affidavit in which he averred that Lynch (his best friend) gave him a key and "unfettered access" to the home.  (Dkt. 254-2.)  He said he stayed in the home when in Atlanta, purchased furniture for the home, hosted friends and family at the home, gave his girlfriend a key and unfettered access to the home, had packages delivered to the home, paid for cleaning at the home, and used a dry cleaners and gym near the home.  (*Id.*)  He said he would still have access if he were not incarcerated.  (*Id.*)  His father offered an

affidavit confirming he had stayed with Earl in the home.  (Dkt. 254-3.)

At an evidentiary hearing, Earl called an investigator who introduced

receipts from the dry cleaners and other documents in support of Earl's

affidavit.  (Dkt. 324 at 12.)

The Magistrate Judge concluded that, even if Earl once had access

to the home, he was not using the home at the time of the search and

thus had no reasonable expectation of privacy at that time.  (Dkt. 422 at

17.)   Earl objects and argues the Magistrate Judge failed to evaluate

necessary factors for establishing an expectation of privacy, including

whether he had the right to exclude others from the home, whether he

exhibited a subjective expectation of privacy from governmental invasion,

and whether he was legitimately at the premises.  (Dkt. 445 at 3.)  He

argues the Magistrate Judge essentially concluded Earl abandoned his

interest in the home but the United States had not properly raised that

issue.  (Dkt. 445 at 3-10.)

The Court overrules this objection.  Earl was required to show, not

that he had an expectation of privacy in the home at some time, but that

he had that expectation at the time of the search. *United States v. Brazel*,

102 F.3d 1120, 1148 (11th Cir. 1997) ("we are not persuaded that [the

defendant] carried his burden of showing a legitimate expectation of privacy in the apartment . . . at the time of the search"); *United States v. Sweat*, 2007 WL 9717235, at \*4 (M.D. Fla. May 9, 2007) ("The Court must determine whether Defendant had a reasonable expectation of privacy at the time of the search, not whether Defendant ever had a reasonable expectation of privacy in the property."). His evidence showed only that he previously had access to the residence—not that he maintained a reasonable expectation of privacy when agents executed the warrant months later. The last dry cleaning receipt was dated July 2022 and his cousin claimed to have cleaned the house between January 2022 and June 2022. (Dkt. 324 at 36-37.)[6] None of this established a continuing connection with the home during the nine months preceding the search. The United States, however, presented evidence that—at the time of the search— no one was living in the home, it had no electrical service, it was messy inside with cobwebs, and it had an unkempt yard with debris

---

[6] Defendant also presented a receipt found in the house for the purchase of a rug by "Mario James." (Dkt. 329-72.) It included the Wright Circle address and Earl's girlfriend's phone number. (*Id.*) Earl offered no evidence he was "Mario James" or that the rug was, in any way, related to the home. And the receipt is dated November 15, 2022—more than a year before the search. (Dkts. 324 at 26; 329-72.)

blocking the driveway.  (Dkt. 324 at 66-67.)  During the search, an agent also found a newspaper dated November 2022 in the trash, suggesting no one had emptied the trash for months.  (*Id.*)

Earl may have stayed at the house frequently, entertained family there, paid for cleaning, and used vendors in the area.  He might even have kept a key.  But the evidence shows he had cleared out long before agents executed the warrant.  And the United States presented this exact issue to the Magistrate Judge (Dkt. 324 at 66-67), thus precluding any claim it forfeited its right to argue Earl essentially abandoned any connection to the residence.  The Court adopts the Magistrate Judge's conclusion that Earl lacks standing to challenge the search of the Wright Circle residence.

Earl submitted an affidavit averring his long-time girlfriend (Elisa Johnson) leased the Center Street residence, gave him a key, and allowed him unfettered access to the home.  (Dkt. 256-2.)  He said he had been staying there in the days before the search.  (*Id.)*  The Magistrate Judge determined Earl had constitutional standing to challenge the search of the Center Street residence (Dkt. 422 at 41), the United States did not object to that conclusion, and the Court adopts it.

Washington, on the other hand, offered no such evidence. With his motion to suppress, he filed two unsigned "declarations" claiming he was staying in the Center Street home at the time of the search with the permission of a friend who was housesitting. (Dkts. 217, 253-2, 253-5.) At the start of an evidentiary hearing, Washington withdrew those declarations, announced he would not testify, and stated he would rely on evidence law enforcement found his wallet at the residence. (Dkt. 325 at 5-7.) The Magistrate Judge concluded Washington had not satisfied his burden of proving an expectation of privacy in the home. (Dkt. 422 at 47-49.) Washington objects, saying the presence of his wallet in a bedroom established his right to contest the search. He also relies upon surveillance footage from the day of the search showing him returning to the residence during the robbery and immediately running away. (*Id.*) He argues that, after considering these same two things, the search warrant affiant concluded there was "reason to believe [Washington] had been staying at [the home], and walked in on the in-progress attempted murder . . . before fleeing the scene." (*Id.* (citing 253-1 at 39).)

The Court agrees Washington failed to establish standing. Neither the recovery of personal items at a location nor occasional presence at a

location demonstrates the expectation of privacy necessary to establish Fourth Amendment standing. *See United States v. Sweeting*, 933 F.2d 962, 964 (11th Cir. 1991) ("The fact that they had temporary access to the premises along with several other members of their family and had some personal effects there does not establish the requisite subjective expectation of privacy to assert standing when coupled with their explicit disclaimer of ownership or interest."); *United States v. Baron-Mantilla*, 743 F.2d 868, 870 (11th Cir. 1984) (establishing legitimate expectation of privacy requires evidence of "an unrestricted right of occupancy or custody and control of the premises as distinguished from occasional presence on the premises as a mere guest or invitee"); *United States v. Bourassa*, 2019 WL 7559294 at *8 (N.D. Ga. May 20, 2019) (defendant's unsupported claim he was overnight guest insufficient to satisfy burden of establishing expectation of privacy). To hold otherwise would extend Fourth Amendment protections to a fleeting visitor who happens to leave personal items at someone else's home.

And he cannot piggyback on the affiant's theory of the case to meet his burden of proof. *United States v.* Singleton, 987 F.2d 1444, 1449 (9th Cir. 1993) (defendant cannot establish standing simply by relying on

United States's theory of the case); *United States v. Henry*, 939 F. Supp. 2d 1279, 1288 (N.D. Ga. April 5, 2013) ("Henry's reliance on the government's theory of the case—that he stored drugs at his girlfriend's residence—is, as has been discussed, an improper basis upon which to claim standing."). That's because a law enforcement agent's conclusion in a search warrant that items found in a house provide "reason to believe" someone lived there is no evidence of that fact.

The Court adopts the Magistrate Judge's conclusion that Washington lacks standing to challenge the Center Street search.

## B.   Adequacy of the Search Warrants

"The Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence exists at the place for which the warrant is requested." *United States v. Betancourt*, 734 F.2d 750, 754 (11th Cir. 1984) (citing *Zurcher v. Stanford Daily*, 436 U.S. 547, 558 (1978)); Probable cause exists when under the "totality of the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238 (1983). In other words, a search warrant is supported by probable cause if the

19

supporting affidavit establishes "a connection between the defendant and the location to be searched; . . . a link between the location and criminal activity; and . . . the informant's veracity and basis of knowledge." *United States v. Davis*, 313 F.3d 1300, 133 (11th Cir. 2002). "[A] police officer's expectation, based on prior experience and the specific circumstances of the alleged crime, that evidence is likely to be found in a suspect's residence satisfies probable cause." *United States v. Bradley*, 644 F.3d 1213, 1263-64 (11th Cir. 2011).

### 1.    The Wright Circle Warrant

The Magistrate Judge found the Wright Circle warrant established probable cause to believe Lynch (and others) used the home to distribute drugs. Lynch objects and insists the warrant only "vaguely suggest[s]" a drug dealer went to the home without "sufficiently establish[ing] that the target location has evidence of a crime (particularly eight months later)." (Dkt. 447 at 39.) He continues that evidence someone "is a drug dealer does not establish that his house is a location that can be searched." (*Id.* at 40.)

Lynch cites the Eleventh Circuit's (somewhat) recent decision in *United States v. Wilson*, 153 F.4th 478 (11th Cir. 2025) to support his

argument here.  The affidavit in *Wilson*, however, offered no link whatsoever between the defendant's alleged crime (pointing a gun at someone in a menacing manner) and the defendant's residence.  The Court noted that "[n]ot one fact—not even a conclusory allegation—tied the alleged assault to contraband inside" the residence.  *Id.* at 485.

The affidavit here is materially different.  It established that Lynch was supplying drugs in Atlanta and using his home to do so.  CD-1's statement that Lynch supplied him or her cocaine—corroborated by his or her text messages with Lynch and the surveillance photo of Lynch he or she identified—established Lynch's role as a cocaine supplier.  (Dkt. 252-1 ¶¶ 10-14.)  The affiant added information from co-conspirator Dominique Gwinn following her arrest at another Atlanta residence.  (*Id.* ¶ 50.)  She admitted she moved drugs and drug proceeds between stash houses belonging to a drug-trafficking organization, identified Lynch as a leader of the organization, and reported every stash house the organization used included a locked room that women (like her) could not enter. (*Id.*)

Egan independently reported Lynch maintained a locked room in the Wright Circle residence that she could not enter.  (*Id.* ¶ 22-23, 31.)

21

Even though she denied being aware of cocaine trafficking, Egan's information mirrored Gwinn's statement and linked the Wright Circle residence to Lynch's illegal activity. Her admission that she told Lynch about police stopping her on July 18, 2022 also explained why other people went to the house that night and then abandoned it.

The affidavit established more. Law enforcement traced Lynch's cell phone to the residence and photographed him there, obtained photographs of drug ledgers that someone sent, received, or created at the residence on May 1, 2022, and saw Lynch's brother and Willis visit the home for a short time before leaving with a duffle bag (conduct consistent with drug trafficking) and engaging in "counter-surveillance maneuvers" to elude law enforcement as they left the home. (*Id.* ¶¶ 17-18, 20, 51.)

The Magistrate Judge correctly concluded the warrant established probable cause to believe Lynch (and others) used the home to distribute drugs. The affiant then noted his belief that the home contained evidence despite having sat empty for nine months. The affiant principally relied on his assertions that people could not have removed all evidence of drug trafficking in the twenty-four minutes they were at the house on July 18,

22

2022.[7] (Dkt. 252-1 ¶¶ 27, 53-55.) That was more than enough to establish the necessary link between the crime and the location to be searched at the time of the warrant.

One issue remains. According to Lynch, the affiant was wrong when he said no one had been in the home since July 18, 2022 because the pole camera shows two people (including Lynch) entered the home for two hours on July 20, 2022. (Dkt. 252 at 32-33.) The Magistrate Judge concluded that error did not matter because there was no evidence the agent intentionally made that mistake and because the affidavit established probable cause even if the correct information was added to the warrant. (Dkt. 422 at 24-25.) The Magistrate Judge thus declined to hold a *Franks* hearing. Alternatively, the Magistrate Judge found suppression improper under the so-called *Leon* good-faith exception to suppression. Defendant objects, arguing accurate information would have prevented the affiant from saying members of the organization had insufficient time to remove all incriminating evidence from the home and

---

[7] The affidavit says alternatively that no one entered the home after 9:10 p.m. on July 18, 2022 and "since July 19, 2022." (*Id.* ¶¶ 32, 53.) The Court believes this (possible) inconsistency immaterial.

that, if intentional or reckless, that misstatement would preclude the good-faith exception. (Dkt. 447 at 41-43.)

A search warrant may be voided if the affiant deliberately or recklessly included false statements or failed to include material omissions that were essential to the finding of probable cause. *Dahl v. Holley*, 312 F.3d 1228, 1235 (11th Cir. 2002). To obtain a *Franks* hearing and explore this issue, a defendant must "make a substantial preliminary showing that (1) the affiant deliberately or recklessly included false statements, or failed to include material information, in the affidavit; and (2) the challenged statement or omission was essential to the finding of probable cause." *United States v. Arbolaez*, 450 F.3d 1283, 1293 (11th Cir. 2006). Negligent misstatements or omissions are not enough to obtain a hearing. *United States v. Whyte*, 928 F.3d 1317, 1332 (11th Cir. 2019). "[E]ven in the face of a deliberate omission, no hearing is required when there was enough evidence to support a probable cause finding even after considering the effect of the omission." *United States v. Leonard*, 4 F.4th 1134, 1147-48 (11th Cir. 2021).

In *United States v. Leon*, the Supreme Court concluded a court should not exclude evidence "obtained by officers acting in reasonable

reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." *United States v. Leon*, 468 U.S. 897, 900 (1984). This good-faith exception, however, does not apply if the affiant misled the issuing magistrate judge by including information in a warrant application the affiant knew was false or would have known but for reckless disregard for the truth. *United States v. Taylor*, 935 F.3d 1279, 1291 (11th Cir. 2019).

Neither the United States nor the Magistrate Judge meaningfully address the significance of the omitted information. The affiant's theory depended on the proposition that the people who entered the home lacked sufficient time to remove all incriminating evidence. If they remained inside for two hours rather than twenty-four minutes, that premise becomes far less obvious. The United States insists the difference between twenty-four minutes and two hours is immaterial because neither period would permit occupants to remove all evidence of drug trafficking. (Dkt. 452 at 26.) The Magistrate Judge essentially says the same. (Dkt. 422 at 25.) They provide no basis for this assertion, and the Court is not persuaded.

The affiant said twenty-four minutes was not enough time to

remove all evidence of drug trafficking from a house that size, but never said how much time would be enough.  And he offered no other basis for probable cause to believe evidence of the crime would still be in the home nine months later.  The affidavit's staleness problem becomes more difficult once the assumption of a rushed twenty-four-minute cleanout is removed.  The Court thus concludes the challenged time frame was central to the probable-cause determination.

The affiant said he had reviewed the pole camera footage.  It's thus difficult to understand how the affiant got this fact wrong.  Perhaps it was an innocent mistake.  But without any evidence as to the cause of the mistake, considering the importance of the misstatement in the affidavit, and aware intentionality could negate application of the good-faith exception to suppression, the Court concludes Defendant is entitled to a *Franks* hearing.  The Court will conduct a limited *Franks* hearing to determine why the affidavit omitted information showing that two individuals remained inside the Wright Circle residence for approximately two hours on July 20, 2022.[8]

---

[8] Lynch has alleged that—at other times—the pole camera was pointing away from the house. (Dkt. 422 at 25.)  The Court does not anticipate

## 2.     The Center Street Warrant

The Magistrate Judge determined the affidavit included with the Center Street warrant provided probable cause to believe evidence of attempted robbery and attempted homicide would be found in that residence because Palacios reported armed intruders entered the residence, demanded access to the safes, and shot him. (Dkt. 422 at 57.) He also concluded the warrant authorized police to open the safes. Earl objects to the latter conclusion, insisting the "description of the attempted armed robbery of Palacios did not support a nexus to search the locked safes within the home." (Dkt. 445 at 5.) He says the Magistrate Judge erred in concluding the search of the safes was supported by probable cause because the safes "were a central part of the affidavit . . . and appear to be the object of the criminal conduct." (*Id.* 5-6.) He says officers could not reasonably have believed the warrant authorized entry into the safes because the crime they were investigating (attempted murder) "does not commonly involve the use of [a] safe" and because the affiant specifically sought access to cell phones without

---

that being part of the *Franks* hearing since that information does not undermine the affiant's assertion.

27

mentioning entry into the safes.  (*Id.* 7-8.)

The Court overrules this objection.  "[A] warrant to search a specific area for a certain class of things authorizes government agents to break open locked containers which may contain the objects of the search." *United States v. Jackson*, 120 F.3d 1226, 1228-29 (11th Cir. 1997).  Earl does not deny the warrant established probable cause to believe the house would contain evidence of the alleged armed robbery about which Palacios complained.  In the light of Palacios's statement that the would-be robbers were trying to steal items from the safes, the Court agrees the items in the safes would constitute evidence of that crime.  The contents would show the motivation for the attempted robbery.  That the officers separately asked for authorization to enter the phones does not undermine the simple fact that the warrant averred the would-be robbers wanted the items in the safes.

## IV.  Conclusion

The Court **OVERRULES IN PART** the objections filed by Defendants Mario Earl, Raymondo Lynch, and Turomne Washington (Dkts. 444, 445, 447), **GRANTS** Defendant Earl's motions to adopt Defendant Washington's and Defendant Lynch's objections (Dkts. 446,

448), **ADOPTS IN PART** the Magistrate Judge's report and recommendation (Dkt. 422), **DENIES** Defendant Earl's motion to suppress the search of the Wright Circle residence (Dkt. 216, 262, 254) for lack of standing, and **DENIES** Defendant Earl's and Defendant Washington's motions to suppress the search of the Center Street residence (Dkt. 217, 253, 257). The Court schedules a *Franks* hearing on Defendant Lynch's motion to suppress (Dkt. 252) for July 23, 2026, at 10:00 a.m., in Courtroom 1906, Richard B. Russell Federal Building, 75 Ted Turner Drive, SW, Atlanta, Georgia 30303.

   **SO ORDERED** this 1st day of July, 2026

_____

MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE

29